Pages 1 - 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  vs.                          )  NO. CR 14-0380 CRB
                               )
FEDEX CORPORATION, et al,      )
                               )  San Francisco, California
          Defendants.          )  Friday
                               )  February 20, 2015
_____)  1:30 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          MELINDA HAAG
                            United States Attorney
                            450 Golden Gate Ave.
                            San Francisco, California  94102
                      **BY:  KIRSTEN AULT, AUSA**
                            **KYLE WALDINGER, AUSA**



**For Defendants:**          Arguedas, Cassman & Headley, LLP
                            803 Hearst Avenue
                            Berkeley, California 94710
                      **BY:  CRISTINA ARGUEDAS, ESQ.**
                            **RAPHAEL GOLDMAN, ESQ.**
                            **TED CASSMAN, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**




*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               *Official Reporter - US District Court*
               *Computerized Transcription By Eclipse*

1    **APPEARANCES:   (CONTINUED)**

2

3    **For Defendants:**            SKADDEN, ARPS, SLATE, MEAGHER & FLOM
                                     525 University Avenue
4                                    Suite 1100
                                     Palo Alto, California 94301
5                              BY:  **ALLEN RUBY, ESQ.**

6

7    **Also Present:**              **Christine Richards**
                                     General Counsel, FedEx
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2  February 20, 2015                                2:30 p.m.
 3          THE CLERK:  Calling Case CR 14-0380, the United
 4  States of America versus FedEx Corporation.
 5      Appearances, counsel.
 6          MS. AULT:  Good afternoon, your Honor.  Kirsten Ault
 7  and Kyle Waldinger for the United States.
 8          THE COURT:  Good afternoon.
 9          MS. ARGUEDAS:  Cris Arguedas for FedEx, and we are
10  here with Christine Richards, who is the general counsel.
11          MR. GOLDMAN:  And Raphael Goldman for FedEx as well.
12          MR. CASSMAN:  Ted Cassman on behalf of FedEx as well.
13          MR. RUBY:  Good afternoon, your Honor.  I'm Allen
14  Ruby appearing for FedEx.
15          THE COURT:  Good afternoon.
16      So there are two issues that we want to address.  One is
17  the Bill of Particulars and one is the government's motion to
18  quash the 17(c) subpoena.
19      Dealing with the Bill of Particulars first, the Court has
20  read the briefings on it.  I'm going to deny the Bill of
21  Particulars.  It appears to the Court that much of what is
22  being sought, while it's not inappropriate to seek it, would be
23  encompassed within the discovery that is either been produced
24  or I anticipate will be produced.
25      Obviously, if it's not there, then we can revisit this
```

1    subject at some point, but I'm satisfied that the government's

2    explanation is adequate in terms of the Bill of Particulars.

3          Turning now to the subpoena, the subpoena --

4          **MR. CASSMAN:**  Your Honor, could I briefly be heard on

5    that?

6          **THE COURT:**  Sure.

7          **MR. CASSMAN:**  So as we all know, the Bill of

8    Particulars is directed at the theory of the government's case.

9    And in -- this is that rare situation where I think it's fair

10   to say you can read this indictment and not understand the

11   theory of the government's case.

12         The reason for that, and the reason it's quite unusual, I

13   would submit, is that this is not a case of your traditional

14   vicarious liability where the Government identifies an

15   individual or individuals who possessed the requisite mens rea

16   for the charged offenses and as a result of vicarious

17   liability, the company is liable.  They have not identified one

18   such person --

19         **THE COURT:**  I understand the government's case.  The

20   Government says you knew that these drug shipments, however you

21   want to characterize it, were issued without proper medical

22   authorization and notwithstanding that, you delivered them.

23   That's their case.  That's their case.  I understand that.

24   That's their case.  By the way, that's an allegation.  Okay.

25   Fine.

1      So when I get to the second part of this hearing today,

2   I'm going to address that issue, because it appears to me that

3   that's the government's -- that's what the Government is

4   saying; that you correctly identified in your motion on the

5   Rule 17(c) -- when I say "correctly" because you're quoting me.

6   You say the Court has observed at the heart of this case are

7   the questions:  What did FedEx know?  What were they told?

8   What did they do?  What did they say?  That's all correct.  So

9   let's get to that.

10              **MR. CASSMAN:**  Well, but before --

11              **THE COURT:**  Because their theory is you were told "X"

12   and did you "Y."  After all, the "Y" is not an issue.  You

13   delivered the -- you delivered the packages.

14      The issue is -- at least factually the issue is:  What

15   were you told?  That may not be the legal issue, but it

16   certainly is the factual issue.  What were you told?  What did

17   you know?

18      And maybe what you did will tell us more about what you

19   knew, but that's all to be fleshed out.  In a sense, what did

20   do you in response to what you were told.  We know what you

21   did, in part, was deliver the packages.

22      Okay.  So why don't you reserve your argument on the Bill

23   of Particulars until you hear what I'm doing on the subpoena

24   and then you can come back and see whether it addresses the

25   problem?

1          **MR. CASSMAN:**  I will reserve my argument, your Honor.

2          **THE COURT:**  Okay.  All right.

3      Now, going to the subpoena.  The Court -- I'm trying to

4  find it here.  The Court rules as follows after considering the

5  opposition and the reply.

6      It's Attachment A to the government's motion to quash Rule

7  17(c).  So we have that all in front of us?  It's a subpoena,

8  right?  That's what I think it is.

9          **MS. AULT:**  Yes, your Honor.

10         **THE COURT:**  And it's divided essentially into two

11 major categories enumerated as Category 1 and Category 2.

12 Category 1 commencing on Page 1 of Attachment A.  Category 2

13 appearing on Page 8 of Exhibit A.  Okay?

14     Dealing with Category 1 first.  All right?  The motion to

15 quash the subpoena as to Category 1 is denied in all

16 particulars save and except for Paragraph Q.  As to that

17 paragraph, the motion to quash is granted.

18     And now turning to Paragraph 2, that paragraph and all its

19 subparts, the motion to quash is granted.

20     So if you look at it, as you have, you see that what I

21 have granted -- what I have denied the Government is the

22 quashing of the subpoena directed towards what was FedEx told

23 essentially.  What were they told?  Because I think we need to

24 know that.

25     It's not discovery.  It's the essence of the crime.  I

1   mean, it's the essence of -- it's the essence of the evidence

2   of the crime.  Because you can't prosecute somebody and say

3   FedEx delivered drugs and, therefore, they are guilty, because

4   every carrier is guilty.  No.  It's, FedEx delivered drugs

5   after being told something.  What were they told?  And that's

6   not discovery.  That's the essence of the case.

7        How can they defend against it if they don't know what you

8   claim they were told?  But what do you do?  You tell them they

9   were told "X" and then we take a recess in the middle of the

10  case for them to go out and investigate it?  No, no, no, no,

11  no.  That's not going to happen.

12       So that's why I didn't quash the motion -- or didn't quash

13  the subpoena.

14       As to the other things, that is essentially discovery.

15  What did the Government do with respect to others, or with

16  respect to the pharmacies, or with respect to this or that?

17  FedEx is not -- FedEx could be implicated in it, but maybe not.

18  And that, I think, is discovery.

19       I'm not saying it's not relevant.  I don't know whether

20  it's relevant or not, but it's not the appropriate -- under

21  *U.S. v Nixon*, it's not the appropriate subject of a Rule 17(c)

22  subpoena.

23       So there we go.  That's the ruling of the Court and if

24  anybody wants to argue the subpoena, I'll be glad to hear some

25  argument on that.

1          **MS. AULT:**  Your Honor, may I simply ask for a

2   clarification?

3          **THE COURT:**  Sure.

4          **MS. AULT:**  As we pointed out in our motion, request

5   one is somewhat unclear in what exactly it's asking for.  The

6   broad request number one seems to indicate that it's only

7   asking for communications with FedEx.

8       However, some of the subparts seem to indicate that it's

9   asking for more than that in that it's asking for internal DEA

10  discussions or things that were not actually communicated to

11  FedEx.

12      So if we interpret the subpoena as simply saying what --

13         **THE COURT:**  Give me -- show me where you think it's

14  not clear.  Okay?

15         **MS. AULT:**  For example, in Subpart O --

16         **THE COURT:**  Hold on.  Hold on.

17      Okay.  Let me read it first, okay?

18         (Brief pause.)

19         **THE COURT:**  Well, the way I read it -- and maybe it's

20  ambiguous, but the way I read it says:

21         "All records constituting or relating to

22         communications in 2004 between DEA personnel, then

23         including without limitation" dah, dah, dah, dah,

24         dah, dah, dah, "and employees or representatives of

25         FedEx."

1          That's the way I read it.

2              **MS. AULT:**  And that's -- if that's what it's limited

3    to, that's fine.  It's simply ambiguous to us whether it also

4    includes any subpoenas that were actually issued, any

5    internal -- whatever the DEA agents did with the subpoenas or

6    records or anything like that.

7          To the extent it's that broad, we would object.  To the

8    extent it's limited to the communications themselves, we have

9    no problem with that.

10             **THE COURT:**  "All records constituting or relating to

11   communications."

12         Now, my guess is if somebody in DEA writes a letter to

13   somebody else in DEA and says:  I just spoke to FedEx today,

14   and they think this or I think that.  Yeah, you've got to

15   produce that.  Of course, you do.

16             **MS. AULT:**  The question is, your Honor, do we have to

17   produce the following, and then this is what I think we should

18   do next?

19             **THE COURT:**  Well, maybe, maybe.  It goes to -- it

20   goes to what did FedEx reasonably -- of course, you do.

21         What if you write -- what if you write in a communication:

22   "I think we should ask FedEx for a clarification," or "I think

23   this is ambiguous and I don't know how FedEx understood this,"

24   or "I think it's clear to FedEx X."  Not to double X it, but

25   yes, of course, you do.  This is the case.  You brought this

1  case, I didn't.

2      Now, the case is all about what did FedEx know and what is

3  reasonable under all of the circumstances as to what they knew.

4  And, therefore, by the way, if you people thought -- or not

5  you.

6      If DEA thought that there was some ambiguity in the

7  communications that they had with FedEx and they expressed it

8  between themselves or among themselves, that shows how

9  reasonable FedEx's position may have been if they thought it

10  was ambiguous.  No, no, no, no, no.  All of it.  All of it.

11      This is open book.  This is -- this case is not going to

12  have a single surprise to it.  You're not dealing with --

13  you're dealing with a legitimate large company that performs an

14  enormous service to people in the United States which you

15  believe in this instance acted improperly.  That's fine.

16  That's your -- that's your allegation.

17      So I'm not worried about FedEx will take this information

18  and somehow continue some nefarious project, or that witnesses

19  will disappear, or that -- or that something else will be done.

20  That's sort of the horrors that one can imagine.

21      No.  This is open.  It's clear.  No surprises.  We're

22  going to let everything that you said about FedEx, what they

23  knew, when they knew it, what you expected them to do and so

24  forth, all disclosed.

25      And maybe you're right, but -- but the history is the

1    history and that -- and the records are the records and they

2    are all going to be produced, as I've indicated.

3        And I did tie it.  I really did tie it to:  What did FedEx

4    know?  When did they know it?  What did the Government say to

5    FedEx?  What did FedEx say to them?  And how they understood it

6    as how the parties understood it.  How you understood it.  You,

7    the Government, understood it and how you understood what FedEx

8    understood.  That's legitimate.

9        What I'm drawing the line at and I'm granting the motion

10   to quash is those things that I find to be essentially a

11   discovery expedition, which is the whole Category No. 2, which

12   may be interesting, but it's not appropriate.

13       So I don't think there is any ambiguity in my ruling, but

14   if there is you can come back.  If you have think something

15   might fall within the category, but you think it shouldn't -- I

16   mean, you think it doesn't, then you can submit it to the Court

17   in camera if you want to.  I don't care.

18       But it better be a legitimate concern about whether it's

19   covered in the subpoena or not because you're to produce

20   everything that's in Category 1.  Okay?

21            **MS. AULT:**  With the exception of Q.

22            **THE COURT:**  With the exception of Q.  Absolutely.

23            **MS. ARGUEDAS:**  Can I talk about Category 2?

24            **MS. AULT:**  And, your Honor, I simply must make one

25   procedural point, which is I am not authorized, absent approval

1  from the DEA, to agree to produce things, but I will certainly

2  go back to the DEA --

3           **THE COURT:**  If they don't agree --

4           **MS. AULT:**  I can't anticipate they won't agree.

5           **THE COURT:**  If they don't, then we take it to the

6  next step and see what happens.  I don't know.

7       The DEA brings a case and then they won't produce their

8  records?  That's interesting.

9           **MS. AULT:**  I don't anticipate that will happen.

10          **THE COURT:**  I don't anticipate that.

11          **MS. ARGUEDAS:**  Category 2?

12          **THE COURT:**  Sure.  Let's look at Category 2 that I

13  granted the motion for.

14          **MS. ARGUEDAS:**  The Category 2 is the other half of

15  this case.  And your nutshell of what the first one is about,

16  we completely agree with.

17       But Count 11 and Count 16 are the other half of this case,

18  and they accuse FedEx of being in a conspiracy with those

19  particular pharmacies to defraud the federal government.  And

20  they say that they are doing it by holding themselves out to be

21  legitimate pharmacies when they are not, and that they told

22  lies while they were doing that.  And we're charged with being

23  in a conspiracy with them.

24       Therefore, the Government in our trial is going to try and

25  attribute all of the statements that the pharmacies made to us

1   as co-conspirators, like a regular drug case.  That is what

2   they are going to do.

3          THE COURT:  Well, run that by me.  Just explain -- I

4   mean, yes.  There are -- I understand about statements of

5   co-conspirators, but explain to me what they are going to do

6   and how this relates.

7          MS. ARGUEDAS:  The charge is that FedEx is in a

8   conspiracy with, let's just say, Superior Pharmacy, but there's

9   25 of them, to defraud the United States by holding themselves

10  out to be legitimate pharmacies, when they are not legitimate

11  pharmacies, and by making false statements to get their

12  licenses and to be in the world of pharmacy.  And they will,

13  under the co-conspirator liability, attribute whatever those

14  co- -- alleged co-conspirators did to us.  They are going to

15  say those statements are attributable to FedEx because you are

16  in a conspiracy.

17         THE COURT:  Well, let's divide this up a bit.  I'm

18  not saying, by the way it's not relevant.

19         MS. ARGUEDAS:  I understand --

20         THE COURT:  What I'm saying is whether you can use a

21  Rule 17(c) subpoena to get it.  And there are a couple things I

22  think to be said in that regard.

23      I understand why you're raising it, but one thing that can

24  be said is that statements of co-conspirators, to the extent

25  that the Government believes they establish -- that they are

1  admissible against you, have to all be produced.  They have to

2  be produced.  They are not even talking about those.

3      So if they think, as you've just said, that Pharmacy X did

4  this and it's a statement in the furtherance of a conspiracy

5  and it will be admissible against you under the government's

6  theory, yes, you're going to get discovery on that.  But

7  that's -- and it may be -- I'll give you this.  It may be

8  encompassed within what you're asking in 2.  But because it's

9  encompassed with your demand in 2, it doesn't mean it's in

10  itself discoverable under Rule 17(c).  That's the -- that's the

11  Government's issue.

12          **MS. ARGUEDAS:**  But this -- in some ways -- well, yes,

13  we would get 801(d)(2) co-conspirators statements.  But they

14  are going to use the actions of the pharmacies as evidence of

15  the crime against us.

16      What we're seeking here, for the most part, is everything

17  that had to do with the registrations of these pharmacies.  So

18  these pharmacies that they say defrauded would make an

19  application to the DEA and to state licenses -- but we're

20  talking about here to the DEA -- to get a license to be able to

21  receive pharmaceutical drugs and transfer them out.  They would

22  make an application and they would say this is who we are and

23  this is how we do things.

24      They would also get re-upped, renewed, during the course

25  of these 10 years that they have alleged we were in a

```
1    conspiracy.  In many occasions they would be the subject of

2    inspection by the DEA, where they would go in and look around.

3        They -- in some instances the DEA sometimes took actions

4    against them.  We don't think you're legitimate.  We're going

5    to suspend your license or we're going to drag you into court

6    to see.

7        They did lots of things related to these registrations,

8    but for the most part, possibly 100 percent of the time,

9    they -- these places were registered by the Government for the

10   entire time of our conspiracy.  That has got to be 100 percent

11   relevant and admissible as to whether or not the pharmacies --

12          THE COURT:  Might be.  Might be.  I'm not disagreeing

13   with anything you've said.  The question is:  Do you get it

14   under a Rule 17(c) subpoena?  I don't think you do.

15          MS. ARGUEDAS:  Well, because --

16          THE COURT:  The test isn't relevance.

17          MS. ARGUEDAS:  I'm sorry?

18          THE COURT:  The test is not relevance.  It's not just

19   relevance.

20          MS. ARGUEDAS:  It's admissibility, which we make, and

21   they -- this Government -- well, let me just finish by

22   saying -- I don't know what's with the --

23          THE COURT:  Go ahead.  Just go ahead.

24          MS. ARGUEDAS:  I retract what I was going to say.

25       In this instance the Government has said to us that their
```

```
 1   responsibilities end within the DEA's office of the Northern

 2   District of California.  None of these registrations are going

 3   to be within the Northern District of California.  They are all

 4   wherever they are, in Washington or Florida or Mississippi or

 5   somewhere else.

 6        But these -- the interactions of inspect me.  Okay.  I'll

 7   give you this -- this license.  I'll revoke your license.  I'll

 8   give you back your license.

 9        All of those things go to the heart of whether or not the

10   pharmacies were telling the truth, whether they were

11   defrauding, whether they were saying the same thing to the

12   Government.  Maybe they were saying the same things to us.

13        These are the statements that they are attributing to us

14   by way of the conspiracy law.  And we -- we -- they are

15   admissible.  They are relevant and we can't get them because

16   the Government -- the most the Government has done, as to about

17   10 of these pharmacies, and I -- roughly theirs 25 pharmacies

18   that are listed.

19        They have given us the actual registration, license, which

20   is nice, but we need all the back and forth.  We need the

21   application for it.  We need to know whether there are any

22   other actions during the life of the pharmacy and the DEA

23   because they have charged us with conspiring to defraud them.

24        So that's why 17(c) --

25             THE COURT:  Well, I think this.  I think this.  I
```

1   understand what you're saying.  I think -- I have to have a

2   better idea from the Government as to what statements of the

3   801(d)(3), or whatever it is, what statements they intend to

4   introduce.  And once I get that, once we all get that, then we

5   can take a look and see whether or not, with particularity, the

6   subpoena can be redrafted if -- if I rule that yes, indeed,

7   your argument has merit and, therefore, you need to find out

8   "X," what did the Government -- what was the Government told at

9   a time that you're charged with having made a statement in

10  furtherance of the conspiracy or adopting the statement made in

11  furtherance of the conspiracy, I'll take a look at it.

12      But I -- this is a pretty blanket -- this is a pretty

13  blanket, very broad, very broad request that struck the Court

14  as being -- as being in the nature of discovery, as distinct

15  from necessarily highly relevant evidence.  And one of the

16  tests is whether there are other sources for you to -- that are

17  available and so forth and so on.

18      I'm just saying as to that -- I think you made a good

19  point, but as to that, premature.  The -- we'll deal with the

20  other first.  What were you told?  What did you know?  What did

21  you say?  What did they say about what you said?  And take a

22  look at there, and take a look at it there.

23          MS. AULT:  And, your Honor, just to be clear, we are

24  happy to engage with the defense under Rule 16 for all of these

25  requests.  And we did understand -- at the beginning they

raised a concern about the scope of our search and we took that

into consideration and we have broadened the scope of our

search taking their concerns into consideration.

I am happy to engage with Ms. Arguedas at any time to

discuss any of these requests, what we have produced, what

we're looking for, additional documents that they want.  We are

more than happy to do that.

**THE COURT:**  Okay.  That's fine.  I appreciate that.

That's a good approach.

**MS. ARGUEDAS:**  Your Honor?

**THE COURT:**  Yes, Ms. Arguedas.

**MS. ARGUEDAS:**  What I would like to do is ask to have

a time in which the Government should alert the Court as to

what they think are going to be 801(d)(2)(E) statements that

are related particularly to these registration issues, and I

would also like the opportunity to submit a brief just on this

subject.

**THE COURT:**  Well, as to your opportunity to submit a

brief on the subject, of course you can do that.  That's

actually what I thought the motion was about.

But putting that aside for the moment, let's talk a little

bit about timing.

**MS. ARGUEDAS:**  Okay.

**THE COURT:**  And these motions that have been, that

are going to come down the pike.

1     By the granting of the 17(c) subpoena as to the first

2  category, you will be in a position, as I understand it to be,

3  to have -- to be privy to whatever the Government has in its

4  files, the DEA, with respect to what they believe you were

5  told, what they believe you said, and what they believe they

6  thought you said or were told.  Okay?  So you'll have all of

7  that.

8     Then the question is:  Given all that, and given the state

9  of the case -- not ultimately whether you be charged with an

10  admission and so forth and so on -- are you going to be in a

11  position to make any motions with respect to the case as it's

12  constituted at that point?  And I thought your response would

13  be yes.

14          **MS. ARGUEDAS:**  Yes.

15          **THE COURT:**  Right.  Okay.  So before we engage in

16  this inquiry that is set off by -- in the second paragraph and

17  is -- and is tethered to adoptive admissions and what you're

18  being charged with and so forth and so on, all of an

19  evidentiary -- what I call a secondary evidentiary level.  It's

20  not what you said, not what you did.  It's what somebody else

21  did that then is charged to you.  So it's got another level of

22  relation to the case.

23     I thought we were going to look at the first level.

24          **MS. ARGUEDAS:**  Right.

25          **THE COURT:**  And then looking at the first level, we

1  look at it, examine it, see what's up and see what rulings are

2  appropriate or not.  Then after that, we take a look at what

3  else is out there.

4       So, I mean, I'm not discouraging you from doing it, but

5  let's say you filed your motion tomorrow on this thing, I would

6  simply -- I'll tell you what I would do.  I would simply --

7            **MS. ARGUEDAS:**  What?

8            **THE COURT:**  What?

9            **MS. ARGUEDAS:**  I was going to say:  What would you

10 do?

11           **THE COURT:**  I would delay it until after I heard the

12 other motions.

13      I was telling a judge the other day who was complaining

14 that there is no lag.  I said complaining about the fact

15 that -- the judge ruled on a motion to dismiss with 51 claims.

16 It was a civil case.  And the judge said to me after going --

17 spending hours and weeks going through the 51 claims.

18 Extremely complicated.  It involved 50 states.  It's a civil

19 case.  Involved all these claims.

20      And then the judge said:  Well, I've gone through them.

21 Out of the 50 claims, I think 30 claims I'm dismissing with

22 leave to amend; 20 I'm dismissing without leave to amend.  So

23 what they are going to do is they are going to come back on the

24 30 claims and I have to do it all over again.

25      I said:  Why?  And the judge said:  Well, because the

1  motions have been filed.  I said:  Wait a minute.  You've got

2  this wrong.  They can file a motion.  There is no law saying

3  you have to answer the motion.  You can answer it in due

4  course, but case management rests peculiarly within the

5  discretion of the Court.  And the Court looks at it in terms of

6  their own view, right or wrong, of efficiency.

7       And, therefore, I am of the school that you only have

8  to -- you only decide those things that really you have to

9  decide or you should decide at the get-go.

10      I don't know where this case is going.  I do know that

11  there are motions to be filed.  You don't have to be a

12  magician or, you know, a seer to figure out what's coming down

13  the pike.

14      So I think -- or look at what's coming down the pike after

15  I do that.  I'll see what the pike looks like.  I don't know.

16  I don't have an opinion.  I don't know.

17      But that's a better way -- that, at least, is the Court's

18  view of how the case would be managed.  And it's no disrespect

19  to you, Ms. Arguedas, that I say you can file your motion, I

20  won't rule on it.

21           MS. ARGUEDAS:  Understood.

22           THE COURT:  It may be a perfectly good motion and it

23  may be something that cries out for an answer and so forth.

24      When is the question.  And you have your view, and I have

25  my view, and I get one more vote than you do in these

```
1  situations.  So that's probably going to be the way it's going

2  to be done.

3           MS. ARGUEDAS:  Understood completely.

4     And I also understand that you're asking for the major

5  motion, which we also -- we have a date by which we are to file

6  it.

7           THE COURT:  Good.

8           MS. ARGUEDAS:  And we have internally been talking

9  about whether or not we can do it sooner, so...

10          THE COURT:  Okay.  Well, there we are.

11          MS. ARGUEDAS:  Can we have a compliance date, though,

12  for the 17(c).

13          THE COURT:  Well, let's see.  You say you don't

14  really represent the DEA.  Where are you on this?

15          MS. AULT:  I can propose a date, your Honor.

16     And simply one more clarification that we are not required

17  to reproduce anything that we've already given them.

18          MS. ARGUEDAS:  Right.

19          THE COURT:  That's true, okay.

20          MS. AULT:  So my understanding is -- and this is my

21  understanding and if anything about this changes, I will

22  certainly let defense counsel know immediately -- the DEA has

23  already sent out a request to their employees, both everyone

24  identified in the subpoena and, also, everybody who they know

25  of who was involved in an internet pharmacy case of any kind,
```

1    asking for any substantive communications, for them to search

2    their files and provide any responses.  And those responses are

3    due at the end of the month.

4            **THE COURT:**  End of which month?

5            **MS. AULT:**  This month.  And then just to give

6    everybody a couple weeks to, you know, fail to comply with your

7    initial deadline, and then give us a little bit of time to

8    compile those results.  If we could have a compliance date

9    maybe March 20th?

10           **THE COURT:**  Great.  March 20th.

11           **MS. ARGUEDAS:**  One point though, your Honor.  This is

12   something that the Government put in its papers, which was not

13   part of our subpoena, which is this limitation that they would

14   be requesting this information from people at the DEA who were,

15   quote, involved in an internet pharmacy investigation.

16        That is not a limitation.  That's in our subpoena and it's

17   not a reasonable one because there are many people in the

18   DEA -- some stuff we've already received -- who are at a high

19   level.  For instance, they are administrator types.  They were

20   not involved --

21           **THE COURT:**  Well, I think it has to be broader.  In

22   other words, the problem with --

23           **MS. ARGUEDAS:**  They have the information --

24           **THE COURT:**  If somebody has the information --

25           **MS. ARGUEDAS:**  -- within the DEA, we get to have it.

1       **THE COURT:**  I think that's right.  In other words, I

2 don't want to hear later on, you know, Jones.  Jones has this

3 whole file of communications.  He or she was interested in it

4 and sort of got cc'd on it, not really -- not really involved

5 in it, but was privy to the information.

6     It's really -- you have to go back to DEA and say, what we

7 mean by "involved" is any person who received this information

8 directly or indirectly.

9       **MS. ARGUEDAS:**  Right.

10      **THE COURT:**  That's what we're talking about.

11      **MS. AULT:**  And, your Honor, the people that I think

12 Ms. Arguedas is talking about are the people at headquarters.

13 We are going through to the particular departments that we know

14 were involved --

15      **THE COURT:**  If any have been forwarded to people at

16 headquarters, they have to disclose it.

17       **MS. ARGUEDAS:**  The subpoena doesn't --

18      **THE COURT:**  Wait, wait, wait.  I'm back with

19 Ms. Ault.

20     Go ahead.

21      **MS. AULT:**  What we're concerned about is that we

22 don't have to go ask every DEA agent in the Kuala Lumpur office

23 when we have no indication that Kuala Lumpur was ever

24 involved --

25      **THE COURT:**  You ask the offices that were involved

```
 1   and you ask the headquarters, or the custodian of records.
 2   Somebody up there who would have been a repository of the
 3   information had it been accumulated.
 4          MS. ARGUEDAS:  If the DEA has something subject to
 5   our subpoena, they have to give it to us and we have not made
 6   any limitations about --
 7          THE COURT:  I'm going --
 8          MS. ARGUEDAS:  They will figure it out.
 9          THE COURT:  I'm going to make that limitation that
10   they don't have to go to Kuala Lumpur.
11          MS. ARGUEDAS:  To that we will stipulate.
12       Thank you, your Honor.
13          THE COURT:  Okay.  Thank you very much.
14       Mr. Cassman, are you back on this?
15          MR. CASSMAN:  I just can't stay away, Judge.
16       I would like to test your patience for a minute.
17          THE COURT:  Okay.
18          MR. CASSMAN:  So because -- you said the Court's
19   comments would elucidates items for me.
20          THE COURT:  I don't know if they did that, but
21   maybe they --
22          MR. CASSMAN:  They did, but your comments about the
23   801(d)(2)(E) statements, for example, co-conspirator
24   statements, and the fact that we need to have knowledge of what
25   they are going to be, that's the third category that we asked
```

1  for in the Bill of Particulars.

2      And it is a fact that they have charged us in Counts 11

3  and 16 with a conspiracy to defraud.  And it is a fact they

4  said we did it by false statements, or the pharmacies did it

5  through false statements.  And it's a fact they alleged not

6  one --

7          **THE COURT:**  Yeah, but you see the way I'm going to

8  approach that.  That's right.  You're absolutely correct.

9      The way I'm going to approach it is I'm going to require

10 the Government to disclose what statements that they believe

11 they are going to produce in their case which constitute

12 admissions.

13     So it's going to be done that way, rather than just simply

14 giving them a Bill of Particulars.  I think it's a Bill of

15 Particulars by another name.

16         **MR. CASSMAN:**  Okay.

17         **THE COURT:**  So --

18         **MR. CASSMAN:**  I will take it by any name.

19     The second point I want to make is this, just if you will

20 give me a couple more minutes.

21         **THE COURT:**  Sure.

22         **MR. CASSMAN:**  In the normal case a corporation which

23 can act and know things only through its employees is charged

24 with actions or knowledge attributable to a specific employee

25 whose knowledge and actions are vicariously attributable to the

1   corporation.

2       In this case, in this indictment of what is it, 129

3   paragraphs or pages, there is not one.  They don't allege a

4   specific individual who has the requisite mens rea, who by

5   virtue of vicarious liability should be attributed to FedEx.

6       Instead, they have thrown up a mosaic with various little

7   discrete points which they think are relevant knowledge of some

8   kind.  And they ask the Court, they ask --

9           THE COURT:  What if they do know?

10          MR. CASSMAN:  Well --

11          THE COURT:  What if the corporation acts and does "X"

12  and they don't know who at the corporation told -- and you're

13  right.  The corporation is made up of people.  And who at the

14  company, whether it was 1, 10 or 20 people, who decided that

15  the corporation should do "X."  What if they don't know?  They

16  can't conduct that discovery.  Maybe they do through Grand Jury

17  proceedings and so forth.

18          MR. CASSMAN:  They had better presented evidence to

19  the Grand Jury, to convince the Grand Jury --

20          THE COURT:  Not necessarily.  Not necessarily.  Maybe

21  they showed that the corporation did -- a decision was made by

22  FedEx not to do "X" or to do "Y."

23      I mean, I don't know -- I think we're having an argument

24  about something that won't be an argument, to tell you the

25  truth.  I think -- I think we'll take it in steps.

1                **MR. CASSMAN:**  Okay.  But just --

2                **THE COURT:**  Without prejudice to your request.  You

3    can renew it if, as we get down the road a bit, it appears that

4    you would have difficulty defending the action, you can renew

5    it and then we see what the Government has actually shown,

6    produced, done, stated.

7                **MR. CASSMAN:**  All right.  Thank you, your Honor.

8                **THE COURT:**  So denied without prejudice.

9                **MS. AULT:**  Thank you, your Honor.

10               **THE COURT:**  Thank you.

11               (Proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, March 3, 2015