Cristina C. Arguedas (CalBN 87787)
    Email: arguedas@achlaw.com
Ted W. Cassman (CalBN 98932)
    Email: cassman@achlaw.com
Raphael M. Goldman (CalBN 229261)
    Email: goldman@achlaw.com
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 845-3000
Facsimile: (510) 845-3003

Allen J. Ruby (CalBN 47109)
    Email: allen.ruby@skadden.com
Jack P. DiCanio (CalBN 138782)
    Email: jack.dicanio@skadden.com
Patrick Hammon (CalBN 255047)
    Email: patrick.hammon@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Counsel for FedEx Corporation,*
*Federal Express Corporation and*
*FedEx Corporate Services, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>     v.<br><br>FEDEX CORPORATION, FEDERAL EXPRESS CORPORATION, and FEDEX CORPORATE SERVICES, INC.,<br><br>         Defendants. | **No. CR 14-380 (CRB)**<br><br>**FEDEX DEFENDANTS' MOTION TO DISMISS THE INDICTMENT PURSUANT TO THE COMMON CARRIER EXEMPTIONS IN TITLE 21 OF THE UNITED STATES CODE**<br><br>Date: May 13, 2015<br>Time: 2:00 p.m.<br>Hon. Charles R. Breyer |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   FACTS ................................................................................................4

    A.    FedEx, a Common Carrier ....................................................4

    B.    The Charges in the Indictment .............................................6

        1.    Controlled Substances Act Charges .............................6

        2.    Misbranding Charges ...................................................7

        3.    Money Laundering Charges ..........................................8

III.  THIS MOTION CAN BE RESOLVED WITHOUT A TRIAL ON THE MERITS ..............................................................................................9

IV.  21 U.S.C. §§ 373(a) AND 822(c) EXEMPT FEDEX FROM LIABILITY FOR ANY OF THE CHARGED CRIMES ...................................................12

    A.    History and Context of the Common Carrier Exemptions ......................13

        1.    The Common Carrier Exemptions in Title 21 are a Century Old ...........................................................14

        2.    Title 21's Common Carrier Exemptions are Part of a Broader Legislative Scheme to Protect Common Carriage.....................15

    B.    FedEx Acted in the Usual Course of a Common Carrier's Business .....17

        1.    The "Usual Course of Business" Means Carrying Out the Normal Duties of a Common Carrier ...........................................17

        2.    FedEx Was Fulfilling the Normal Duties of a Common Carrier ......................................................21

    C.    The Common Carrier Exemptions Apply Regardless of FedEx's Alleged Knowledge ..................................................26

    D.    FedEx Cannot Be Liable for Distributing Controlled Substances in Violation of 21 U.S.C. § 841....................................28

    E.    FedEx Cannot Be Liable for Conspiring to Distribute Controlled Substances in Violation of 21 U.S.C. § 846 ...........................................32

      F.      FedEx Cannot Be Liable for Conspiring to Violate the Money Laundering Statutes...............................................................................33

      G.     FedEx Cannot Be Liable for Conspiring to Violate the FDCA ................34

V.     A CONVICTION FOR ANY OF THE CHARGED OFFENSES WOULD OFFEND THE FIFTH AMENDMENT BY IMPOSING A CRIMINAL SANCTION IN THE ABSENCE OF FAIR WARNING THAT THE CHARGED CONDUCT VIOLATED THE CRIMINAL LAWS............................35

VI.    CONCLUSION.................................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884 (9th Cir. 1995) .................18

*Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 131 S. Ct. 871 (2011).....................18

*Clark v. Brown*, 450 F.3d 898 (9th Cir. 2006) .............................................................39

*Commissioner v. Brown*, 380 U.S. 563 (1965) ............................................................27

*Dolan v. U.S. Postal Service*, 546 U.S. 481 (2006) ..............................................27, 29

*E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 758 F.3d 1162 (9th Cir. 2014) ...............................................................................................................18

*First National Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 791 (7th Cir. 2007) ......................................................................................................................19, 20

*Franklin v. Terr*, 201 F.3d 1098 (9th Cir. 1999) ..........................................................32

*Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) ..............................20

*Gonzales v. Raich*, 545 U.S. 1 (2005) .................................................................13, 15

*Grayned v. Rockford*, 408 U.S. 104 (1972) ....................................................36, 37, 39

*Hanni v. American Airlines, Inc.*, No. C 08-00732 CW, 2010 U.S. Dist. LEXIS 3410 (N.D. Cal. Jan. 15, 2010).......................................................................................20

*Hercules, Inc. v. EPA*, 938 F.2d 276 (D.C. Cir. 1991) .................................................27

*Hunt v. Los Angeles*, 638 F.3d 703 (9th Cir. 2011) .....................................................37

*Kelly v. General Electric Co.*, 110 F. Supp. 4 (E.D. Pa. 1953)................................4, 21

*Kieronski v. Wyandotte Terminal R.R. Co.*, 806 F.2d 107 (6th Cir. 1986) .........4, 21, 33

*Kolender v. Lawson*, 461 U.S. 352 (1983)....................................................................36

*Las Vegas Hacienda, Inc. v. Civil Aeronautics Board*, 298 F.2d 430 (9th Cir. 1962) ...........................................................................................................................4

*Marks v. United States*, 430 U.S. 188 (1977) .......................................................36, 39

*McBoyle v. United States*, 383 U.S. 25 (1931) ............................................................37

*Miller v. Carrington Mortg. Servs.*, No. C-12-2282 EMC, 2013 U.S. Dist. LEXIS 134389 (N.D. Cal. Sept. 19, 2013) .............................................................20

*National Ass'n of Regulatory Utility Comm'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) ....................................................................................................4, 25

*New York Susquehanna & Western Railway Corp. v. Jackson*, 500 F.3d 238 (3rd Cir. 2007) ...........................................................................................4

*Novelty, Inv. v. DEA*, 571 F.3d 1176 (D.C. Cir. 2009) .................................30

*Nunez v. San Diego*, 114 F.3d 935 (9th Cir. 1997) .....................................38

*Planned Parenthood of Idaho v. Wasden*, 376 F.3d 908 (9th Cir. 2004) ...................38

*Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224 (2007).......................31

*Rehberg v. Paulk*, __ U.S. __, 132 S. Ct. 1497 (2012).................................32

*Screws v. United States*, 325 U.S. 91 (1945) .............................................12

*Salinas v. United States*, 522 U.S. 52 (1997) .............................................26

*Thompson v. Western States Medical Center*, 535 U.S. 357 (2002).......................2, 13

*Trans Alaska Pipeline Rate Cases*, 436 U.S. 631 (1978)..........................27, 29

*United States v. Barletta*, 644 F.2d 50 (1st Cir. 1981) .................................10

*United States v. Black*, 512 F.2d 864 (9th Cir. 1975) .................................11

*United States v. Cain*, 130 F.3d 381 (9th Cir. 1997)...................................28

*United States v. California*, 297 U.S. 175 (1936).........................................20

*United States v. Clark*, 912 F.2d 1087 (9th Cir. 1990).................................38

*United States v. Covington*, 395 U.S. 57 (1969).........................................10

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011)...............................38

*United States v. Harriss*, 347 U.S. 612 (1954) ..................................36, 37

*United States v. Hernandez*, No. 07-60027-CR-ZLOCH/Snow, 2007 U.S. Dist. LEXIS 74373 (S.D. Fla. Oct. 4, 2007) .......................................................11

*United States v. Hiland*, 909 F.2d 1114 (8th Cir. 1990)...............................28

*United States v. Hill*, 589 F.2d 1344 (8th Cir. 1979) .................................30

*United States v. Jones*, 542 F.2d 661 (6th Cir. 1976)......................................................10

*United States v. Lanier*, 520 U.S. 259, 267-71 (1997).....................................12, 37, 39

*United States v. Lewis*, 368 F.3d 1102 (9th Cir. 2004) ............................................12

*United States v. LKAV*, 712 F.3d 436 (9th Cir. 2013) ..............................................18

*United States v. Lovin*, No. 07-cr-2016-IEG, Docket #759 (S.D. Cal. Jul 10, 2009) ....28

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ...................................................18

*United States v. Murphy*, 35 F.3d 143 (4th Cir. 1994) ..............................................26

*United States v. Murray*, 618 F.2d 892 (2d Cir. 1980) ..............................................11

*United States v. Napoli*, No. 10-cr-642 (CRB), Docket #1056 (2012) ........................28

*United States v. Nader*, 542 F.3d 713 (9th Cir. 2008) ..........................................28, 31

*United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) (*en banc*) ..............................23

*United States v. Nosal*, No. C 08-0237 MHP, 2010 U.S. Dist. LEXIS 24359 (N.D. Cal. Jan. 6, 2010) ......................................................................................................23

*United States v. Nukida*, 8 F.3d 665 (9th Cir. 1993) ...................................................9

*United States v. Petri*, 731 F.3d 833 (9th Cir. 2013)..........................................27, 29

*United States v. Roberts*, 363 F.3d 118 (2nd Cir. 2004)............................................11

*United States v. Roberts*, No. 01 Cr. 410 (RWS), 2002 U.S. Dist. LEXIS 16778 (S.D.N.Y. Sept. 9, 2002)...........................................................................................11

*United States v. Rosenberg*, 515 F.2d 190 (9th Cir. 1975).......................................11

*United States v. Shortt Accountancy Corp.*, 785 F.2d 1448 (9th Cir. 1986) ...........9, 10

*United States v. Smith*, 866 F.2d 1092 (9th Cir. 1989) ...............................................10

*United States v. Suarez*, 682 F.3d 1214 (9th Cir. 2012) ............................................27

*United States v. Trikha*, No. 06-CR-30098-DRH, 2007 U.S. Dist. LEXIS 43554 (S.D. Ill. Jun. 15, 2007)..............................................................................................11

*United States v. Watkins*, 278 F.3d 961 (9th Cir. 2002) ............................................26

*United States v. Williams*, 644 F.2d 950 (2nd Cir. 1981)............................................10

*United States v. Wiltberger*, 5 Wheat. 76, 18 U.S. 76 (1820) .......................................28

*United States v. Wittich*, No. 14-35, 2014 U.S. Dist. LEXIS 145784 (E.D. La. Oct. 10, 2014) ............................................................................................................11

*Webster v. Woodford*, 369 F.3d 1062, 1066-67 (9th Cir. 2004)..................................39

*Woolsey v. NTSB*, 993 F.2d 516 (5th Cir. 1993) ....................................................5, 21

## **Other Authorities**

14 C.F.R. §§ 1.1 *et seq.* ............................................................................................16

15 U.S.C. § 68a ........................................................................................................16

15 U.S.C. § 69 ..........................................................................................................16

15 U.S.C. § 70 ..........................................................................................................16

15 U.S.C. § 1200 ......................................................................................................16

15 U.S.C. § 1271 ......................................................................................................16

16 U.S.C. § 1371 ......................................................................................................38

18 U.S.C. § 1953 ......................................................................................................16

18 U.S.C. § 1956 ...................................................................................................8, 33

18 U.S.C. § 2339A ...................................................................................................38

21 U.S.C. § 331 ....................................................................................................7, 13

21 U.S.C. § 333 .........................................................................................................7

21 U.S.C. § 353 ....................................................................................................7, 14

21 U.S.C. § 373 ............................................................................................... *passim*

21 U.S.C. § 393 ........................................................................................................14

21 U.S.C. § 822 ............................................................................................... *passim*

21 U.S.C. § 828 ........................................................................................................16

21 U.S.C. § 841 .......................................................................................6, 8, 27, 29

21 U.S.C. § 846 .......................................................................................6, 27, 32

21 U.S.C. § 957 .................................................................................16

21 C.F.R. § 1.1 .............................................................................2, 13

21 C.F.R. § 1300.01 ..........................................................................2

29 U.S.C. § 215 .................................................................................16

42 U.S.C. § 1983 ...............................................................................32

49 U.S.C. §§ 40101 *et seq.* ..............................................................16

49 U.S.C. § 40102 ...............................................................................5

49 U.S.C. § 41101 ...............................................................................5

52 Stat. 1040, 75 P.L. 717 (1938) ...............................................14, 29

63 Pub. L. No. 223, 38 Stat. 785 .................................................14, 19

89 P.L. 74, 79 Stat. 226....................................................14, 19, 29, 30

91 P.L. 513, 84 Stat. 1236.................................................................15

116 Cong. Rec. 977-78 ........................................................................1

Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* ......................... *passim*

FAA Advisory Circular 120-12A (Apr. 24, 1986) ........................5, 33

FDA Compliance Guide § 100.500 (1989) .................14, 17, 27, 35

Federal Rule of Criminal Procedure 12 ............................... *passim*

Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* .................. *passim*

H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566 ......................... *passim*

Ninth Circuit Model Jury Instruction 9.18 .......................................28

Ninth Circuit Model Jury Instruction 9.19.......................................28

# I.    INTRODUCTION

This Court has several times observed that the trial of this case would raise the crucial questions "What did FedEx know?  What were they told?  What did they do?  What did they say?"  9/25/2014 Tx (Docket #53) at 5:8-12 & 22-24; *see also* 1/21/2015 Tx (Docket #69) at 8:20-23, 9:24-10:3, 11:20-12:16.  The evidence at trial would show that FedEx did not act with the knowledge or specific intent that would be required for conviction.  But a trial is not necessary, and this prosecution should end now.  Exemptions that have long been a part of the Controlled Substances Act ("CSA") and the Food, Drug and Cosmetic Act ("FDCA") expressly make common carriers like FedEx immune from criminal liability for the conduct alleged in the superseding indictment ("indictment"), and the charges must be therefore be dismissed under Federal Rule of Criminal Procedure 12(b).

The indictment charges FedEx with transporting prescription pharmaceuticals that, according to the government, had been dispensed pursuant to prescriptions issued by doctors in violation of federal law.  Based fundamentally on the government's assertion that some of FedEx's more than 180,000 employees supposedly knew that certain customers were shipping improperly-prescribed medications, the indictment claims that FedEx entered into conspiracies with two online pharmacy "organizations" to violate the CSA, the FDCA, and the federal money laundering statutes.

The distribution of controlled substances by manufacturers, wholesalers, prescribers and dispensers is regulated by the Drug Enforcement Administration ("DEA") as part of a "closed system" under the CSA.  *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566; 116 Cong. Rec. 977-78.  All manufacturers, wholesalers,

prescribers and dispensers are required to register with the DEA, and registrants' activities are governed by a detailed series of regulations.  *See* 21 U.S.C. §§ 801 *et seq.*; 21 C.F.R. §§ 1300.01 *et seq.*  Prescription medications — both controlled and non-controlled — are also monitored by the Food and Drug Administration ("FDA") pursuant to the FDCA.  *See* 21 U.S.C. §§ 301 *et seq.*; 21 C.F.R. §§ 1.1 *et seq.*  That agency oversees an equally thorough regulatory apparatus in the course of its job of "regulat[ing] drug manufacturing, marketing and distribution."  *Thompson v. Western States Medical Center*, 535 U.S. 357, 361 (2002).

FedEx is not a manufacturer, wholesaler, marketer, prescriber or dispenser of pharmaceuticals.  It is a common carrier.  Companies that are part of the pharmaceutical distribution chain, like hundreds of thousands of other business customers in the myriad and varied industries that comprise the American economy, often use common carriers like FedEx to transport their wares.  But common carriers, as transporters for the public at large, cannot reasonably be expected to police whether any of the millions of packages tendered for shipment each day encloses a commodity that might somehow violate one among the thicket of federal, state and local laws and regulations that might apply to the shipment or shipper — including the complicated rules that apply to the prescription and dispensation of medications.

In order to avoid obstructing common carriers' vital function of facilitating commerce, Congress wisely exempted common carriers that transport pharmaceutical shipments from the regulatory and enforcement schemes established by the CSA and FDCA. The CSA provides that

> [t]he following persons shall not be required to register and may lawfully possess any controlled substance or list I chemical under this title: . . . . (2)

> A common or contract carrier or warehouseman, or an employee thereof, whose possession of the controlled substance or list I chemical is in the usual course of his business or employment.

21 U.S.C. § 822(c).  The language of this provision is clear and unambiguous.  It straightforwardly pronounces that a common carrier whose possession of controlled substances is in the usual course of business need not register with the DEA and, furthermore, may "*lawfully possess any controlled substance*."  Of course, a common carrier possessing a "controlled substance . . . in the usual course of [its] business" can only be doing one thing: transporting a package that contains the controlled substance.  That is precisely what FedEx is accused of doing in this case, and § 822(c) makes its alleged conduct lawful.

Likewise, the FDCA provides that "carriers engaged in interstate commerce . . . . shall not be subject to the other provisions of this Act by reason of their receipt, carriage, holding or delivery of food, drugs, services, tobacco products, or cosmetics in the usual course of their business as carriers . . . ."  21 U.S.C. § 373(a).  As with the CSA's exemption, the text of § 373(a) is unequivocal.  It states that a common carrier cannot be criminally responsible for violations of the FDCA if the charges arise from the carrier's receipt, carriage or delivery of pharmaceuticals in the usual course of its business.  Once again, however, that is precisely what the indictment alleges against FedEx.

The exemptions set out in 21 U.S.C. §§ 373(a) and 822(c) require dismissal for two related doctrinal reasons.  First, the indictment is defective because the common carrier exemptions apply on the face of the indictment — even if the facts alleged therein are taken as true.  Second, a conviction on the instant charges would violate the

Fifth Amendment's prohibition on imposing criminal liability in the absence of fair warning that the charged conduct was legally proscribed. The common carrier exemptions appear affirmatively to establish that common carriers may transport pharmaceuticals without being subject to criminal sanction, and no jurisprudence has suggested otherwise. In light of Title 21's statutory scheme, no common carrier could reasonably have been expected to understand that it faced criminal liability for transporting prescription medications.

## II. FACTS

### A. FedEx, a Common Carrier

A common carrier is

> one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant.

*Kieronski v. Wyandotte Terminal R.R. Co.*, 806 F.2d 107, 108 (6th Cir. 1986) (quoting *Kelly v. General Electric Co.*, 110 F. Supp. 4, 6 (E.D. Pa. 1953)); *see also New York Susquehanna & Western Railway Corp. v. Jackson*, 500 F.3d 238, 250 (3rd Cir. 2007); *National Ass'n of Regulatory Utility Comm'rs v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976); *Las Vegas Hacienda, Inc. v. Civil Aeronautics Board*, 298 F.2d 430, 434 (9th Cir. 1962). The indictment establishes that FedEx is not a manufacturer, wholesaler, prescriber or dispenser of prescription or controlled pharmaceuticals. Rather, FedEx is one of the world's largest common carriers. *See* Indictment (Docket #28) ¶ 1 (asserting that during the time period covered by the indictment the FedEx defendants "were package delivery companies and providers of specialized transportation and logistics

services that delivered packages to persons located in the Northern District of California and throughout the United States").

Indeed, because FedEx Express holds itself out to the public as engaged in the business of transporting packages by air from place to place, it is required to maintain — and does maintain — an Air Carrier Certificate issued by the Federal Aviation Administration that permits Express to "operate as an air carrier and conduct common carriage operations in accordance" with the Federal Aviation Act of 1958. *See* 49 U.S.C. § 40102 (defining "air transportation" to mean the "transportation of passengers or property by aircraft as a common carrier for compensation" in interstate, intrastate or foreign commerce); 49 U.S.C. § 41101 (requiring air carriers who provide "air transportation" to obtain certificates issued by the FAA); FAA Advisory Circular 120-12A (Apr. 24, 1986) ("A carrier becomes a common carrier when it 'holds itself out' to the public, or to a segment of the public, as willing to furnish transportation within the limits of its facilities to any person who wants it."); *Woolsey v. NTSB*, 993 F.2d 516, 523 (5th Cir. 1993) (affirming that the Advisory Circular's definition comports with the common law as it applies to air carriers).

Each day, FedEx Express transports over four million packages. These packages contain innumerable products and commodities, many of which are shipped by the millions of customers that have FedEx accounts. Customers may, and commonly do, set up FedEx accounts simply by filling out an online form. FedEx invoices its account holders and receives payment for its common carriage services. FedEx also offers a Collect on Delivery ("COD") service, pursuant to which FedEx will, for a fee, collect payment for a shipment and then return it to the shipper through the

FedEx Express network.  Over the past decade or so, FedEx's many customers included some online pharmacies, and some of those pharmacies used FedEx's COD service.

**B.     The Charges in the Indictment**

The charges in the indictment relate to FedEx's shipment of packages for two alleged online pharmacy networks — the so-called "Chhabra-Smoley Organization," and a network of businesses and people associated with a pharmacy called Creative Pharmacy or Superior Drugs.  The indictment's charges are entirely predicated upon FedEx's provision of common carrier services to some members of these networks and the acceptance of payment for those services.

1.     Controlled Substances Act Charges

Counts One and Thirteen allege that FedEx conspired with the Chhabra-Smoley and Superior Drugs networks "to distribute, and to possess with intent to distribute outside the usual course of professional practice and not for a legitimate medical purpose one or more controlled substances, knowing and intending that the distribution was outside the usual course of professional practice and not for a legitimate medical purpose . . . .," all in violation of 21 U.S.C. §§ 841 and 846.  Indictment (Docket #28) ¶¶ 23 & 71.  The indictment asserts that certain FedEx employees knew that people and businesses associated with the online pharmacy networks previously had been the subject of law enforcement action, that "the purpose of the [networks] was to provide controlled substances to consumers without the need for a face-to-face meeting with . . . a physician," and that such practices violated the law.  *Id.* ¶¶ 37-39, 83 & 85.  The indictment further alleges that FedEx "departed from its usual business practices" in

shipping the online pharmacy networks' packages because (1) "[a]ccording to FEDEX's Service Guide and Tariff . . . FEDEX did not ship contraband, including illegal drugs . . . ."; (2) the company applied an "Online Pharmacy Credit Policy," which imposed restricted credit terms on online pharmacy customers; and (3) the company designated online pharmacy accounts to the Sales department's "catchall" account, which caused the revenue to be disregarded in calculating salespeople's compensation. *Id.* ¶¶ 39 & 84; *see also id.* ¶¶ 9-16 (discussing the credit and sales policies).

Counts Two through Ten and Fourteen and Fifteen allege that FedEx shipped eleven specific packages containing controlled substances in violation of 21 U.S.C. § 841. The government claims that the company allegedly possessed with intent to distribute and distributed the controlled substances "outside the usual course of professional practice and not for a legitimate medical purpose . . ., knowing and intending that the distribution and possession with intent to distribute was outside the usual course of professional practice and not for a legitimate purpose . . . ." *Id.* ¶¶ 41-42, 89-89.

### 2. Misbranding Charges

Counts Eleven and Sixteen charge that FedEx conspired with the Chhabra-Smoley and Superior Drugs networks to ship prescription drugs in violation of the FDCA. The counts allege that FedEx conspired to distribute prescription drugs "without valid prescriptions from licensed practitioners, which caused the drugs to be misbranded while held for sale after their shipment in interstate commerce, and did so with the intent to defraud and mislead as to a material matter," all in violation of 21 U.S.C. §§ 331, 333 and 353. Indictment (Docket #28) ¶¶ 43-61, 90-106. Counts

Eleven and Sixteen allege a number of charged "Overt Acts," which include assertions that FedEx transported specified packages for entities affiliated with the Chhabra-Smoley and Superior Drugs networks and that those packages contained invalidly prescribed medications, including in some cases controlled substances. *Id.* ¶¶ 48-61, 95-106.

### 3.   Money Laundering Charges

Counts Twelve, Seventeen and Eighteen allege that FedEx joined conspiracies to launder money in violation of 18 U.S.C. § 1956.

Counts Twelve and Seventeen are similar: both arise from FedEx's receipt of payments for its transportation services. *Id.* ¶¶ 65-69, 109-113. These counts assert that FedEx conspired with the Chhabra-Smoley and Superior Drugs networks to "conduct a financial transaction involving the proceeds of a specified activity, knowing that the property involved in the financial transaction represented proceeds of some form of unlawful activity, and intending to promote the carrying on of the specified unlawful activity." Indictment (Docket #28) ¶¶ 63 & 108. The purported "specified activity" alleged in Counts Twelve and Seventeen is "the possession with intent to distribute and distribution of controlled substances outside the usual course of professional practice and not for a legitimate medical purpose, knowing and intending that the possession with intent to distribute and distribution was outside the usual course of professional practice and not for a legitimate medical purpose" in violation of 21 U.S.C. § 841. *Id.*

Count Eighteen relates to FedEx's COD service. It alleges that FedEx conspired with entities affiliated with the Superior Drugs network to "conduct a financial transaction

involving the proceeds of a specified activity, knowing that the property involved in the financial transaction represented proceeds of some form of unlawful activity, and intending to promote the carrying on of the specified unlawful activity." *Id.* ¶ 115. It asserts that FedEx "delivered and attempted to deliver packages from Superior containing controlled substances for which FedEx had agreed to collect payment, in the form of checks and money orders, from the recipients using FEDEX's cash-on-delivery (COD) service." *Id.* ¶ 116. Count Eighteen further alleges that FedEx

> knew that the money orders and checks were intended as payment for controlled substances that FEDEX had delivered and attempted to deliver from Superior to consumers. FEDEX further knew that those orders had been placed by customers after filling out an online questionnaire with no contact between the prescribing physician and patient and were thus distributed outside the usual course of professional practice and not for a legitimate medical purpose and were not based on valid prescriptions.

*Id.* ¶ 119.

## III. THIS MOTION CAN BE RESOLVED WITHOUT A TRIAL ON THE MERITS

Federal Rule of Criminal Procedure 12 (as amended effective December 1, 2014) generally provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Rule 12(b)(1). Rule 12(b)(3) sets out several categories of motion that must be raised before trial if the motion "can be determined without a trial on the merits," including motions asserting "a defect in the indictment." Rule 12(b)(3) & (b)(3)(B).

"A pretrial motion is generally 'capable of determination' before trial if it involves questions of law rather than fact." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986); *see also United States v. Nukida*, 8 F.3d 665, 669 (9th Cir.

1993).[1]  Likewise, a defense is "'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the offense."  *United States v. Covington*, 395 U.S. 57, 60 (1969).  "[A] district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact."  *Shortt*, 785 F.2d 1452 (quoting *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976)).  "Under this standard, the district court must decide the issue raised in the pretrial motion before trial if it is 'entirely segregable' from the evidence to be presented at trial."  *Id.* (quoting *United States v. Barletta*, 644 F.2d 50, 57-58 (1st Cir. 1981)).  But "[i]f the pretrial claim is 'substantially founded upon and intertwined with' evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred."  *Id.* (quoting *United States v. Williams*, 644 F.2d 950, 952-53 (2nd Cir. 1981)).

As suggested by the above authorities, an exemption to liability may be litigated before trial if it raises primarily a question of law or may be resolved without delving substantially into the circumstances of the alleged offense.  *Covington*, 395 U.S. at 60; *see also United States v. Smith*, 866 F.2d 1092, 1098 (9th Cir. 1989).  Here, the indictment frames a pure question of law.  As discussed in more detail in Part IV, *infra*,

---

[1] The former version of Rule 12(b) was phrased slightly differently than it is today: it permitted any defense "which is capable of determination without the trial of the general issue" to be raised by pretrial motion.  *See, e.g., Shortt*, 785 F.2d at 1452.  The updated phrasing was not intended as a substantive change to the rule, *see* Rule 12, Advisory Committee Notes on 1987, 2002 & 2014 Amendments, and thus the cited cases remain authoritative.

even assuming that all of the factual averments in the indictment are true,[2] the common carrier exemptions preclude criminal liability.[3]

Likewise, the question whether a statute or statutory scheme provided fair warning that a defendant's conduct was subject to criminal sanction is legal in nature, and subject to pretrial resolution under Rule 12. *See, e.g., United States v. Wittich*, No. 14-35, 2014 U.S. Dist. LEXIS 145784 at *32-33 (E.D. La. Oct. 10, 2014) ("Whether a criminal statute is unconstitutionally vague is a question of law. Therefore, it is proper for the Court to consider" a pretrial motion to dismiss (internal quotation marks and citation omitted)); *United States v. Hernandez*, No. 07-60027-CR-ZLOCH/Snow, 2007 U.S. Dist. LEXIS 74373 (S.D. Fla. Oct. 4, 2007) (resolving before trial online pharmacy defendants' claims concerning the constitutionality of applying the CSA to their alleged conduct); *United States v. Trikha*, No. 06-CR-30098-DRH, 2007 U.S. Dist. LEXIS 43554 at *8-15 (S.D. Ill. Jun. 15, 2007) (resolving before trial the defendants' vagueness arguments); *United States v. Roberts*, No. 01 Cr. 410 (RWS), 2002 U.S. Dist. LEXIS 16778 (S.D.N.Y. Sept. 9, 2002) (granting a pretrial motion that argued the CSA was unconstitutionally vague as applied), *overruled on other grounds by* 363 F.3d 118 (2nd Cir. 2004) (finding the statute not vague as applied, but without questioning the district

---

[2] They are not.

[3] As the indictment itself demonstrates that FedEx is a common carrier, if the case were to proceed to trial, the government would have the burden of proving beyond a reasonable doubt that the common carrier exemptions were inapplicable. *United States v. Black*, 512 F.2d 864, 867 (9th Cir. 1975); *see also United States v. Murray*, 618 F.2d 892, 901 (2d Cir. 1980); *United States v. Rosenberg*, 515 F.2d 190, 198-99 (9th Cir. 1975). But the case need not proceed to trial because the indictment establishes as a matter of law that under Title 21's common carrier exemptions, FedEx cannot be held liable for the charged crimes.

court's pretrial resolution of the issue).[4]  Accordingly, FedEx's motion to dismiss the indictment for lack of fair warning is appropriately resolved before trial.

## IV.  21 U.S.C. §§ 373(a) AND 822(c) EXEMPT FEDEX FROM LIABILITY FOR ANY OF THE CHARGED CRIMES

The CSA expressly provides that common carriers may "lawfully" possess controlled substances, 21 U.S.C. § 822(c)(2), and the FDCA provides that carriers "shall not be subject to the other provisions of th[e] Act by reasons of their receipt, carriage, holding or delivery" of pharmaceuticals, 21 U.S.C. § 373(a).  These exemptions are not boundless — the law provides protection only for common carriers possessing a controlled substance "in the usual course of [their] business," *see* 21 U.S.C. §§ 373(a) & 822(c)(2) — but they fully apply in the context of the allegations in the indictment. FedEx cannot be liable for any of the charges against it, as the indictment itself establishes that each count seeks to punish this common carrier for its possession of prescription pharmaceuticals in the usual course of its business.

---

[4] *United States v. Lewis*, 368 F.3d 1102 (9th Cir. 2004) is not to the contrary.  In *Lewis*, the court wrote that a defendant's motion to dismiss the indictment against him on fair warning grounds would properly be decided at trial.  *Id.* at 1106.  But the *Lewis* court's discussion is not authoritative here for several reasons.  First, the discussion was *dictum*: the true issue before the court was whether the defendant could take an interlocutory appeal from the denial of his motion.  *Id.* at 1104-05.  Second, the court's discussion relied crucially on a factual determination that Lewis's motion "goes directly to the underlying merits; the evidence he seeks to introduce regarding his fair warning defense goes the heart of his criminal liability."  *Id.* at 1106.  This may have been true because Lewis was charged with violating 18 U.S.C. § 242, a crime which, under Supreme Court jurisprudence, specifically incorporates constitutional fair warning principles into its elements.  *See United States v. Lanier*, 520 U.S. 259, 267-71 (1997); *Screws v. United States*, 325 U.S. 91, 96, 103 (1945) (plurality opinion).  In any event, the *Lewis* court did not articulate the factual bases for its determination that the defendant's fair warning motion was inextricably intertwined with the trial facts, and thus the case cannot stand for any broader principle about the circumstances in which Rule 12 might or might not permit pretrial resolution of a fair warning argument.

## A.  History and Context of the Common Carrier Exemptions

The history of §§ 373(a) and 822(c) and the presence of similar provisions in other federal statutes demonstrate Congress's intent to establish a regulatory scheme in which common carriers serve in their traditional role as a conduit for economic activity, and play no part in ensuring compliance with the laws and regulations governing the manufacture, distribution, prescription and dispensing of controlled substances.

In enacting the CSA, Congress created

> a comprehensive regime to combat the international and interstate traffic in illicit drugs.  The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances. Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels.

*Gonzales v. Raich*, 545 U.S. 1, 12-13 (2005) (footnotes omitted).  "To effectuate these goals, Congress devised a closed regulatory system" governing manufacturers, distributors and dispensers of controlled substances, and "[t]he CSA and its implementing regulations set forth strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping."  *Id.* at 13; *see also* H.R. Rep. No. 91-1444 at 598, 1970 U.S.C.C.A.N. 4566 (1970).  Yet, as discussed throughout this motion, Congress not only declined to include common carriers as part of the closed system, but in fact went a step further and determined that common carriers should affirmatively be exempted from the law's requirements.  *See* H.R. Rep. No. 91-1444 at 630-31, 1970 U.S.C.C.A.N. 4566 (1970); 21 U.S.C. § 822(c)(2).

The FDCA establishes a parallel regulatory scheme for prescription drugs.  *See Western States Medical Center*, 535 U.S. at 361; 21 U.S.C. §§ 301 *et seq.*; 21 C.F.R. §§ 1.1 *et seq.*  21 U.S.C. § 331(a) prohibits introducing a "misbranded" drug into

interstate commerce; a drug is "misbranded" unless dispensed upon a "prescription of a practitioner licensed by law to administer such drug." 21 U.S.C. § 353(b)(1)(C). The FDCA created the FDA, which is authorized to enforce the law. 21 U.S.C. § 393. In enacting the FDCA, Congress again determined that common carriers should be exempt from the law's provisions, including those related to misbranding. 21 U.S.C. § 373(a); 52 Stat. 1040, 1057, 75 P.L. 717, § 703 (1938). Indeed, the FDA itself explicitly recognizes that "[t[he proviso in section 703 of the Federal Food, Drug, and Cosmetic Act, grants *immunity from prosecution* to carriers by reason of their receipt, carriage, holding, or delivery of products subject to the Act in their usual course of business as carriers." FDA Compliance Guide § 100.500 (1989) (emphasis added). It is difficult to imagine a clearer pronouncement that FedEx cannot be liable under the FDCA for the acts charged in the indictment.

1.    The Common Carrier Exemptions in Title 21 are a Century Old

The common carrier exemptions embedded in Title 21 are not new. These laws date at least as far back as 1914, when Congress enacted the Harrison Narcotics Tax Act, 63 Pub. L. No. 223, 38 Stat. 785, to regulate the production and distribution of opiates. The Harrison Act made it unlawful for persons not registered under the provisions of the Act to possess opiates, but excepted "common carriers engaged in transporting such drugs." 63 Pub. L. No. 233, § 8, 38 Stat. 785, 789. The FDCA exemption appeared in in essentially its present form when that statute was first enacted in 1938. 52 Stat. 1040, 1057, 75 P.L. 717, § 703. A common carrier exemption likewise appeared in the regulatory scheme enacted as part of the Drug Abuse Control Amendments of 1965. *See* 89 P.L. 74, § 511(b), 79 Stat. 226, 229

(prohibiting the sale, delivery or disposition of certain medications by unregistered entities, but excepting "a common or contract carrier . . . whose possession of [the medication] is in the usual course of his business"). Eventually Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of 1970, Title II of which is the CSA, to synthesize the various federal narcotics laws. H.R. Rep. No. 91-1444 at 598, 1970 U.S. Code, Cong. & Admin. News 4566 (1970) ("Since 1914 the Congress has enacted more than 50 pieces of legislation relating to control and diversion, from legitimate channels, of those drugs referred to as narcotics and dangerous drugs . . . . This bill collects and conforms these diverse laws in one piece of legislation . . . ."). The CSA's common carrier exemption was there at the law's inception. *See Raich*, 545 U.S. at 12 n.1; 91 P.L. 513, § 302, 84 Stat. 1236, 1253. This statutory evolution reveals Congress's consistent judgment that while certain pharmaceuticals must be carefully regulated, the responsibility for ensuring compliance with the regulations should be allocated to the government and to manufacturers, wholesalers and medical professionals — not to common carriers.

> 2. Title 21's Common Carrier Exemptions are Part of a Broader Legislative Scheme to Protect Common Carriage

Nor are the common carrier exemptions in Title 21 unique. Rather, §§ 373(a) and 822(c) are part of a broader scheme enshrined in the United States Code that implements the pragmatic rule that common carriers should be free to carry out their vital societal function without fear that they will be criminally liable for the contents of packages tendered for carriage, or for the failures of persons participating in the regulated industries to comply with the specific requirements imposed on those industries. Congress has often enacted common carrier exemptions when, as with the

CSA and FDCA, it has imposed regulatory requirements on the distribution of particular types of goods and allocated responsibility for ensuring compliance to a federal agency and to the members of the regulated industry. *See, e.g.,* 15 U.S.C. § 68a(a) (exemption embodied in Federal Trade Commission Act regulatory scheme, enforced by the FTC, governing the distribution of wool products); 15 U.S.C. § 69(a)(f) (exemption embodied in Federal Trade Commission Act regulatory scheme, enforced by the FTC, governing the distribution of fur products); 15 U.S.C. § 70(a)(d) (exemption embodied in Federal Trade Commission Act regulatory scheme, enforced by the FTC, governing the distribution of textile fiber products); 15 U.S.C. § 1200 (exemption embodied in Federal Trade Commission Act regulatory scheme, enforced by the FTC, governing the distribution of flammable fabrics); 15 U.S.C. § 1271 (exemption contained in statutes regulating the distribution of hazardous materials under the oversight of the Consumer Product Safety Commission); 18 U.S.C. § 1953(a) (exemption embodied in rules governing the interstate transportation of wagering paraphernalia); 29 U.S.C. § 215(a)(1) (exemption embodied in Fair Labor Standards Act rules, enforced by the Department of Labor, governing the distribution of goods produced in violation of labor standards). In fact, similar, though more particular, exemptions for common carriers appear elsewhere in the CSA itself. *See* 21 U.S.C. §§ 828(b)(2) & 957(b)(1)(B).

The indictment in this case flouts Congress's consistent intent to exclude common carriers from participation in the regulatory schemes governing the distribution of goods, particularly pharmaceuticals.[5]  In order to effectuate this Congressional intent,

---

[5] Of course, air carriers that engage in common carriage are not unregulated — they are subject to extensive regulation by the federal government under the Federal Aviation Act of 1958. *See* 49 U.S.C. §§ 40101 *et seq.*; 14 C.F.R. §§ 1.1 *et seq.*

the indictment must be dismissed.

## B. FedEx Acted in the Usual Course of a Common Carrier's Business

Congress clearly did not intend to give all people who transport a package blanket immunity from the drug laws, which is why it established a condition on the exemptions enshrined in §§ 373(a) and 822(c)(2).  The exemptions, as with similar provisions discussed above, apply only in circumstances in which a common carrier possesses a prescription drug in the "usual course of [its] business."  This means that the protection applies in this case only if FedEx was acting *as a common carrier* — transporting goods for the general public — when it possessed the pharmaceuticals in question.  Under the allegations in the indictment, FedEx was plainly acting in that role throughout the period of the charges, including when it transported online pharmacies' shipments.  The exemptions therefore apply.

### 1. The "Usual Course of Business" Means Carrying Out the Normal Duties of a Common Carrier

The phrase "usual course of business" is not defined in either the CSA or the FDCA.  Nonetheless, agency interpretation, jurisprudence and common sense compel a straightforward reading: an entity acting in the "usual course of [its] business" is carrying out the normal duties of a business in the relevant industry.  Accordingly, a common carrier acting in the usual course of its business is carrying out the normal duties of a common carrier.

The FDA has adopted this sensible reading.  In Compliance Policy Guide § 100.500 (1989), the FDA wrote:

> The proviso in section 703 of the Federal Food, Drug, and Cosmetic Act [codified at 21 U.S.C. § 373], grants immunity from prosecution to carriers by reason of their receipt, carriage, holding, or delivery of products subject

to the Act in their usual course of business as carriers.  The immunity does not extend to operations or functions which are outside *the normal duties of a carrier*.

(Emphasis added).  Thus, the agency understands the term "usual course of business" to mean that the carrier in question is conducting the normal duties of a carrier — the receipt, carriage, holding or delivery of products.  The FDA's interpretation of its own enabling statute is entitled to considerable deference.  *E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 758 F.3d 1162, 1173-74 (9th Cir. 2014); *see also, e.g., Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 131 S. Ct. 871, 880 (2011); *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001); *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 894 (9th Cir. 1995).  Especially here, where no compelling alternative reading presents itself, the Court should defer to the FDA's construction of the FDCA.

The DEA has issued no similar interpretation of the CSA's common carrier exemption.  Nonetheless, § 822(c)(2)'s "usual course of business" term must logically have the same meaning as the similar term in § 373(a).  Under established principles of statutory construction, a court should look to "the language of related or similar statutes to aid in interpretation" of an undefined term.  *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013).  The FDCA's and CSA's common carrier exemptions are both similar and related.  The provisions have the same apparent purpose, employ much the same language, and have a closely intertwined statutory history: as discussed, the CSA was expressly intended to conform and incorporate previously-enacted narcotics laws, which included the FDCA.  *See* H.R. Rep. No. 91-1444 at 598, 1970 U.S. Code, Cong. & Admin. News 4566 (1970).  The CSA's exemption should therefore be read in the same

manner as the FDCA's:  a common carrier is operating in the ordinary course of business when it is carrying out the normal duties of a carrier.

Other predecessor statutes support this conclusion.  The 1914 Harrison Act referred expressly to "common carriers engaged in transporting" regulated medications, 63 Pub. L. No. 223, § 8, 38 Stat. 785, 789, and thus it plainly intended to protect carriers engaged in the business of transporting packages.  The Drug Abuse Control Amendments of 1965 exempted common carriers "whose possession [of certain pharmaceuticals] is in the usual course of his business or employment *as such*," 89 P.L. 74, § 511(b)(2), 79 Stat. 226, 229 (emphasis added), again demonstrating that Congress was focused on the carrier's conduct of the business of transportation.  As the CSA was designed to incorporate and conform to these prior laws, its common carrier provision should be read as continuing those laws' exemption for businesses engaged in the normal duties of a common carrier — i.e., transporting the public's packages for compensation.

Cases support the same construction.  In *First National Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 791 (7th Cir. 2007), the court considered an insurance policy that covered only losses incurred "in the usual course of business."  One question for the court was whether the plaintiff bank was acting in the usual course of its business at the time it incurred the losses in question.  *Id.* at 975, 977-79.  The defendant insurer argued that the "usual course of business" phrase meant "consistent with sound business practices," but the court rejected a construction that imposed such normative requirements:

> On its face, the phrase does not suggest a duty of care but, rather, a certain category of acts — i.e., those usually conducted in the banking business.

> Because the language of the [policy] is not standard in this respect, bond-specific case law provides little guidance. However, Wisconsin courts that have addressed this phrase in other contexts have understood it to mean actions normally taken by a bank. [¶] This is the interpretation the district court adopted in its well-reasoned opinion, and we agree. Because the Bank acted "upon the kinds of documents that it would normally act upon in its business, such as leases, checks, securities, etc., rather than documents outside that usual course," the Bank acted in the usual course of business.

*Id.* at 978-79 (citations and footnote omitted); *see also Miller v. Carrington Mortg. Servs.*, No. C-12-2282 EMC, 2013 U.S. Dist. LEXIS 134389 at *7-8 (N.D. Cal. Sept. 19, 2013) (finding that under bankruptcy law the debtor's sale of a loan was in the "ordinary course of business" because "it is common for banks to sell loans"); *Hanni v. American Airlines, Inc.*, No. C 08-00732 CW, 2010 U.S. Dist. LEXIS 3410 at *40-41 (N.D. Cal. Jan. 15, 2010) (granting summary judgment on a conversion claim because "a common carrier incurs no liability for conversion in receiving and forwarding goods tendered in the usual course of business," and the defendant airline "did nothing more than move Plaintiffs' personal property from their point of origin to their destination" (quotation marks omitted)); *cf. also United States v. California*, 297 U.S. 175, 181 (1936) ("Whether a transportation agency is a common carrier depends not upon its corporate character or declared purposes, but upon what it does."), *overruled on other grounds as stated in Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 541 & n.6 (1985).

For all of these reasons, this Court should read the common carrier exemptions in the CSA and FDCA to apply when a common carrier transports pharmaceuticals in the course of fulfilling the normal duties of a common carrier.

## 2. FedEx Was Fulfilling the Normal Duties of a Common Carrier

The normal duties of a common carrier are easily stated. As previously discussed, a common carrier is

> one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant.

*Kieronski*, 806 F.2d at 108 (quoting *Kelly*, 110 F. Supp. at 6); *see also Woolsey*, 993 F.2d at 523. Accordingly, a common carrier acting in the usual course of its business — i.e., carrying out the normal duties of a common carrier — is a company that (a) is engaged in the business of transportation of property and (b) offers its services to the public generally.

This means that the common carrier exemptions enshrined in Title 21 would not apply to an airline whose sole activity was flying controlled substances from Jamaica to Miami, since the airline would not in such an example be "offering [its] services to the public generally," and consequently would not be acting as a common carrier. Likewise, if FedEx was to open a pharmaceutical-manufacturing plant, in that capacity it would not be acting as a common carrier because it would not be "engaged in the business of transportation of persons or property from place to place for compensation," and it would be required to register with the DEA and comply with FDA rules. But here, as the government cannot seriously dispute, FedEx *was* at all times engaged in the business of transporting the public's packages from place to place in exchange for compensation. The indictment specifically alleges that this was so. *See* Indictment (Docket #28) ¶ 1 (asserting that during the time period covered by the indictment the FedEx defendants

"were package delivery companies and providers of specialized transportation and logistics services that delivered packages to persons located in the Northern District of California and throughout the United States").  Furthermore, FedEx Express is certified as a common carrier by the FAA, and was so certified for the entire period at issue.

The gravamen of the government's allegations against FedEx is that the company "shipped controlled substances and prescription drugs" for the Superior Drugs and Chhabra-Smoley online pharmacy networks.  Indictment (Docket #28) ¶ 5; *see also* United States' Opposition to Defendants' Motion for a Bill of Particulars (Docket #63) at 1 ("[T]he superseding indictment . . . charges [FedEx] with drug trafficking, pharmaceutical misbranding, and money laundering offenses related to [its] shipment of drugs for illegal Internet pharmacies").  As the Court observed at the most recent hearing in this matter: "I understand the government's case.  The Government says you [FedEx] knew that these drug shipments, however you want to characterize it, were issued without proper medical authorization and notwithstanding that, you delivered them.  That's their case." 2/20/2015 Tx (Docket #85) at 4:19-23.  But transporting such packages was part of the usual course of FedEx's business as a common carrier: it was providing transportation services to the public.

The government seeks to avoid this self-evident conclusion by alleging that FedEx, in servicing online pharmacies generally and the Chhabra-Smoley and Superior Drugs networks' accounts specifically, "departed from its usual business practices." Indictment (Docket #28) ¶¶ 39 & 84.[6]  This phrasing is curious, and may reflect a

_____

[6] The mere fact that the indictment alleges that FedEx was not acting in the usual course of its business does not save it from dismissal.  That statement is a legal

misunderstanding by the government that explains why this prosecution was commenced in the first place despite Title 21's common carrier exemptions. Whether FedEx adhered to its own "usual business practices" is not the inquiry here, nor is it relevant to any other issue in the case. The question for purposes of analyzing the common carrier exemptions is whether FedEx was acting in the ordinary course of business *of a common carrier*.

The government's apparent misunderstanding finds expression in three assertions that form the basis of its effort to avoid the common carrier exemptions. The indictment alleges that:

- the Terms and Conditions in FedEx's *Service Guide* prohibited customers from shipping contraband using the company's system, and thus when FedEx permitted online pharmacies to ship pharmaceuticals that were not dispensed pursuant to a valid doctor-patient relationship, it was no longer acting in the usual course of its business;

- FedEx's Credit department applied restrictive credit policies to all accounts associated with the online pharmacy industry, including the Chhabra-Smoley and Superior Drugs networks' accounts; and

- the company's Sales group assigned to a special "catchall" category all accounts associated with the online pharmacy industry, including those accounts related to the Chhabra-Smoley and Superior Drugs networks, which resulted in those

---

conclusion, and cannot overcome the specific factual allegations that establish on the face of the indictment that FedEx is exempt from liability under the law. *See, e.g., United States v. Nosal*, No. C 08-0237 MHP, 2010 U.S. Dist. LEXIS 24359 at *6 (N.D. Cal. Jan. 6, 2010), *aff'd* 676 F.3d 854 (9th Cir. 2012) (*en banc*).

accounts not affecting the yearly sales goals of account executives or their managers.

Indictment (Docket #28) ¶¶ 39 & 84.  Leaving aside certain inaccuracies in these allegations, they avail the government nothing because they say nothing at all about whether FedEx, in servicing the online pharmacy accounts, was acting as a common carrier.  The application of the common carrier exemptions does not depend on a fine parsing of the carrier's internal policies, but instead, as demonstrated above, on a determination whether the carrier (a) was engaged in the business of transportation of property and (b) offered its services to the public generally.  As FedEx plainly satisfied those basic requirements, the exemptions apply in this case and the indictment must be dismissed.

The alleged fact that some online pharmacies may have violated the Terms and Conditions of FedEx's *Service Guide* is hardly unique or enlightening.  Surely numerous customers violate FedEx's shipping rules every day of every year, but it does not follow that when FedEx ships such packages it is acting outside of the normal duties of a common carrier.  The fact that FedEx has self-imposed rules and restrictions on the use of its network does not change the fact that the company is still operating as a common carrier if prohibited items are transported through that network — either knowingly or unknowingly.

The government's implicit contention appears to be that FedEx may define for itself the scope of the "usual course of business" of a common carrier.  That cannot be correct.  It would be an absurd and anomalous result if the application of 21 U.S.C. §§ 373(a) and 822(c)(2) turned on whether the common carrier in question had granted

itself legal protection by drafting its terms of service to explicitly permit customers to ship improperly-prescribed pharmaceuticals.  *Cf. United States v. Nosal*, 676 F.3d 854, 860-63 (9th Cir. 2012) (*en banc*) (refusing to construe a statute in such a manner that criminal liability would turn on standards established by private entities).  Rather, the common carrier exemptions are properly understood as reflecting Congress's judgment that, when a business acts in the vital and "quasi-public" role of a common carrier, *see National Ass'n of Regulatory Utility Comm'rs*, 533 F.2d at 608, the business becomes merely a conduit — akin somewhat to public infrastructure like a road — and sits entirely outside the regulated network of pharmaceutical distribution, at least in any way related to criminal or regulatory compliance.

The indictment's allegations related to credit and payment terms and the administration of FedEx's employee compensation programs are similarly irrelevant, as these features do not undermine the conclusion that when FedEx allegedly picked up and delivered online pharmaceutical packages, the company was carrying out the duties of a common carrier: transporting the public's packages from place to place.  To the contrary, the Credit and Sales policies were the actions of a large common carrier attempting to manage that business in an orderly way.  Indeed, FedEx applies special policies to different types of customers in many circumstances: some customers need refrigerated shipping, others have special billing arrangements, and still others — like the U.S. government itself — require unique security or secrecy measures.  None of the differences in FedEx's treatment of the online pharmacy industry demonstrates that the company was acting outside the usual course of its business as a common carrier.

Even accepting the truth of the factual allegations in the indictment, FedEx's

transportation of packages for the Chhabra-Smoley and Superior Drugs networks was nonetheless part of the usual course of the company's business as a common carrier. Consequently, the §§ 373(a) and 822(c)(2) exemptions apply, and the indictment must be dismissed.

### C. The Common Carrier Exemptions Apply Regardless of FedEx's Alleged Knowledge

The government might argue that the purported knowing nature of FedEx's alleged conduct somehow takes this case outside the protections of the common carrier exemptions enshrined in Title 21. But for three reasons such an argument would be wrong and illogical. Although FedEx's supposed knowledge would surely be a central issue at trial, the charges need not be tried because the common carrier exemptions apply regardless of FedEx's knowledge.

First, and most importantly, the common carrier provisions at issue in this motion make no mention of any exclusion for carriers who act with knowledge — or any other limitation on their protections, for that matter, other than the requirement that the common carrier in question act within the usual course of business. Thus, in order for the exemptions to be defeated because FedEx supposedly had knowledge of the illegal nature of some online pharmacy shipments, this Court would have to read into §§ 373(a) and 822(c) a limitation that nowhere appears in the text of the statutes. Courts must avoid such judicial surgery in the absence of an unresolvable inconsistency in the law. *United States v. Watkins*, 278 F.3d 961, 965 (9th Cir. 2002); *see also Salinas v. United States*, 522 U.S. 52, 56 (1997) (refusing, in light of a criminal statute's "expansive, unqualified language," to read a limitation into the statute); *United States v. Murphy*, 35 F.3d 143, 145 (4th Cir. 1994) ("Courts are not free to read into the language

what is not there, but rather should apply the statute as written."); *Hercules, Inc. v. EPA*, 938 F.2d 276, 280 (D.C. Cir. 1991) (rejecting a proposed construction of a statute "because it reads into the statute a drastic limitation that nowhere appears in the words Congress chose and that, in fact, directly contradicts the unrestricted character of those words").  No judicial re-writing is necessary here, and the Court should not engage in it.

Second, courts must construe a statute so as to effectuate its purposes.  *See Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643 (1978) (quoting *Commissioner v. Brown*, 380 U.S. 563, 571 (1965) for the proposition that a law should not be read in a manner that would "thwart the obvious purpose of the statute"); *United States v. Petri*, 731 F.3d 833, 839 (9th Cir. 2013) ("When interpreting a statute, words and phrases must not be read in isolation, but with an eye toward the 'purpose and context of the statute.'" (quoting *Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006)).  It would run afoul of this precept to read the common carrier exemptions in such a way that they would not apply if the carrier in question acted knowingly.

As the FDA has recognized, the FDCA's common carrier exemption is intended, at least in part, to "grant[ ] *immunity from prosecution* to carriers by reason of their receipt, carriage, holding, or delivery of products subject to the Act in their usual course of business as carriers." FDA Compliance Guide § 100.500 (1989) (emphasis added).  The same purpose undergirds the exemption that appears in the CSA.  *See* Part IV.A, *supra.*  But an exemption that did not apply if the carrier acted knowingly would fail to effectuate this purpose because it is already lawful for a person to possess prescriptions medications *unknowingly*.  Knowledge is a necessary element, for example, of the crimes set out in 21 U.S.C. §§ 841 and 846.  *See United States v. Suarez*, 682 F.3d

1214, 1219 (9th Cir. 2012); *United States v. Cain*, 130 F.3d 381, 382 (9th Cir. 1997);

*United States v. Napoli*, No. 10-cr-642 (CRB), Docket #1056 at 25 (2012); Ninth Circuit

Model Jury Instructions 9.18 & 9.19.  Similarly, many FDCA violations already require

knowledge as a necessary element.  *See, e.g.*, *United States v. Hiland*, 909 F.2d 1114,

1128 (8th Cir. 1990); *United States v. Lovin*, No. 07-cr-2016-IEG, Docket #759 at

Instruction No. 47 (S.D. Cal. Jul 10, 2009).  In order for the common carrier exemptions

to protect common carriers from criminal liability for carrying prescription

pharmaceuticals, the exemptions must apply when carriers act knowingly.

Third, even if there were some ambiguity about whether the common carrier

exemptions could be negated by a carrier's knowledge, pursuant to the rule of lenity

such ambiguity would have to be resolved in FedEx's favor.  *United States v.*

*Wiltberger*, 5 Wheat. 76, 95, 18 U.S. 76 (1820); *United States v. Nader*, 542 F.3d 713,

721 (9th Cir. 2008).

Congress made its intent clear with the plain language of the common carrier

exemptions.  The application of the exemptions is not limited by a common carrier's

supposed knowledge, but instead by a determination whether the carrier acted in the

usual course of business as a carrier — that is, in the course of carrying the public's

packages.  Congress has determined that businesses so engaged should not be liable

for violations of the CSA or FDCA that might otherwise arise from the transportation of

pharmaceutical packages.

### D.    FedEx Cannot Be Liable for Distributing Controlled Substances in Violation of 21 U.S.C. § 841

Counts Two through Ten and Fourteen and Fifteen charge FedEx with

possessing with intent to distribute and distributing controlled substances in violation of

21 U.S.C. § 841.  The charges must be dismissed because liability is precluded by the exemption contained in § 822(c)(2).

While § 822(c)(2) on its face refers to "possession" of controlled substances, it would make no sense to cabin its application solely to cases involving simple possession.  The provision seeks to exempt a common carrier from liability under Title 21 when it acts in "the usual course of [its] business" — and a common carrier acting in the usual course of its business is, by definition, engaged in *transporting* a package from one location to another.  The exemption must be construed to cover this conduct, or else it would be rendered meaningless.  *See Dolan*, 546 U.S. at 486; *Trans Alaska Pipeline Rate Cases*, 436 U.S. at 643; *Petri*, 731 F.3d at 839.

The historical development of the common carrier exemptions contained in Title 21 provides additional evidence that the word "possess" should be read broadly.  The CSA's predecessor statutes made clear that the exemption should apply to a common carrier's transportation and final delivery of prescription pharmaceuticals.  The 1914 Harrison Act's version of the exemption referred expressly to "common carriers engaged in transporting" the regulated medications.  63 Pub. L. No. 223, § 8, 38 Stat. 785, 789.  The FDCA, passed in 1938, likewise referred (and still refers) to the "receipt, carriage, holding, or delivery of food, drugs, devices, tobacco products, or cosmetics in the usual course of business as carriers."  52 Stat. 1040, 1057, 75 P.L. 717, § 703 (codified at 21 U.S.C. § 373(a)).  Similarly, the Drug Abuse Control Amendments of 1965 exempted common carriers "whose possession [of certain pharmaceuticals] is in the usual course of his business or employment as such" from the general rule that unregistered persons may not "sell, deliver, or otherwise dispose" of regulated

medications. 89 P.L. 74, § 511(b)(2), 79 Stat. 226, 229. The CSA's provisions derive from these prior laws, *see* H.R. Rep. No. 91-1444 at 598, 1970 U.S. Code, Cong. & Admin. News 4566 (1970) ("Since 1914 the Congress has enacted more than 50 pieces of legislation relating to control and diversion, from legitimate channels, of those drugs referred to as narcotics and dangerous drugs . . . . This bill collects and conforms these diverse laws in one piece of legislation . . . ."), and demonstrate that Congress intended to use "possess" to refer to a carrier's possession of a controlled substance from the point of origin to its delivery destination.

The necessity of broadly construing the term "possess" in the context of § 822(c) is further confirmed by another exemption established by the same provision. Section 822(c)(1) makes lawful the possession of a controlled substance by "[a]n agent or employee of any registered manufacturer, distributor, or dispenser of any controlled substance or list I chemical if such agent or employee is acting in the usual course of his business or employment." At least some employees of distributors and dispensers of controlled substances must necessarily be employed to distribute and dispense the medications, and it would make no sense if the exemption did not apply to their performance of their job duties.[7] If such employees' "possess[ion] . . . in the usual

_____

[7] A few cases have discussed the exemption set out in § 822(c)(1), but none of the cases rendered a holding on the issues presented here. In *Novelty, Inv. v. DEA*, 571 F.3d 1176 (D.C. Cir. 2009) (per curiam), for example, one concurring judge and her dissenting colleague each noted the exemption and its potential application to the case, but the case involved a putative "sales agent" that would not ship or handle medications, and neither judge discussed the meaning of the term "possess" as it is used in § 822(c). *Id.* at 1185 n.17 (Henderson, J., concurring) & 1198 (Brown, J., dissenting). In *United States v. Hill*, 589 F.2d 1344 (8th Cir. 1979), the defendant was a sales manager for the manufacturer of a controlled substance. The defendant was accused of diverting controlled substances through a scheme in which he would

course of . . . business" may include distribution and dispensation for purposes of subsection (c)(1), then the term must be read in the same manner when applied to common carriers under (c)(2). *Cf. Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."). The term "possess," by necessity, therefore relates to a common carrier's possession of a controlled substance from the origin at which the package is tendered to the destination at which it is delivered.

Finally, as § 822(c)(2) acts to limit a defendant's criminal liability, if the Court finds any ambiguity in its use of the term "possess," under the rule of lenity it must construe the statute in the defendant's favor. *Nader*, 542 F.3d at 721.

In short, the history and context of the exemption — and simple common sense — reveal that the Court should construe § 822(c)(2) to prohibit criminal liability for the possession and transportation of controlled substances by common carriers like FedEx. The common carrier exemption provides immunity from the indictment's charges that FedEx distributed controlled substances in violation of the CSA. The counts alleging substantive violations of § 841 must be dismissed.

_____

"mistaken[ly]" cause shipments to be made to customers, then pick up the shipment but never return it to his employer. *Id.* at 1348. The defendant asserted at trial that his conduct was part of a practice called "sliding," which involved transferring shipments among customers as an effort to provide special pricing, and claimed that he was exempt from liability under § 822(c) as an employee acting in the regular course of his business. *Id.* at 1348, 1350. The Court of Appeals affirmed his conviction, noting that the jury had been properly instructed that it must find the defendant not guilty "if it found that [he] acquired possession of the controlled substances in the usual course of his business," and that sufficient evidence supported the jury's conclusion that the defense did not apply. *Id.* at 1350. The *Hill* court did not purport to define the term "possess" as it is used in § 822(c).

**E.    FedEx Cannot Be Liable for Conspiring to Distribute Controlled Substances in Violation of 21 U.S.C. § 846**

Counts One and Thirteen charge FedEx with conspiring to distribute controlled substances in violation of 21 U.S.C. § 846.  Again, § 822(c)(2) exempts FedEx from liability.

The crux of the conspiracy charges is that FedEx employees, allegedly knowing that the Chhabra-Smoley and Superior Drugs networks were distributing medications that were not validly prescribed, agreed to ship the networks' packages.  FedEx denies these allegations, and if necessary will defeat them at trial.  But even if the allegations are taken as true for purposes of this motion, the charges must be dismissed because § 822(c)(2)'s exemption must rationally apply to such conspiracy charges.

As discussed, the exemption applies when a common carrier is engaged in its usual course of business by accepting packages from the public at large — regardless of the carrier's asserted knowledge.  Conducting the business of transporting the public's packages by its very nature involves agreeing to carry packages for customers.  Accordingly, in order for the CSA's exemption to have any effect and provide common carriers with any protection, it must extend to allegations that the carrier agreed to carry packages containing controlled substances.  *Cf., e.g., Rehberg v. Paulk*, __ U.S. __, 132 S. Ct. 1497, 1506-07 (2012) (finding that grand jury witnesses enjoy immunity from suit under 42 U.S.C. § 1983 for giving false testimony, and holding that "this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony . . . . We decline to endorse a rule of absolute immunity that is so easily frustrated."); *Franklin v. Terr*, 201 F.3d 1098, 1101 (9th Cir. 1999) (making a similar holding regarding witnesses' testimony at trial, and observing that permitting plaintiffs to

circumvent a witness's immunity by pleading a conspiracy would "eviscerate" the immunity rule). Counts One and Thirteen must be dismissed.

### F. FedEx Cannot Be Liable for Conspiring to Violate the Money Laundering Statutes

Counts Twelve, Seventeen and Eighteen allege that FedEx conspired to launder money in violation of 18 U.S.C. § 1956. As with the other charges, the common carrier exemptions dictate that FedEx cannot be liable for the alleged violations.

As previously explained, § 822(c)(2) is plainly intended to permit common carriers to carry out their business of shipping packages — including pharmaceutical packages — without criminal sanction. The statute affirmatively makes it "lawful[ ]" for common carriers to do this business. It would scuttle the intent of the provision to permit the government to circumvent the exemption's protections by charging a common carrier with money laundering simply for accepting payment for the performance of its business.

Yet that is precisely what the government has done in this case. Counts Twelve and Seventeen assert that FedEx received payments from the Chhabra-Smoley and Superior Drugs networks following its delivery of the networks' shipments. Indictment (Docket #28) ¶¶ 62-69, 107-113. That, of course, is nothing more than the everyday conduct of FedEx's business as a common carrier. FedEx charges for its services and receives payments from its customers, a practice that is entirely consistent with the core definition of a common carrier as one "engaged in the business of transportation of persons or property from place to place *for compensation* . . . ." *Kieronski*, 806 F.2d at 108 (emphasis added; quoting *Kelly*, 110 F. Supp. at 6); *see also* FAA Advisory Circular 120-12A (Apr. 24, 1986).

Count Eighteen similarly alleges that FedEx delivered for the Superior Drugs network packages for which FedEx had agreed to collect COD payments from recipients, and subsequently returned the payment instruments to the Superior Drugs network.  *Id.* ¶¶ 116-120.  Again, this COD service was an entirely normal part of FedEx's business as a common carrier.  Permitting the government to dodge § 822(c)(2) by charging that FedEx provided to a pharmaceutical shipper a transportation service that the company offers to the general public would eviscerate the point of the exemption.

The government may protest that it has alleged that FedEx received payments with knowledge that the online pharmacy networks had improperly prescribed the shipped medications.  But, for the reasons discussed in Part IV.C, *supra*, such alleged knowledge cannot nullify the protections of the common carrier exemption.  The money laundering counts cannot stand in the face of § 822(c)(2).

## G.    FedEx Cannot Be Liable for Conspiring to Violate the FDCA

Finally, Counts Eleven and Sixteen charge that FedEx conspired with the Chhabra-Smoley and Superior Drugs networks to ship prescription drugs in violation of the FDCA's misbranding provisions.  Like all the other charges, the FDCA charges must be dismissed.

The FDCA's version of the common carrier exemption is arguably even clearer than the CSA's.  Section 373(a) expressly provides that "carriers shall not be subject to the other provisions of this Act [21 U.S.C. §§ 301 *et seq.*] by reason of their receipt, carriage, holding, or delivery of food, drugs, devices, tobacco products, or cosmetics in the usual course of business as carriers," except in circumstances not applicable here.

*See* § 373(a) & (b).  Thus, the law affirmatively exempts a carrier from FDCA liability arising from its receipt, carriage or delivery of prescription pharmaceuticals, so long as it is acting in the usual course of its business "as [a] carrier[ ]."  *See also* FDA Compliance Policy Guide § 100.500 (1989) ("The proviso in section 703 of the Federal Food, Drug, and Cosmetic Act, grants immunity from prosecution to carriers by reason of their receipt, carriage, holding, or delivery of products subject to the Act in their usual course of business as carriers.").

For reasons similar to those discussed above, this broad provision must shield a common carrier from liability under a conspiracy theory, or else it would have no effect.  A carrier receiving, carrying and delivering a pharmaceutical in every case "agrees" to take the shipment.  If the government could skirt the exemption in § 373(a) by charging carriers with conspiracy, the exemption would be nullified.

Likewise, § 373(a) is clear that the protection applies to carriers acting "in the usual course of business *as carriers*."  For the reasons discussed above, even assuming the truth of the allegations set forth in the indictment, FedEx was performing the services of a common carrier when it took the pharmaceutical shipments that are the subject of the indictment.  The charged conduct relates to FedEx's pickup, carriage and delivery of customer packages.

Accordingly, under § 373(a) FedEx cannot be guilty of the crimes charged in Counts Eleven and Sixteen.

**V.    A CONVICTION FOR ANY OF THE CHARGED OFFENSES WOULD OFFEND THE FIFTH AMENDMENT BY IMPOSING A CRIMINAL SANCTION IN THE ABSENCE OF FAIR WARNING THAT THE CHARGED CONDUCT VIOLATED THE CRIMINAL LAWS**

The indictment must also be dismissed for a second reason, which is a corollary

to the first. Sections 373(a) and 822(c)(2) make it lawful for a common carrier to possess prescription pharmaceuticals in the usual course of its business. For all of the reasons discussed above, the provisions make it appear that a common carrier may transport prescription pharmaceuticals without being subject to criminal repercussions, so long as the transportation occurs — as it unquestionably did in this case — as part of the carrier's provision of services to the general public. Imposing penal sanctions for the alleged conduct set out in the indictment would therefore violate the Fifth Amendment's requirement that potential defendants receive fair warning that their contemplated conduct runs afoul of the law.

"Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty. Statutory limits on those freedoms are examined for . . . definiteness or certainty of expression." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954); *see also Marks v. United States*, 430 U.S. 188, 194 (1977) ("[T]he notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties . . . is fundamental to our concept of constitutional liberty."); *Grayned v. Rockford*, 408 U.S. 104, 108 (1972) ("[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.").

There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."  Second, as a sort of "junior version of the vagueness doctrine," the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered.  Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.  In each of these guises, *the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.*

*United States v. Lanier*, 520 U.S. 259, 266 (1997) (emphasis added; citations omitted).

The fair warning inquiry is an objective one: a reviewing court asks not whether the defendant actually understood that the criminal statute would apply to him or her, but instead whether the statute provided reasonably clear notice to a common person. *McBoyle v. United States*, 383 U.S. 25, 27 (1931) ("Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed."); *see also Grayned*, 408 U.S. 108 (asking whether the statute gave fair notice to "a person of ordinary intelligence"); *Harriss*, 347 U.S. at 617 (same).

Ninth Circuit jurisprudence holds that the fair warning principles apply in the context of statutory exemptions.  In *Hunt v. Los Angeles*, 638 F.3d 703 (9th Cir. 2011), the court considered a series of Los Angeles ordinances governing activities on a city boardwalk.  One of the ordinances generally prohibited vending on the boardwalk, but permitted people to obtain permits for "public expression."  *Id.* at 707.  Permit holders

were permitted to sell "merchandise constituting, carrying or making a religious, political, philosophical or ideological message or statement which is inextricably intertwined with the merchandise." *Id.* Permit holders who violated the rules were subject to criminal penalties, and the plaintiff Hunt — a seller of shea butter — had been arrested for violating the ordinance. *Id.* at 708. The court found that the ordinance was unconstitutional because its exemptions allowing expression-related sales were too vague: the law failed to give fair warning of what conduct was proscribed and what conduct fell within the exemptions. *Id.* at 711-13.

Similarly, in *Nunez v. San Diego*, 114 F.3d 935 (9th Cir. 1997), the court struck down as unconstitutionally vague a San Diego penal ordinance prohibiting "loitering." In reaching its decision, the court found that "[t]he key to determining whether the San Diego ordinance is unconstitutionally vague is to determine the breadth of the ordinance's basic proscription *in light of the enumerated exceptions.*" *Id.* at 940 (emphasis added); *see also United States v. Farhane*, 634 F.3d 127, 142-44 (2d Cir. 2011) (considering whether a statutory exemption contained in 18 U.S.C. § 2339A(b)(1) renders the statute unconstitutionally vague, but finding the statute not vague); *Planned Parenthood of Idaho v. Wasden*, 376 F.3d 908, 932-33 (9th Cir. 2004) (striking down an abortion statute in part because the criminal provision applying to doctors was subject to a vague exemption); *United States v. Clark*, 912 F.2d 1087, 1090 (9th Cir. 1990) (considering whether language in the exemption for Alaskan natives contained in 16 U.S.C. § 1371 rendered the statute unconstitutionally vague, but ultimately determining that the exemption provided sufficient notice of the proscribed conduct).

Here, in light of the exemptions set forth in §§ 373(a) and 822(c)(2), it was not

"reasonably clear at the relevant time that [FedEx's alleged] conduct was criminal"

under the CSA, FDCA or the money laundering statutes. *See Lanier*, 520 U.S. at 266.

To the contrary, for all the reasons discussed in Part IV, *supra*, the common carrier

exemptions appeared affirmatively to make FedEx's conduct *legal*. Especially in the

context of the historical protections against criminal liability afforded to common carriers

transporting pharmaceuticals and other goods, the CSA and FDCA are not merely

vague or unclear; rather, sections 373(a) and 822(c)(2) have operated — at least until

this case — to proactively inform common carriers that they are not subject to

prosecution merely for carrying pharmaceuticals, whether improperly prescribed or not.

To be sure, an otherwise-vague statute may be saved by judicial decisions giving

the law more definite boundaries. *See, e.g., Grayned*, 408 U.S. at 110-12. But here

there are no judicial decisions carefully interpreting §§ 373(a) or 822(c)(2), and certainly

none that would have given fair warning to FedEx that its transportation of

pharmaceuticals could give rise to criminal liability. Even if this Court were to interpret

the exemptions in such a way as to permit criminal liability, retroactive application of that

interpretation to FedEx's conduct would violate due process. *See Marks*, 430 U.S. at

191-92; *Clark v. Brown*, 450 F.3d 898, 911 (9th Cir. 2006); *Webster v. Woodford*, 369

F.3d 1062, 1066-67, 1070-71 (9th Cir. 2004).

## VI. CONCLUSION

For all of the foregoing reasons, all charges in the indictment must be dismissed.

Dated: March 25, 2015

Respectfully submitted,                    ARGUEDAS, CASSMAN & HEADLEY, LLP


By: _____/s/_____
                    Raphael M. Goldman
                    803 Hearst Avenue
                    Berkeley, CA 94710
                    (510) 845-3000

                    Counsel for FedEx Corporation,
                    Federal Express Corporation and
                    FedEx Corporate Services, Inc.