Cristina C. Arguedas (CalBN 87787)
    Email: arguedas@achlaw.com
Ted W. Cassman (CalBN 98932)
    Email: cassman@achlaw.com
Raphael M. Goldman (CalBN 229261)
    Email: goldman@achlaw.com
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone: (510) 845-3000
Facsimile: (510) 845-3003

Allen J. Ruby (CalBN 47109)
    Email: allen.ruby@skadden.com
Jack P. DiCanio (CalBN 138782)
    Email: jack.dicanio@skadden.com
Patrick Hammon (CalBN 255047)
    Email: patrick.hammon@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA  94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570

*Counsel for FedEx Corporation,
Federal Express Corporation and
FedEx Corporate Services, Inc.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FEDEX CORPORATION, FEDERAL EXPRESS CORPORATION, and FEDEX CORPORATE SERVICES, INC.,<br><br>Defendants. | **No. CR 14-380 (CRB)**<br><br>**MOTION BY FEDEX DEFENDANTS FOR DISCLOSURE OF INSTRUCTIONS TO THE GRAND JURY**<br><br>Date: December 16, 2015<br>Time: 2:00 p.m.<br>Hon. Charles R. Breyer |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

I.    INTRODUCTION .................................................................................... 1

II.   PROCEDURAL HISTORY ...................................................................... 3

      A.    The Indictment ............................................................................ 3

      B.    FedEx's Motion to Dismiss the Indictment Pursuant to the Common
            Carrier Exemptions Enshrined in Title 21 of the United States Code ....... 3

      C.    *PG&E* ........................................................................................ 5

      D.    The Prosecution Declined to Disclose Records of the Instructions .......... 5

III.  DISCUSSION ......................................................................................... 6

      A.    The Instructions are Ministerial Records and No Presumption of
            Secrecy Attaches ......................................................................... 6

      B.    In the Alternative, the Instructions Should be Disclosed Because
            FedEx has Demonstrated a Particularized Need ...................... 8

            1.    The Standard for Ordering Disclosure Under Rule 6(e)(3) ............. 8

            2.    Instructional Errors May Support Dismissal ................................ 10

                  a.    Instructions Concerning the Common Carrier
                        Exemptions ........................................................ 11

                        i.    The Indictment's Allegations ................................ 13

                        ii.   The Government's Arguments in Litigation ............. 15

                  b.    Instructions Concerning Principles of Corporate
                        Criminal Liability ................................................ 17

                  c.    Instructions Concerning the Alternative Fines Act ............. 21

IV.   CONCLUSION ........................................................................................ 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988) ........................................11

*Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211 (1979)...........8, 9

*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004) ........16

*First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256 (S.D.N.Y. 1988) ......20

*Ginena v. Alaska Airlines, Inc.*, No. 2:04-CV-01304-MMD-CWH, 2013 U.S. Dist.
LEXIS 86162 (D. Nev. June 19, 2013) ...........................................................................19

*Gonzales v. Raich*, 541 U.S. 1 (2005) ...........................................................................16

*Gutter v. E.I. DuPont de Nemours*, 124 F. Supp. 2d 1291 (S.D. Fla. 2000) ................19

*In re Special Grand Jury (Anchorage, Alaska)*, 674 F.2d 778 (9th Cir. 1982) ...............7

*McVey v. McVey*, 26 F. Supp. 3d 980 (C.D. Cal. 2014) ..................................................2

*Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395 (1959)................................8

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006) .....................2

*Saba v. Compagnie Nationale Air Fr.*, 78 F.3d 664 (D.C. Cir. 1996) ...........................19

*Staub v. Proctor Hospital*, 562 U.S. 411 (2011) ...........................................................19

*TRW, Inc. v. Andrews*, 534 U.S. 19 (2001) ...................................................................16

*United States v. Alter*, 482 F.2d 1016 (9th Cir. 1973)......................................................7

*United States v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987) ................18

*United States v. Belton*, No. 14-cr-00030-JST, 2015 U.S. Dist. LEXIS 52426
(N.D. Cal. Apr. 21, 2015) ..................................................................................................7

*United States v. Bowling*, No. 7:14-CR-98-D, 2015 U.S. Dist. LEXIS 70802
(E.D.N.C. May 26, 2015) ................................................................................................11

*United States v. BP Products North America*, 610 F. Supp. 2d 655 (S.D. Tex.
2009) ...............................................................................................................................22

*United States v. Breslin*, 916 F. Supp. 438 (E.D. Penn. 1996) ....................................11

*United States v. Beusch*, 596 F.2d 871 (9th Cir. 1979) ...............................................17

*United States v. Caruto*, 663 F.3d 394 (9th Cir. 2011) ............................................. 10, 11

*United States v. Cerullo*, No. 05-cr-1190, 2007 U.S. Dist. LEXIS 101358 (S.D. Cal. Aug. 28, 2007) ....................................................................................................... 11

*United States v. Citgo Petroleum Corp.*, 908 F. Supp. 2d 812 (S.D. Tex. 2012) .......... 22

*United States v. Diaz*, 236 F.R.D. 470 (N.D. Cal. 2006) ................................................. 7

*United States v. Dionisio*, 410 U.S. 1 (1973) ............................................................... 10

*United States v. Fischbach & Moore, Inc.*, 776 F.2d 839 (9th Cir. 1985) ....................... 9

*United States v. Ferreboeuf*, 632 F.2d 832 (9th Cir. 1980) ........................................... 11

*United States v. Fuentes*, No. CR.S-07-0248 WBS, 2008 U.S. Dist. LEXIS 50425 (E.D. Cal. Jun. 24, 2008) ............................................................................................... 7

*United States v. Hilton Hotels Corp.*, 467 F.2d 1000 (9th Cir. 1972) ........................... 17

*United States v. Hui Hsiung*, 778 F.3d 738 (9th Cir. 2015) (amended) ....................... 22

*United States v. Jack*, No. CR.S-07-0266 FCD, 2009 U.S. Dist. LEXIS 133638 (E.D. Cal. Feb. 20, 2009) ................................................................................................ 7

*United States v. Kenny*, 645 F.2d 1323 (9th Cir. 1981) ................................................ 11

*United States v. LBS Bank-New York, Inc.*, 757 F. Supp. 496 (E.D. Pa. 1990) ............ 20

*United States v. Marcucci*, 299 F.3d 1156 (9th Cir. Cal. 2002) .................................... 10

*United States v. Murray*, 751 F.2d 1528 (9th Cir. 1985) ................................................ 8

*United States v. Navarro*, 608 F.3d 529 (9th Cir. 2010) ............................................... 11

*United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir. 2005) (en banc) ................ 10

*United States v. Nosal*, 676 F.3d 854, 860-63 (9th Cir. 2012) (en banc) ..................... 15

*United States v. Pacific Gas & Electric Co.*, No. 14-cr-175 (TEH) ........................*passim*

*United States v. Pacific Gas & Electric Co.*, No. 14-cr-175 (TEH), 2015 U.S. Dist. LEXIS 84139 (N.D Cal. Jun. 29, 2015) ..................................................................... 7, 8, 9

*United States v. Peralta*, 763 F. Supp. 14 (S.D.N.Y. 1991) .......................................... 11

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) .................... 19

*United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 147-148 (D.D.C. 2012) ........... 2, 21

*United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010).......19

*United States v. Sells Eng'g, Inc.*, 463 U.S. 418 (1983) ................................................12

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940).......................................9

*United States v. Stevens*, 771 F. Supp. 2d 556 (D. Md. 2011) .....................................11

*United States v. T.I.M.E.-D.C., Inc.*, 381 F. Supp. 730 (W.D. W. Va. 1974) ................18

*United States v. Williams*, 504 U.S. 36 (1992) ...........................................................11

*Wood v. Georgia*, 370 U.S. 375 (1962) ......................................................................10


**States and Other Authorities**

18 U.S.C. § 3571 ........................................................................................*passim*

21 U.S.C. § 373 .........................................................................................*passim*

21 U.S.C. § 822 .........................................................................................*passim*

21 U.S.C. § 841 ...............................................................................................16

21 U.S.C. § 844 ...............................................................................................16

21 U.S.C. § 846 .................................................................................................3

FDA Compliance Policy Guide § 100.500 (1989) ...........................................13

Federal Rule of Criminal Procedure 6 ..........................................................6, 7, 8, 10

Federal Rule of Evidence 201 ........................................................................2

Thomas A. Hagemann & Joseph Grinstein, *The Mythology of Aggregate Corporate Knowledge: a Deconstruction*, 65 Geo. Wash L. Rev. 210 (1997)..............19

United States Attorneys' Manual, available at *http://www.justice.gov/usam/united-states-attorneys-manual*....................................................................................12

**I.      INTRODUCTION**

On December 16, 2015 at 2:00 p.m. in the above-titled Court, FedEx Corporation, Federal Express Corporation and FedEx Corporate Services, Inc. (collectively, "FedEx") will and hereby do move this Court for an order directing the disclosure of any legal instructions provided by the prosecution to the grand jury related to the following matters:

- the defenses established by the "common carrier" exemptions set forth in 21 U.S.C. § 373(a) and 21 U.S.C. § 822(c)(2);

- principles of "collective" *mens rea* and corporate liability under the criminal law; and

- the Alternative Fines Act, 18 U.S.C. § 3571(d), or the "gross gains" derived by FedEx and its alleged co-conspirators.

First, the allegations in the indictment make it apparent that the grand jury almost certainly received some type of instruction about the defenses established by 21 U.S.C. § 373(a) and 21 U.S.C. § 822(c)(2).  But the indictment itself and the government's responses to our earlier motion to dismiss demonstrate that the government improperly understood those defenses, and therefore establish a strong likelihood that government attorneys erroneously instructed the grand jury on the governing law.

Second, the grand jury must have received instructions concerning the circumstances under which the corporations under investigation could be said to have possessed the *mens rea* required for conviction of the charged crimes.  In a case arising from another grand jury investigation of a corporation that was conducted at the same time as the FedEx investigation, Judge Thelton Henderson ordered disclosed to

the defense grand jury instructions concerning principles of corporate *mens rea* and collective knowledge, and the corporation has moved to dismiss the indictment against it based on the government's erroneous grand jury instructions.  *See United States v. Pacific Gas & Electric Co.*, No. 14-cr-175 (TEH) ("*PG&E*") Dkt. 103, 110, 127.[1]

Third, government attorneys almost certainly instructed the grand jury concerning the meaning of the term "gross gain" as used in the Alternative Fines Act., 18 U.S.C. § 3571(d).  Although the jurisprudence concerning the precise meaning of "gross gain" is unsettled, the leading case held that the term does not refer to revenues but rather to pre-tax profits.  *See United States v. Sanford Ltd.,* 878 F. Supp. 2d 137, 147-148 (D.D.C. 2012).  Given the state of the law, and the fact that the PG&E grand jury received a plainly erroneous instruction at around the same time that the FedEx grand jury investigation was proceeding, there is a significant likelihood that the FedEx grand jury was misinstructed.

If the grand jury that indicted FedEx received erroneous instructions, the errors may have constituted a violation of the Fifth Amendment requirement that the grand jury act independently, and may therefore form the basis for a motion to dismiss the indictment or certain counts or allegations therein.  The Court should order the prosecution to disclose to the defense the requested instructions, or, in the alternative, order the records to be provided to the Court itself for *in camera* review.

---

[1] FedEx requests that the Court take judicial notice of the filings in the *PG&E* docket.  *See* Fed. R. Evid. 201; *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *McVey v. McVey*, 26 F. Supp. 3d 980, 984 (C.D. Cal. 2014).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   PROCEDURAL HISTORY

### A.   The Indictment

The superseding indictment ("indictment") in this matter generally alleges that FedEx participated in conspiracies with two separate online pharmacy networks: the so-called "Chhabra-Smoley Organization," and a network of businesses and people associated with a pharmacy called Creative Pharmacy or Superior Drugs.  *See* Dkt. 28, *passim*.  Counts One and Thirteen charge FedEx with conspiring with the Chhabra-Smoley Organization and the Superior Drugs networks, respectively, to violate 21 U.S.C. § 846.  Dkt. 28 ¶¶ 22-40, 70-87.  Those counts include essentially identical allegations concerning FedEx's supposed departure from its usual business practices:

> FEDEX departed from its usual business practices to participate in and facilitate the [online pharmacy network's] unlawful sale of controlled substances.  According to FEDEX's Service Guide and Tariff, as well as the understanding of its employees, FEDEX did not ship contraband, including illegal drugs, in the usual course of business.  FEDEX also deviated from its usual course of business by applying its Online Pharmacy Credit Policy to the [online pharmacy network].  FEDEX further deviated from its usual course of business by placing assigning accounts associated with the [online pharmacy network] to the catchall classification for purposes of determining compensation for its sales executives, pursuant to FEDEX's Online Pharmacy Catchall Policy.

Dkt. 28 ¶¶ 39 & 84.

In a special "sentencing allegation," the indictment avers that, "for purposes of determining the alternative maximum fine pursuant to Title 18, United States Code, Section 3571(d)," FedEx and its supposed "coconspirators derived gross gains of at least $820,000,000."  Dkt. 28 ¶ 126.

### B.   FedEx's Motion to Dismiss the Indictment Pursuant to the Common Carrier Exemptions Enshrined in Title 21 of the United States Code

The Controlled Substances Act ("CSA") and the Food, Drug and Cosmetic Act

("FDCA") each establish defenses for common carriers like FedEx that carry

prescription pharmaceuticals as part of the usual course of their business.  The CSA

provides that

> [t]he following persons shall not be required to register and may lawfully possess any controlled substance or list I chemical under this title: . . . . (2) A common or contract carrier or warehouseman, or an employee thereof, whose possession of the controlled substance or list I chemical is in the usual course of his business or employment.

21 U.S.C. § 822(c).  Similarly, the FDCA provides that "carriers engaged in interstate

commerce . . . . shall not be subject to the other provisions of this Act by reason of their

receipt, carriage, holding or delivery of food, drugs, services, tobacco products, or

cosmetics in the usual course of their business as carriers . . . ."  21 U.S.C. § 373(a).

FedEx argued in its previously-filed motion to dismiss the indictment that these

provisions apply on the face of the charging document.  Dkt. 87 at 12-35; *see also* Dkt.

95 (reply brief), *passim*.

The government's primary argument in opposition to FedEx's motion was that the

common carrier exemptions in 21 U.S.C. §§ 373 and 822 have a hidden meaning:

common carriers "may possess controlled substances [only] *to the extent that such*

*possession is otherwise lawful under the CSA*."  Dkt. 93 at 1, 6, 12 (emphasis added).

The government's opposition also relied on the allegations concerning FedEx's "usual

business practices" contained in paragraphs 39 and 84 of the indictment.  The

government contended that that FedEx had "established special policies that applied

only to Internet pharmacies" and argued that the allegations in paragraphs 39 and 84, if

proven, would establish as a matter of law that FedEx acted outside the usual course of

business.  Dkt. 93 at 14, 17.

At the hearing on FedEx's motion, the Court declined to dismiss the indictment, finding that Congress would not have written a law that would allow a carrier to "knowingly deliver illicit drugs and be exempted."  Dkt. 105 (Transcript of 5/14/2015 Hearing) at 13:3-5.[2]  But the Court also appeared to find unpersuasive the government's interpretation of the common carrier exemptions.  *Id.* at 17:9-19:11.

### C.   *PG&E*

In *PG&E* — another prosecution of a corporate entity proceeding in the Northern District of California — the grand jury was empaneled during the same period as the one that indicted FedEx, and it returned an indictment less than four months before the initial indictment in this case.  *See PG&E* Dkt. 1 & 127.  PG&E asked Judge Henderson for an order disclosing transcripts of grand jury instructions because they could form the basis for a motion to dismiss the indictment.  *PG&E* Dkt. 69.  After reviewing the instructions *in camera*, Judge Henderson disclosed to the defense instructions concerning principles of corporate *mens rea* and collective knowledge, and PG&E has moved to dismiss the indictment against it based on errors in those instructions.  *See PG&E* Dkt. 103, 110, 127.  Judge Henderson also ordered disclosed to PG&E records of instructions concerning the Alternative Fines Act, 18 U.S.C. § 3571(d).  *See PG&E* Dkt. 103, 110, 127.

### D.   The Prosecution Declined to Disclose Records of the Instructions

On an October 1, 2015 telephone call with government attorneys, undersigned counsel requested that the government produce transcripts of the instructions that

---

[2] FedEx respects the Court's ruling on the motion to dismiss, but, for the record, disagrees with the ruling and reserves the company's objection to the indictment.

FedEx seeks in this motion.  Declaration of Raphael M. Goldman ¶ 2.  The government attorneys would not agree to provide the transcripts.  *Id.*

## III.   DISCUSSION

The Court should order disclosure of transcripts or copies of any legal instructions provided to the grand jury concerning the following matters:

- the defenses established by the "common carrier" exemptions set forth in 21 U.S.C. § 373(a) and 21 U.S.C. § 822(c)(2);

- principles of "collective" *mens rea* and corporate liability under the criminal law; and

- the Alternative Fines Act, 18 U.S.C. § 3571(d), or the "gross gains" derived by FedEx and its alleged co-conspirators;

as well as any answers to questions the jurors may have asked about these subjects. Disclosure is appropriate because such records are "ministerial" records of the grand jury and not governed by principles of grand jury secrecy.  In the alternative, even if the instructions were subject to grand jury secrecy rules, disclosure would still be appropriate because FedEx has established a particularized need for these records.

### A.   The Instructions are Ministerial Records and No Presumption of Secrecy Attaches

Federal Rule of Criminal Procedure 6(e) generally obligates the government to keep secret "a matter occurring before the grand jury."  *See* Rule 6(e)(2) & (3).  Not every record related to grand jury proceedings, however, constitutes a "matter occurring before the grand jury" subject to Rule 6(e)'s secrecy provisions.  The Ninth Circuit has held that ministerial records, such as "the ground rules by which the grand jury conducts [its] proceedings," are not governed by Rule 6(e) and are instead public records that the

public has a right to access.  *See In re Special Grand Jury (Anchorage, Alaska)*, 674 F.2d 778, 779 n.1, 780-81, 784 (9th Cir. 1982); *United States v. Alter*, 482 F.2d 1016, 1028-29 & n.21 (9th Cir. 1973).

Several district courts in this circuit have applied the principles of *Special Grand Jury* and *Alter* in holding that the instructions received by a grand jury are not governed by the secrecy provisions of Rule 6(e), and thus that a defendant is "entitled to disclosure of the[ ] instructions even without a showing of particularized need."  *United States v. Belton*, No. 14-cr-00030-JST, 2015 U.S. Dist. LEXIS 52426 at *8-9 (N.D. Cal. Apr. 21, 2015); *see also, e.g., United States v. Jack*, No. CR.S-07-0266 FCD, 2009 U.S. Dist. LEXIS 133638 at *6-8, *13 (E.D. Cal. Feb. 20, 2009); *United States v. Fuentes*, No. CR.S-07-0248 WBS, 2008 U.S. Dist. LEXIS 50425 at *4-6, *10 (E.D. Cal. Jun. 24, 2008); *United States v. Diaz*, 236 F.R.D. 470, 475-76, 477-78 (N.D. Cal. 2006).

The *PG&E* court recognized a split between the above-cited authorities from the Ninth Circuit and some out-of-circuit cases.  *See PG&E*, No. 14-cr-00175-TEH, 2015 U.S. Dist. LEXIS 84139 at *37-38 (N.D Cal. Jun. 29, 2015) (citing cases).  The *PG&E* court ordered *in camera* review of grand jury instructions to determine the propriety of their production to the defense:

> [T]he Court does not believe that the legal instructions provided to the grand jury are necessarily separate from the substance of the grand jury's deliberations.  Whether the instructions go to the substance will depend to some extent on the format of their presentation — for example, whether they are distributed as a discrete printout with no relation to the evidence, or presented in a colloquy while the prosecutor makes connections to the evidence.  It is impossible to know at the outset whether instructions can be disclosed without compromising the secrecy of the grand jury's deliberations.  [¶]  Accordingly, the Court finds that in camera review of the legal instructions that the Government provided to the grand jury is appropriate.

1   *Id.* at *38.

2       This Court should follow the approach of *Belton*, *Jack*, *Fuentes* and *Diaz* and

3   order disclosure of the grand jury instructions to FedEx.  Alternatively, the Court should

4   follow *PG&E* and inspect the instructions *in camera* to determine whether they

5   somehow disclose the substance of the grand jury's deliberations, and thereafter

6   disclose to the defense those legal instructions that do not implicate grand jury secrecy.

7

8       **B.      In the Alternative, the Instructions Should be Disclosed Because
            FedEx has Demonstrated a Particularized Need**

9

10      Even if the secrecy provisions of Rule 6(e) governed this request for disclosure of

11  grand jury instructions, disclosure would be appropriate.  Rule 6(e)(3) sets out various

12  exceptions to the secrecy rules; one exception permits the court to order disclosure of

13  grand jury materials "at the request of a defendant who shows that a ground may exist

14  to dismiss the indictment because of a matter that occurred before the grand jury."  Rule

15  6(e)(3)(E)(ii).  Such a ground exists in this case.

16

17          1.      The Standard for Ordering Disclosure Under Rule 6(e)(3)

18      Discovery of grand jury proceedings under Rule 6(e)(3)(E)(ii) "may be ordered if

19  the party seeking disclosure has demonstrated that a particularized need exists that

20  outweighs the policy of grand jury secrecy."  *United States v. Murray*, 751 F.2d 1528,

21  1533 (9th Cir. 1985); *see also Douglas Oil Co. of California v. Petrol Stops Northwest*,

22  441 U.S. 211, 222-23 (1979).  The decision whether to disclose grand jury materials is

23  committed to the "sound discretion of the trial court."  *Murray*, 751 F.2d at 1528 (citing

24  *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959)); *see also*

25

26  *Douglas Oil*, 441 U.S. at 223.

27      Although the requesting party bears the burden of showing that disclosure of

28

grand jury materials is warranted, "as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification."  *Douglas Oil*, 441 U.S. at 223; *see also United States v. Fischbach & Moore, Inc.*, 776 F.2d 839, 843 (9th Cir. 1985).  Grand jury secrecy vindicates several interests:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony.  Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements.  There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment.  Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas Oil*, 441 U.S. at 219.  These interests fade when, for example, an indictment has already been returned or the grand jury otherwise discharged, *see United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 233-34 (1940); *Fischbach & Moore*, 776 F.2d at 844; *PG&E*, 2015 U.S. Dist. LEXIS 84139 at *26, or when portions of the grand jury transcripts have already been disclosed, *see Douglas Oil*, 441 U.S. at 222 n.13; *Fischbach & Moore*, 776 F.2d at 844; *PG&E*, 2015 U.S. Dist. LEXIS 84139 at *26.

In this case, the interests of grand jury secrecy are not seriously implicated. FedEx has already been indicted, the prosecution has already disclosed a number of grand jury transcripts pursuant to its Jencks Act obligations, and FedEx is not seeking material that relates to testimony by witnesses.  On the other hand, FedEx has a great need for disclosure of the prosecution's instructions to the grand jury because the instructions were likely erroneous, and the errors may support dismissal of the indictment.

1

2.   Instructional Errors May Support Dismissal

2

As discussed, Rule 6(e)(3)(E)(ii) permits the disclosure of grand jury matters if "a

3

ground may exist to dismiss the indictment because of a matter that occurred before the

4

grand jury."  Here, the indictment may have to be dismissed because it appears that the

5

prosecution erroneously instructed the grand jury in several ways.

6

7

"The text of the Fifth Amendment simply provides for the right to indictment by a

8

grand jury and does not explain how the grand jury is to fulfill this constitutional role."

9

*United States v. Navarro-Vargas*, 408 F.3d 1184, 1188 (9th Cir. 2005) (en banc).  "Such

10

details were either assumed by the framers of the Bill of Rights or left to Congress, the

11

Executive, and the Judiciary to flesh out."  *United States v. Caruto*, 663 F.3d 394, 399

12

(9th Cir. 2011) (citing *Navarro-Vargas*, 408 F.3d at 1188).

13

> Historically, [the grand jury] has been regarded as a primary security to the
> innocent against hasty, malicious and oppressive persecution; it serves the
> invaluable function in our society of standing between the accuser and the
> accused, whether the latter be an individual, minority group, or other, to
> determine whether a charge is founded upon reason or was dictated by an
> intimidating power or by malice and personal ill will.

14

15

16

17

18

*United States v. Marcucci*, 299 F.3d 1156, 1161 (9th Cir. Cal. 2002) (quoting *Wood v.*

19

*Georgia*, 370 U.S. 375, 390 (1962); alteration added by *Marcucci* court).  "The grand

20

jury's ability to fulfill its historical role effectively flows in part from its unusual position in

21

the Constitution's structure.  The grand jury belongs to no branch of government, but is

22

a constitutional fixture in its own right."  *Caruto*, 663 F.3d at 398 (quotation marks

23

24

omitted).  Thus, the Fifth Amendment "presupposes an investigative body acting

25

independently of either prosecuting attorney or judge."  *United States v. Dionisio*, 410

26

U.S. 1, 16 (1973) (quotation marks omitted).  "The Fifth Amendment may be violated,"

27

28

and dismissal required, "if the independence of the grand jury in performing its historical

1   function is substantially infringed."  *Caruto*, 663 F.3d at 398.

2       A prosecutor is not required to instruct the grand jury in order to secure an

3   indictment, *see United States v. Kenny*, 645 F.2d 1323, 1347 (9th Cir. 1981), nor must a

4   prosecutor present exculpatory evidence to the grand jury, *see United States v.*

5   *Williams*, 504 U.S. 36, 55 (1992).  Nonetheless, when the prosecution does instruct the

6   grand jury, and the instruction is erroneous, such error can infringe on the

7   independence of the grand jury; dismissal of an indictment is appropriate if the grand

8   jury received erroneous instructions and the error "substantially influenced the grand

9   jury's decision to indict or if there is grave doubt that the decision to indict was free from

10  the substantial influence of such violations."  *United States v. Navarro*, 608 F.3d 529,

11  539 (9th Cir. 2010) (relying on *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256

12  (1988)); *see also Caruto*, 663 F.3d at 399; *PG&E*, 2015 U.S. Dist. LEXIS 84139 at *27;

13  *United States v. Bowling*, No. 7:14-CR-98-D, 2015 U.S. Dist. LEXIS 70802 at *22-23

14  (E.D.N.C. May 26, 2015); *United States v. Stevens*, 771 F. Supp. 2d 556, 567-68 (D.

15  Md. 2011); *United States v. Cerullo*, No. 05-cr-1190*,* 2007 U.S. Dist. LEXIS 101358 at

16  *8-9 (S.D. Cal. Aug. 28, 2007); *United States v. Breslin*, 916 F. Supp. 438, 442-46 (E.D.

17  Penn. 1996); *United States v. Peralta*, 763 F. Supp. 14, 19-21 (S.D.N.Y. 1991).

18      Although "[m]ere unsubstantiated, speculative assertions of improprieties in the

19  [grand jury] proceedings do not supply the 'particular need' required to outweigh the

20  policy of grand jury secrecy," *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir.

21  1980), FedEx's claims are manifestly substantial.

22          a.      *Instructions Concerning the Common Carrier Exemptions*

23      The Court denied FedEx's motion to dismiss the indictment pursuant to the

defenses enshrined in 21 U.S.C. § 373(a) and 822(c)(2).  *See* Dkt. 98 & 105.  By this motion, we do not seek to question or revisit that ruling.  Rather, we demonstrate that the government's previous articulations of the common carrier defenses are plainly incorrect and that its legal instructions to the grand jury must therefore have been erroneous.  The Court should order disclosed to FedEx records of any instructions provided by the prosecution to the grand jury concerning those defenses.

As an initial matter, it appears very likely that the prosecution issued *some* instructions to the grand jury concerning the common carrier exemptions.  Although the grand jury is constitutionally independent and prosecutors may not have an absolute duty to instruct the grand jurors, the Supreme Court has recognized that the "modern grand jury" relies extensively on the prosecution in discharging its duties.  *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 430 (1983).  This includes the prosecutor's "advis[ing] the law jury on the applicable law."  *Id.*  Accordingly, the provisions of the United States Attorneys' Manual ("USAM") relating to the grand jury, available at *http://www.justice.gov/usam/usam-9-11000-grand-jury,* suggest that legal instructions are provided to grand juries in the usual course.  The USAM states that "[t]he prosecutor's responsibility is to advise the grand jury on the law and to present evidence for its consideration."  USAM § 9-11.010.  The USAM further states that "[i]t is the policy of the Department of Justice . . . that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person."  USAM § 9-11.233.  The USAM's policy statements alone raise the strong likelihood that the prosecution

addressed with the grand jury the common carrier exemptions enshrined in the CSA and FDCA.

Furthermore, the indictment includes allegations that appear specifically targeted at defeating the common carrier exemptions.  Paragraphs 39 and 84 of the indictment allege that FedEx "departed from its usual business practices" and "deviated from its usual course of business."  Dkt. 28 ¶¶ 39 & 84.  Those allegations would be irrelevant to the charges if they did not relate to the common carrier exemptions, and, indeed, the government pointed to those paragraphs in defending against FedEx's motion to dismiss pursuant to the common carrier exemptions.  *See* Dkt. 93 at 14, 17.  Again, these facts strongly suggest that the prosecution instructed the grand jury concerning the common carrier exemptions.

Based on the allegations contained in the indictment and the government's positions in prior litigation, the Court can only conclude that whatever instruction the prosecution gave on these crucial matters must have been erroneous.

### i.    The Indictment's Allegations

The allegations in paragraphs 39 and 84 of the indictment suggest that the grand jury was misled about the legal import of the common carrier exemptions.  Paragraphs 39 and 84 assert that FedEx, in servicing online pharmacies generally and the Chhabra-Smoley and Superior Drugs networks' accounts specifically, "departed from its usual business practices."  Dkt. 28 ¶¶ 39 & 84.  But whether FedEx adhered to its own self-developed "usual business practices" is not the proper inquiry under the statutes.  Rather, the question is whether FedEx was acting in the usual course of business of a common carrier.  *See* Dkt. 87 at 17-20; FDA Compliance Policy Guide § 100.500

(1989).

Furthermore, the factual assertions in paragraphs 39 and 84 point to a misunderstanding of the meaning of "usual course of business."  The indictment alleges that:

- the Terms and Conditions in FedEx's *Service Guide* prohibited customers from shipping contraband using the company's system, and thus when FedEx permitted online pharmacies to ship pharmaceuticals that were not dispensed pursuant to a valid doctor-patient relationship, it was no longer acting in the usual course of its business;

- FedEx's Credit department applied restrictive credit policies to all accounts associated with the online pharmacy industry, including the Chhabra-Smoley and Superior Drugs networks' accounts; and

- the company's Sales group assigned to a special "catchall" category all accounts associated with the online pharmacy industry, including those accounts related to the Chhabra-Smoley and Superior Drugs networks, which resulted in those accounts not affecting the yearly sales goals of account executives or their managers.

Dkt. 28 ¶¶ 39 & 84.  But the alleged fact that some online pharmacies may have violated the Terms and Conditions of FedEx's *Service Guide* is not relevant to a determination whether FedEx was acting in the usual course of business.  Surely numerous customers violate FedEx's shipping rules every day, but it does not follow that when FedEx transports such packages it is acting outside of the normal duties of a common carrier.  The fact that FedEx has self-imposed rules and restrictions on the use

of its network does not change the fact that the company is still operating as a common carrier if prohibited items are transported through that network — either knowingly or unknowingly.

The government's implicit contention appears to be that FedEx may define for itself the scope of the "usual course of business" of a common carrier.  That cannot be correct.  It would be an anomalous result if 21 U.S.C. §§ 373(a) and 822(c)(2) provided legal protection only to a common carrier that had terms of service that explicitly permitted customers to ship improperly-prescribed pharmaceuticals.  *Cf. United States v. Nosal*, 676 F.3d 854, 860-63 (9th Cir. 2012) (en banc) (refusing to construe a statute in such a manner that criminal liability would turn on standards established by private entities).

The indictment's allegations related to credit and payment terms and to the administration of FedEx's employee compensation programs are similarly misplaced.  These features do not undermine the conclusion that when FedEx allegedly picked up and delivered online pharmaceutical packages, the company was acting in the usual course of common carriage: transporting the public's packages from place to place.

In sum, the misdirected nature of the allegations in paragraphs 39 and 84 of the indictment strongly suggest that the grand jury was incorrectly instructed on the common carrier exemptions enshrined in Title 21.

ii.    The Government's Arguments in Litigation

The prosecution's misunderstanding of the common carrier exemptions was even more directly demonstrated by its positions in litigation before this Court.  The government's primary basis for opposing FedEx's motion to dismiss was its argument

that the common carrier exemptions mean that carriers "may possess controlled substances [only] *to the extent that such possession is otherwise lawful under the CSA.*" Dkt. 93 at 1, 6, 12 (emphasis added).  Whatever the meaning of the common carrier exemptions, it cannot be that.

The primary problem is that the government's reading entirely departs from the actual language of 21 U.S.C. §§ 373 and 822, thus flouting the main principle that should guide any effort to construe a statute: "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004); *see also* Dkt. 95 at 2. The government's proposed construction is also so circular as to be meaningless. Possession of a controlled substance is always unlawful under the CSA except when specific exemptions and authorizations apply.  *See* 21 U.S.C. §§ 841 & 844; *Gonzales v. Raich*, 541 U.S. 1, 12 (2005).  Section 822(c)(2) expressly establishes one such exemption.  But the government would limit its application only to instances in which the possession was *otherwise* lawful under the CSA — thereby effectively reading the exemption entirely out of the law.  Such a provision would be pointless, and the Court must not construe statutory provisions so as to render them "superfluous, void or insignificant."  *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *see also* Dkt. 95 at 2-6.

The government further evinced its misapprehension of the common carrier exemptions during oral argument on FedEx's motion to dismiss when it asserted that the exemptions apply only to medications traveling in "legitimate channels," a concept that is not even mentioned in the statutes.  *See* Dkt. 105 at 17-19; 21 U.S.C. §§ 373 &

822.

Cumulatively, the governments' proffered definitions of the common carrier exemptions raise an inference that its instructions to the grand jury incorrectly stated the law.  FedEx should have to opportunity to review the instructions to determine whether they fundamentally infringed upon the independence of the grand jury.

> b.   *Instructions Concerning Principles of Corporate Criminal Liability*

The government also very likely gave incorrect instructions concerning principles of corporate criminal liability.  Knowledge and specific intent are fundamental elements of the crimes charged in the indictment.  The FedEx defendants are large companies that collectively employ hundreds of thousands of people; the grand jury almost certainly needed guidance on how to determine whether such entities possessed the requisite knowledge and intent.  Yet the law in this area is unsettled, and the U.S. Attorney's Office gave dubious "collective scienter" instructions to another grand jury confronting the same issue at the same time as the FedEx grand jury investigation.  *See PG&E* Dkt. 127 at 4-5.  FedEx must have an opportunity to review the instructions provided to its grand jury to determine whether the jurors were properly instructed on these crucial matters.

Generally, under the criminal law "a corporation is liable . . . for the acts of its agents in the scope of their employment."  *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1007 (9th Cir. 1972); *accord United States v. Beusch*, 596 F.2d 871, 877-78 (9th Cir. 1979).  But the indictment in case, like the one in *PG&E*, *see PG&E* Dkt. 127 at 2, is unusual because it generally alleges that corporate defendants had criminal knowledge and intent without identifying any particular person who supposedly had

1  those states of mind.

2      A few courts have suggested that criminal culpability may extend beyond a

3  *respondeat superior* theory to encompass liability under a "collective knowledge" theory.

4

5  In *United States v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987), for

6  example, the First Circuit Court of Appeals stated that

7          [c]orporations compartmentalize knowledge, subdividing the elements of
8          specific duties and operations into smaller components.  The aggregate of
          those components constitutes the corporation's knowledge of a particular
9          operation.  It is irrelevant whether employees administering one component
          of an operation know the specific activities of employees administering
10         another aspect of the operation:

11              [A] corporation cannot plead innocence by asserting that the
12              information obtained by several employees was not acquired
                by any one individual who then would have comprehended its
13              full import.  Rather the corporation is considered to have
                acquired the collective knowledge of its employees and is held
14              responsible for their failure to act accordingly.

15  *Id.* at 856 (quoting *United States v. T.I.M.E.-D.C., Inc.*, 381 F. Supp. 730, 738-39 (W.D.

16
    W. Va. 1974)).  The *Bank of New England* court found that "[a] collective knowledge
17
    instruction is entirely appropriate in the context of corporate criminal liability," *id.*, and
18

19  approved the following instruction:

20          [T]he bank's knowledge is the totality of what all of the employees know
21          within the scope of their employment.  So, if Employee A knows one facet
            of the currency reporting requirement, B knows another facet of it, and C a
22          third facet of it, the bank knows them all.  So if you find that an employee
            within the scope of his employment knew that CTRs had to be filed, even if
23          multiple checks are used, the bank is deemed to know it.  The bank is also
24          deemed to know it if each of several employees knew a part of that
            requirement and the sum of what the separate employees knew amounted
25          to knowledge that such a requirement existed.

26  *Id.* at 855.

27      The Ninth Circuit has never held that knowledge may be proved in such a

28
    piecemeal manner in a criminal case, and the *Bank of New England* holding has been

*U.S. v. FedEx Corp. et al.*                    18          Motion to Disclose Grand Jury Instructions
No. CR 14-380 (CRB)

1  the subject of considerable subsequent criticism.  As one district court recently

2  explained, "commentators and later decisions have undermined the force of *Bank of*

3  *New England*'s collective knowledge doctrine" by showing that it has applied only in

4  cases of willful blindness — even in civil litigation.  *Ginena v. Alaska Airlines, Inc.*, No.

5  2:04-CV-01304-MMD-CWH, 2013 U.S. Dist. LEXIS 86162 at *22-23 (D. Nev. June 19,

6  2013) (citing Thomas A. Hagemann & Joseph Grinstein, *The Mythology of Aggregate*

7  *Corporate Knowledge: a Deconstruction*, 65 GEO. WASH L. REV. 210, 226-36 (1997));

8  *see also, e.g., Staub v. Proctor Hospital*, 562 U.S. 411, 418 (2011) (questioning

9  whether, under the federal common law of torts, "the malicious mental state of one

10  agent cannot generally be combined with the harmful action of another agent to hold the

11  principal liable for a tort that requires both"); *United States v. Science Applications Int'l*

12  *Corp.*, 626 F.3d 1257, 1275-76 (D.C. Cir. 2010) (refusing to apply a "collective

13  knowledge" theory in a False Claims Act case).

14       Moreover, even if corporate *knowledge* could be proved by aggregation, no court

15  has held that a corporation may be found to have a specific wrongful *intent* based on a

16  "collective intent" theory.  *See Saba v. Compagnie Nationale Air Fr.*, 78 F.3d 664, 670

17  n.6 (D.C. Cir. 1996) (citing *Bank of New England* for the proposition that "corporate

18  knowledge of certain facts [may be] accumulated from the knowledge of various

19  individuals, but the proscribed intent (willfulness) [must] depend[ ] on the wrongful intent

20  of specific employees"); *see also United States v. Philip Morris USA Inc.*, 566 F.3d

21  1095, 1122 (D.C. Cir. 2009) (describing as "dubious" the "collective intent" doctrine in a

22  civil RICO action seeking to establish that the defendants possessed the specific intent

23  to defraud consumers); *Gutter v. E.I. DuPont de Nemours*, 124 F. Supp. 2d 1291, 1311

(S.D. Fla. 2000) ("The knowledge necessary to form the requisite fraudulent intent must be possessed by at least one agent and cannot be inferred and imputed to a corporation based on disconnected facts known by different agents."); *United States v. LBS Bank-New York, Inc.*, 757 F. Supp. 496, 501 n.7 (E.D. Pa. 1990) (stating that "specific intent cannot be aggregated"); *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988) ("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual.").  The lack of any jurisprudential support for such an aggregation theory of intent makes perfect sense; it is difficult to conceive how a corporation could be said to have a wrongful intent if none of its employees had that intent.

Yet, as described in PG&E's motion papers, government attorneys instructed the PG&E grand jury that the company could be indicted based on a collective scienter theory.  *See PG&E* Dkt. 127 at 4-5.  Among other things, the government attorneys told the grand jury:

- "Another theory of liability is what they call the 'collective corporate knowledge doctrine' where you take the collective . . . the idea is the collective actions of employees are imputed to the corporation," *id.* at 4;

- "[D]id they have that intent, whether it was collectively through the individuals or even just one individual making decisions about what to do . . . do you see in the end that this – they're willful violations by the company through the actions of its employees," *id.*; and

- "It's the idea that you are imputing to a company the actions of all of its employees to get to the state of showing the company willfully violated the law

. . . . The idea being that the company, not any individual, but the company through the actions of all of its employees, that that — that liability imputes to the company," *id.* at 5.

Because the FedEx grand jury was empaneled at the same time as the PG&E grand jury, and in the same district, it is highly likely that the FedEx grand jury received similar instructions.  In light of the legally dubious nature of the *PG&E* instructions, FedEx must have a chance to determine whether instructions concerning corporate liability fundamentally infringed upon the independence of the grand jury in this case.

        *c.*     *Instructions Concerning the Alternative Fines Act*

18 U.S.C. § 3571 provides in pertinent part that an organization that has been found guilty of an offense may be fined up to (1) the amount specified in the statute establishing punishment for the offense, (2) not more than $500,000 or (3) pursuant to the alternative fine provision of subdivision (d), whichever is greater.  Section 3571(d), the alternative fine provision, provides as follows:

> If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may not be fined more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process.

The superseding indictment in this case includes an allegation that, "for purposes of determining the alternative maximum fine pursuant to Title 18, United States Code, Section 3571(d)," FedEx and its supposed "coconspirators derived gross gains of at least $820,000,000."  Dkt. 28 ¶ 126.

The courts have struggled to determine the proper the definition of "gross gain" as used in § 3571(d).  The leading case, *Sanford Ltd.,* 878 F. Supp. 2d 137, held that

the term "gross gain" means "pre-tax profit," not gross revenues or proceeds.  *Id.* at 147-148; *see also United States v. Citgo Petroleum Corp.,* 908 F. Supp. 2d 812, 814 (S.D. Tex. 2012) (citing cases).  The *Sanford* court emphasized that this conclusion is consistent with the language of § 3571(d) — which, after all, employs the word "gain" — the legislative history and the larger statutory regime that governs sentencing.  *But see United States v. BP Products North America*, 610 F. Supp. 2d 655, 683 (S.D. Tex. 2009) (stating in dictum that "'[g]ross' pecuniary gain or loss simply means that the court is not to reduce the amounts to a net sum, by deducting such items as costs").  There is to date no controlling authority from the Ninth Circuit on this issue.[3]

In light of the "[t]he prosecutor's responsibility . . . to advise the grand jury on the law," USAM § 9-11.010, it is likely that the grand jury that indicted FedEx received instructions on the meaning of "gross gain" as it considered its Alternative Fines Act allegation.  But the conflicting and unsettled jurisprudence on the meaning of the term makes it likely that any such instruction was wrong.  Moreover, the PG&E grand jury was told only that it should allege a gain under § 3571(d) that "we [the government] think is appropriate."  *PG&E* Dkt. 127 at 5.  FedEx should have an opportunity to review the government's instructions to its own grand jury for errors that infringed upon the independence of the grand jury.

---

[3] The Ninth Circuit recently affirmed a judgment in which the trial court had instructed the jury that "[g]ross gain is the additional revenue to the conspirators from the conspiracy.  That total gain should not be reduced by any taxes or costs associated with the sales of those products."  *United States v. Hui Hsiung*, 778 F.3d 738, 761 (9th Cir. 2015) (amended).  The proposition that "gross gain" meant gross revenues, without subtraction of costs, was not litigated in either the district court or the Ninth Circuit.

## IV.    CONCLUSION

For all of the reasons discussed herein, the Court should order the prosecution to produce all records of instructions provided by the prosecution to the grand jury concerning any of the following matters:

- the affirmative defenses established by 21 U.S.C. § 373(a) and 21 U.S.C. § 822(c)(2);

- principles of "collective" *mens rea* and corporate liability under the criminal law; and

- the Alternative Fines Act, 18 U.S.C. § 3571(d), or the "gross gains" derived by FedEx and its alleged co-conspirators;

as well as any answers to questions the jurors may have asked about these subjects. In the alternative, the Court should order that all such materials be disclosed to the Court *in camera* so that the Court may review them and produce to the defense such records as are appropriate and necessary to the inquiry whether the grand jurors were misled by erroneous instructions.

Dated: November 4, 2015

Respectfully submitted,          ARGUEDAS, CASSMAN & HEADLEY, LLP


By: _____/s/_____
                 Raphael M. Goldman
                 803 Hearst Avenue
                 Berkeley, CA 94710
                 (510) 845-3000

                 Counsel for Federal Express
                 Corporation, FedEx Corporation and
                 FedEx Corporate Services, Inc.