# U.S. MOTION IN LIMINE #6

**UNITED STATES' MOTION IN LIMINE #6 TO ADMIT STATEMENTS OF PARTY OPPONENTS AND TO PRECLUDE DEFENDANTS' INTRODUCTION OF THEIR EMPLOYEES' HEARSAY STATEMENTS**

The United States submits this motion in limine to address two evidentiary issues related to the admissibility of out-of-court statements made by employees of the defendants:

*First*, the United States requests a ruling that it may introduce into evidence relevant statements made by the defendants' employees as statements of a party opponent under Fed. R. Evid. 801(d)(2). These statements are not hearsay.

*Second*, the United States moves to preclude the defendants from introducing for the truth of the matter asserted out-of-court statements made by their own employees.  Offered by the defendants, these statements are hearsay and, except under narrow circumstances not present here, they are not admissible. The misunderstood and oft-abused "state of mind" exception to the prohibition on hearsay is not a refuge for defendants; to offer their own out-of-court statements, defendants must identify specific exceptions under Rules 803 or 804 to establish admissibility.

## BACKGROUND

**A.  Defendants' Employees' Statements**

The United States intends to introduce a number of e-mails, memoranda and other documents drafted by the defendants' employees.  These documents will demonstrate that the defendants conspired with the Internet pharmacies identified in the Superseding Indictment to deliver controlled substances and prescription drugs outside the usual course of professional practice and not for a legitimate medical purpose and that the defendants did so knowingly and intentionally.

In these documents, a few examples of which are attached, the defendants' employees discussed a variety of information directly relevant to proving the United States' case, such as that their on-line pharmacy customers were: (1) using fulfillment pharmacies that were shut down by the DEA, FDA, FBI, and state boards of pharmacy;[1] (2) using physicians, pharmacists and others associated with the organizations who were arrested, prosecuted and convicted for violating the Controlled Substances Act or otherwise illegally selling drugs;[2] (3) distributing controlled substances and prescription drugs based

---

[1] See, e.g., Exhibit 6A

[2] See, e.g., Exhibit 6B & 6C

on a customer's completion of an online questionnaire;[3] (4) included on lists of known Internet pharmacy customers maintained by FedEx's Credit and Sales organizations;[4] (5) subject to company-wide policies implemented by the FedEx Worldwide Revenue Operations organization to prevent FedEx from losing money in the event that the fulfillment or Internet pharmacies were shut down by law enforcement;[5] (6) transferring their orders to different fulfillment pharmacies when the pharmacy they were previously using was shut down by law enforcement;[6] (7) subject to company-wide policies implemented by FedEx's Sales organization to prevent sales employees from reductions in the portion of their compensation based on sales volume when large Internet or fulfillment pharmacies were closed by law enforcement; (8) using FedEx's services to deliver drugs to drug addicts and drug dealers; and (9) using FedEx's services to deliver drugs to persons who overdosed and were hospitalized or died.

**B.      The FedEx Defendants Are Agents of Each Other**

In support of their earlier motion to dismiss certain counts on statute-of-limitations grounds, defendants FedEx Corporation and FedEx Corporate Services ("FedEx Services") explained the relationship between the three FedEx entities charged in this case.  *See* Clerk's Record (CR) 161, Decl. of Clement E. Klank III ("Klank Decl."); CR 204, Supp. Decl. of Clement E. Klank III ("Supp. Klank Decl.").  FedEx Corporation is a publicly-traded holding company with several wholly owned subsidiaries, including FedEx Services and Federal Express Corporation ("FedEx Express").  Klank Decl. ¶ 3.  "FedEx Corporation provides strategic leadership and consolidated financial reporting for its subsidiary operating companies."  *Id.*  "FedEx Express is the world's largest express transportation company, offering time definite delivery to more than 220 countries and territories."  *Id.* ¶ 4.  "FedEx Services provides sales, marketing, information technology, and back office support to the other FedEx operating companies."  *Id.* ¶ 5.

The defendants also provided the Court with excerpts from some of their annual reports to stockholders and filings with the Securities and Exchange Commission.  *See* Klank Supp. Decl., Exs. A-

---

[3] See, e.g., Exhibit 6C

[4] See, e.g., Exhibit 6C

[5] See, e.g., Exhibit 6D & 6E

[6] See, e.g., Exhibit 6F

L.  These excerpts included pages from the Form 10-K that FedEx Express filed with the SEC on July 15, 2010, and the defendants explained that a full copy of the report ("2010 FedEx Express 10-K") was available at http://investors.fedex.com/financial-information/sec-filings/default.aspx.  *Id.* ¶ 8.  In this Form 10-K, FedEx Express explained that its "sister company" FedEx Services provided FedEx Express "with customer-facing sales, marketing, information technology and customer service support, as well as retail access for our customers through FedEx Office and Print Services, Inc. ('FedEx Office')."  2010 FedEx Express 10-K at 21.  FedEx Express further stated that it paid "salaries and benefits, depreciation and other costs for the sales, marketing, information technology and customer service support provided to us by FedEx Services and FedEx Office's net operating costs."  *Id.*  In the 2010 Form 10-K, FedEx Express reported these payments to FedEx Services under the expense line item "Intercompany charges."  *Id.* at 21.  *See also id.* at 40 ("FedEx Services performs marketing functions for us and the related charges are allocated to us and are reflected on the line item 'Intercompany charges' on the consolidated statements of income."); *id.* at 59 ("The costs of FedEx Services are allocated to us and are included in the expense line item 'Intercompany charges' based on metrics such as relative revenues or estimated services provided.").  FedEx Express further stated that the "Intercompany charges" line item also included "allocated charges from [FedEx Corporation] for management fees related to services received for general corporate oversight, including executive officers and certain legal and finance functions."  *Id.* at 21.  *See also id.* at 3 (explaining that FedEx Express's "parent holding company" was FedEx Corporation).

FedEx Express reported that its "Intercompany charges" were $2.129 billion in 2008, $2.093 billion in 2009, and $1.918 billion in 2010.  2010 FedEx Express 10-K at 23, 37.  In each of these years, these "Intercompany charges" represented between 8.8 and 9.4 percent of FedEx Express's total revenue.  *Id.* at 24.

## DISCUSSION

**A.  The United States May Introduce Statements of Employees of Each of The Defendants; These Statements Are Not Hearsay.**

Federal Rule of Evidence 801(d)(2) provides that a statement is a non-hearsay party admission if it "is offered against an opposing party" and:

(A)    was made by the party in an individual or representative capacity;

(B)    is one the party manifested that it adopted or believed to be true;

(C)    was made by a person whom the party authorized to make a statement on the subject;

(D)    was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

(E)    was made by the party's coconspirator during and in furtherance of the conspiracy.

*Id.* For purposes of this rule, the United States must prove by a preponderance of the evidence such "preliminary facts" as the existence of a conspiracy or the scope of an employment relationship. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987).

Pursuant to Rule 801(d)(2) the United States will offer statements that the defendants' employees made about matters within the scope of their employment.[7] These statements are non-hearsay under Rule 801(d)(2) for three reasons.

*First*, with respect to each defendant, the statements of that defendant's own employees are admissible as non-hearsay under the employee prong of Rule 801(d)(2)(D), which applies to any employee statements made during the employment on matters within the scope of the employment relationship. Matters within the scope of the employment relationship necessarily include matters relating to the defendants' business, which the defendants have described as "provid[ing] shipping services to the public at large." CR 208 at 14; *see also* Klank Decl. ¶ 4 ("FedEx Express is the world's largest express transportation company, offering time definite delivery to more than 220 countries and territories."). FedEx Corporation's business also includes the provision of "strategic leadership and consolidated financial reporting for its subsidiary operating companies," and FedEx Services' business also includes the provision of "sales, marketing, information technology, and back office support to the other FedEx operating companies." Klank Decl. ¶¶ 3, 5. Accordingly, for purposes of the United States' case against FedEx Express, Rule 801(d)(2)(D) authorizes the United States to introduce as non-hearsay any statements that FedEx Express employees made on matters relating to the defendants' provision of shipping services. Likewise, for purposes of the United States' case against FedEx

---

[7] The United States is not, at this time, seeking any ruling as to the relevance of these statements under Rules 401, 402, or 403.

MOT. IN LIMINE #6 RE: HEARSAY STATEMENTS
14-CR-00380 CRB                              6-4

Corporation, Rule 801(d)(2)(D) authorizes the United States to introduce as non-hearsay any statements that FedEx Corporation employees made on matters relating to the defendants' provision of shipping services and on FedEx Corporation's provision of strategic leadership and consolidated financial reporting for its subsidiaries.  And for purposes of the United States' case against FedEx Services, Rule 801(d)(2)(D) authorizes the United States to introduce as non-hearsay any statements that FedEx Services employees made on matters relating to the defendants' provision of shipping services and on FedEx Services' provision of sales, marketing, information technology, and back office support to other FedEx entities.

*Second*, with respect to FedEx Express, the statements of FedEx Services and FedEx Corporation employees are admissible as non-hearsay under the agency prong of Rule 801(d)(2)(D), which applies to statements made by a party's agent on matters within the scope of that agency relationship.  The defendants' public statements, including their statements in this case, reveal that employees of FedEx Services and FedEx Corporation were agents of FedEx Express during the relevant period.  For purposes of Rule 801(d)(2)(D), "[a]n agent is one who 'act[s] on the principal's behalf and subject to the principal's control." *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010) (quoting Restatement (Third) Agency § 1.01).  To form an agency relationship, both the principal and the agent must manifest assent to the principal's right to control the agent. *Id.*  A person may be an agent even if "the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment." Restatement (Third) of Agency § 1.01 cmt. c.  Furthermore, agents of one corporation may also be agents of an affiliated corporation, provided a separate agency relationship has been created between the agents and the affiliated corporation.  Restatement (Third) of Agency § 1.01 cmt. f(2).

In this case, FedEx Express had a separate agency relationship with FedEx Services and FedEx Corporation because FedEx Express was paying for services that these sister and parent companies were providing to support FedEx Express's shipping business.  Specifically, FedEx Express paid FedEx Services for "sales, marketing, information technology and customer support," and paid FedEx Corporation for "general corporate oversight, including executive officers and certain legal and finance functions." 2010 FedEx Express 10-K at 21, 23, 37, 40, 59.  To the extent that FedEx Services and

FedEx Corporation were providing these services to FedEx Express, they were acting as paid agents of FedEx Express and were performing tasks in furtherance of FedEx Express's business. Accordingly, under the agency prong of Rule 801(d)(2)(D), the United States may offer against FedEx Express any statements that FedEx Services and FedEx Corporation employees made on matters within the scope of their work with FedEx Express, and those statements will not be hearsay.

This is particularly true with respect to the FedEx Services employees who interacted with FedEx Express's actual and potential customers to further FedEx Express's shipping business. *See* Restatement (Third) of Agency § 1.01 cmt. g ("Employee and nonemployee agents who represent their principal in transactions with third parties act on the principal's account and behalf."); *id.* at Illus. 11 (explaining that where "P Corporation and A Corporation agree that A Corporation will negotiate and enter into contracts between P Corporation and retail stores for the sale of footwear manufactured by P Corporation," A Corporation is acting as P Corporation's agent in connection with the contracts). Indeed, a district judge in the Southern District of New York recently held that FedEx Services was an agent for FedEx Ground, the FedEx Express sister company that provides ground shipping services. *See U1it4Less, Inc. v. FedEx Corp.*, 2015 WL 3916247, at *5 (S.D.N.Y. 2015) ("FedEx Ground used sales representatives from FedEx Services to sign customers to its Pricing Agreements and shipped goods in accordance with the discounted rates provided for in those agreements. FedEx Services was an agent of FedEx Ground in this case as it acted with authority by FedEx Ground to enter into contracts on the principal's behalf.")).

*Third*, to the extent that Rule 801(d)(2)(D) does not allow the United States to offer as non-hearsay the statements of each defendants' employees against the other defendants, Rule 801(d)(2)(E) does as non-hearsay statements of co-conspirators in furtherance of the conspiracy. In the Superseding Indictment, the grand jury found probable cause to believe that all three defendants were co-conspirators for purposes of the crimes charged in this case. *See generally* CR 28. The factual allegations in the indictment support that conclusion, and the United States expects to prove the truth of those allegations at trial, thereby demonstrating that these three FedEx entities were co-conspirators throughout the periods charged in the indictment. The United States will also be able to establish by a preponderance of the evidence that the defendants' employees made each of the statements in question in furtherance of

the conspiracy. The United States therefore requests a preliminary ruling that statements of each defendant's employees will be admissible as non-hearsay against the other defendants under Rule 801(d)(2)(E), provided that the United States "shows by a preponderance of the evidence that a conspiracy existed at the time the statement was made; the defendant had knowledge of, and participated in, the conspiracy, and the statement was made in furtherance of the conspiracy." *United States v. Bowman*, 215 F.3d 951, 960-61 (9th Cir. 2000).

**B.      The Defendants May Not Introduce Statements of Their Own Employees Without First Identifying A Hearsay Exception; The "State of Mind" Exception Does Not Apply Except In Narrow Circumstances.**

While the Rules of Evidence allow the United States to introduce the defendants' employees' e-mails and other communications discussing matters relevant to the charged crimes, the Rules do not permit the defendants to offer their own out-of-court statements to the jury. Fed. R. Evid. 801(d)(2)(A); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) (district court properly sustained government's hearsay objection to defendant's attempt to elicit defendant's post-arrest statements during cross examination of FBI agent). Thus, the defendants may not introduce or elicit statements from their own employees unless those statements fall within one or more exceptions to the rule against hearsay. *See United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); Fed. R. Evid. 802, 803, 804. To hold otherwise would allow a defendant "to place his exculpatory statements 'before the jury without subjecting [himself] to cross-examination, precisely what the hearsay rule forbids.'" *Ortega*, 203 F.3d at 682 (quoting *Fernandez*, 839 F.2d at 640).

It is axiomatic that defendants may not introduce evidence that inadmissible under the Federal Rules of Evidence simply because they claim it will assist their defense. *See United States v. Mitchell*, 502 F.3d 931, 964-65 (9th Cir. 2007) (affirming district court's exclusion of statements defendant made during interviews because "[t]hese statements were inadmissible hearsay; as Mitchell was attempting to introduce them himself, they were not party opponent admissions, nor did the fact that they were made in a more broadly self inculpatory confession bring them within the statement against interest exception."); *United States v. Sayakhom*, 186 F.3d 928, 937 (9th Cir. 1999) (upholding exclusion of recorded meeting because it did not fall within any hearsay exception). Thus, unless the defendants can establish that their employees' out-of-court statements meet one of the established exceptions to the

hearsay rule, the Court must preclude their introduction.

### 1.    The "State of Mind" Exception Does Not Apply to Statements of Belief

The defendants should not be permitted to introduce their own employees' un-cross-examined, out-of-court statements to demonstrate their "state of mind" during the commission of the crimes alleged in the indictment. The defendants have asserted that they were acting in good faith when they continued to deliver drugs for the Chhabra-Smoley and Superior Drugs organizations long after it became apparent to their employees that those organizations were distributing drugs that were not based on valid prescriptions to persons who had no legitimate medical need for them. *See United States v. Feingold*, 454 F.3d 1001, 1006 (9th Cir. 2006) ("Thus, good faith in this context means an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country."); *United States v. Boettjer*, 569 F.2d 1078, 1081 (9th Cir. 1978) ("Whether the defendant acted in good faith is not merely a matter of the good faith of his intentions toward the people who came to see him but, rather, the good faith of his effort to conduct himself in accordance with the medical standards generally recognized and accepted in the United States."). Any efforts by the defendants to introduce their own employees' out-of-court statements that they were acting in good faith should be rebuffed. *See Sayakhom*, 186 F.3d at 937 (upholding trial court's exclusion of a recording of a meeting between investigators and defendant because defendant sought to introduce the recording "in order to refute the intent requirement of the crimes charged. Sayakhom thus proffered the tape to prove the truth of her statements to the investigators. The recording is hearsay.").

Simply because evidence is relevant to proving the defendant's state of mind, does not make it admissible under the hearsay exception outlined in Rule 803(3). "State of mind" in the hearsay context is a term of art. Under the rule, only statements conveying the declarant's then-existing mental or emotional state are admissible, *i.e.*, "I am afraid," or "I am confused." The rule expressly excludes from the exception any statements of belief and statements that reveal analysis, evaluation, or reflection, *e.g.*, "I am doing nothing wrong," "I think these pharmacies are legal." *See* Fed.R.Evid. 803, Advisory Committee Notes to 1972 Proposed Rules, Paragraph 3 ("The exclusion of 'statements of memory or belief to prove the fact remembered or believed' is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement,

to serve as the basis for an inference of the happening of the event which produced the state of mind.") The Ninth Circuit has expressly held that it is improper for defendants to seek to introduce out-of-court statements of their belief that they were not violating the law to prove their good faith. *Sayakhom*, 186 F.3d at 937 (upholding exclusion of recorded meeting because it did not fall within the Rule 803(3) exception; "Sayakhom's attempt to introduce statements of her belief (that she was not violating the law) to prove the fact believed (that she was acting in good faith) is improper").

Moreover, the Ninth Circuit has long made clear that the reason behind a declarant's state of mind is outside the Rule 803(3) exception:

> [T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. *If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition - "I'm scared"- and not belief- "I'm scared because Galkin threatened me*.

*United States v. Emmert*, 829 F.2d 805, 810 (9th Cir. 1987), *quoting United States v. Cohen*, 631 F.2d 1223 (5th Cir. 1980) (emphasis in original). Thus, the defendants should be precluded from introducing any of their employees' e-mails or other out-of-court statements under the "state of mind" exception to the hearsay rule unless those statements reveal solely the defendants' then-existing mental or emotional state. In other words, *what* an employee is feeling at a particular moment may fall within the exception (though is likely not relevant), but *why* she is feeling it and the various beliefs and perceptions that inform her feeling do not.

2.   E-mails, Notes, Memoranda, and Similar Correspondence Addressing Singular Issues Are Not Business Records.

An e-mail is not a business record unless the proponent of the e-mail lays the necessary foundation under Rule 803(6). E-mails do not meet the requirements of the "regularly conducted activity" exception to the hearsay rule simply because they are exchanged by employees during the course of their employment. An e-mail is no more a business record than a letter was in the days when most business was conducted through the mail; the mere fact that e-mail correspondence is dashed off electronically throughout the course of the workday does not make it a business record.

The hallmark of the exception set forth in Rule 803(6), commonly referred to as the "business

records" exception, is the regularity with which the record is made and kept.  To meet the exception's foundational requirements, the record must be (1) "kept in the course of a regularly conducted business activity," where (2) "it was the regular practice of that business activity to make the . . . report."  Fed. R. Evid. 803(6).  Thus, the employee must be engaged in a regular business activity that generates a particular type of record or report in order for the record or report generated to fall within the exception. Accounting records are the paradigmatic example of a business record:  it is the regular business of an accounting department to maintain profit and loss reports; therefore, profit and loss reports that are regularly compiled by the accounting department are business records under the rule.  However, every e-mail exchanged by any member of the accounting department does not thereby become a business record admissible over a hearsay objection. *See Monotype Corp. PLC v. International Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994) ("E-mail is an ongoing electronic message and retrieval system" that is not "a regular, systematic function . . . prepared in the course of business").  Thus, unless the document in question is of the type that a defendant "was in the practice of making in the regular course of its business," it does not meet the requirements of the regularly recorded activity exception to the hearsay rule. *Id*. at 449-50 (holding that a report containing "some 'off-hand impression' that [an employee] put on paper for the review of a few people" was not a "business record for purposes of the rule").

To hold otherwise would create an untenable situation where the hearsay rules would apply differently to different types of defendants.  On the one hand, defendants charged with "blue collar" crimes, such as street-level drug dealing, felon-in-possession, or trafficking in child pornography would be prohibited from introducing their own self-serving out-of-court statements.  However, corporate defendants and white-collar defendants who commit crimes in the course of their employment would be able to introduce self-serving e-mails, notes, or other documents that were created during the course of any "business activity."  Interpreting the rules of evidence to apply differently to different classes of defendants, or to different types of crime, defies the bedrock principles of the rule of law upon which our judicial system rests.

Moreover, interpreting the Rule 803(6) exception to apply to every e-mail or document drafted by a business's employee would not only circumvent the rationale behind the exceptions to the hearsay rule, but would swallow the rule entirely in white-collar litigation (whether criminal or civil).  The

exceptions are meant to apply to particular types of out-of-court statements that bear time-tested hallmarks of reliability.  Exception 803(6) is based on the premise that certain types of documents maintained in the regular course of a business's regular activities are presumptively reliable because the business relies on them for its proper functioning.  *See* Fed. R. Evid. 803, Advisory Committee Notes, Notes to 1972 Proposed Rules, paragraph 6 ("The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.").  While this rationale applies to payroll records or accounts receivable, it cannot be stretched to include every e-mail sent by every employee that is arguably work-related.  Fed. R. Evid. 803, Advisory Committee Notes, Notes to 1974 Enactment, paragraph 6 ("[T]he committee concluded that the additional requirement . . . that it must have been the regular practice of a business to make the record is a necessary further assurance of its trustworthiness.").  The substance of a particular e-mail communication, simply because e-mails are sent and received in the work environment, is not inherently trustworthy.

**C.      The "Rule of Completeness" Does Not Render Inadmissible Hearsay Statements Admissible.**

If the United States introduces portions of an e-mail or e-mail chain under the party-opponent, co-conspirator, or other exception to the hearsay rule, the defendants may not introduce the remainder of the statement under the rule of completeness without establishing that a valid exception to the hearsay rule applies.  This is because the rule of completeness is a rule of relevance, not an exception to the hearsay rule.  *See Ortega*, 203 F.3d at 682 (rule of completeness does not allow for admission of inadmissible hearsay); *United States v. Nakai*, 413 F.3d 1019, 1022 (9th Cir. 2005) (holding inadmissible as hearsay a defendant's exculpatory statements which the defense sought to introduce after FBI agent testified about defendant's inculpatory statements).

**D.      The Defendants' Own Self-Serving Statements Are Unreliable and Should be Excluded Under Rule 403.**

A defendant's own self-serving statements should be excluded under Rule 403, even if not offered for the truth, where they do not carry the hallmarks of reliability and disinterest that would

render them more probative than prejudicial and confusing to the jury. *See United States v. Miller*, 874 F.2d 1255, 1265-66 (9th Cir. 1989).   For example, evidence that is not relevant to proving a valid defense carries no probative value and can only serve to confuse the jury.  Therefore, to the extent that the defendants intend to introduce evidence that they thought their conduct did not violate federal law - as opposed to evidence that they believed they were distributing drugs within the usual course of professional practice and for a legitimate medical purpose - such evidence is not relevant to a valid defense and should be excluded, lest it confuse the jury and distract them from the true issues to be decided in this case. *See United States v. DeCruz*, 82 F.3d 856, 867 (9th Cir. 1996) ("Defendant sought to introduce facts which established that she did not know that her conduct violated federal law.  This is a classic mistake or ignorance of the law argument, and as such, it is not a valid defense."); *United States v. Moncini*, 882 F.2d 401, 405 (9th Cir. 1989) ("Even assuming Moncini was ignorant of the law as he claims, he must bear the risk of the potential illegality of his conduct."); *see also United States v. Carozza*, 608 Fed.Appx. 532, 535 (9th Cir. July 24, 2015) (government not required to prove defendant knew he was violating the law to prove conspiracy, aiding and abetting or drug trafficking).

Similarly, statements by the defendants' employees that were made after they were aware that the conduct they were engaged in was legally questionable do not carry the indicia of reliability necessary for admission under Rule 803(3) or any other exception to the hearsay rule. *See United States v. Faust*, 850 F.2d 575, 585-86 (9th Cir. 1988) (excluding a letter that defendant claimed would corroborate his testimony, as "Faust's opportunity to reflect in drafting the letter, however, weighs heavily against admission [under Rule 803(3)] . . . . The circumstances in this case allowed Faust to think long and hard before drafting the letter.  The fact that Faust went through several drafts indicates that he had ample time to reflect upon his statements").  After the defendants' executives were subpoenaed to testify before Congress in 2004 and again in 2005, and after representatives from several law enforcement agencies met with those executives from 2002 through 2007 to inform them that they were delivering drugs for illegal online pharmacies, the self-serving statements of those executives and their assistants do not carry the hallmarks of reliability required for admission.  Out-of-court statements in the form of e-mails, notes, reports or other documents professing excuses for the defendants' continued delivery of illegal drugs, such as that they could not identify which of their customers were

Internet pharmacies, they were confused about the state of the law, they needed law enforcement to give them a list of the bad actors, and similar protestations of innocence, should be excluded as both unreliable hearsay under Rule 802, and more prejudicial than probative, under Rule 403.

### **CONCLUSION**

For the foregoing reasons, the United States requests that the Court order:

(1)  The United States may introduce the out-of-court statements of each of the defendants and their employees, for the truth of the matter asserted, as against each defendant and against each co-defendant.

(2)  Defendants may not introduce the out-of-court statements of the defendants' employees without first (a) identifying the relevant hearsay exception and (b) seeking permission from the Court outside the presence of the jury.

# EXHIBIT 6A

| | |
|---|---|
| **From:** | james.vernon@fedex.com |
| **Sent:** | Friday, January 30, 2004 5:40 PM |
| **To:** | Reggie Rankins |
| **Subject:** | Pres.Resources Edge profile.xls |
| **Attachments:** | Pres.Resources Edge profile.xls |

Reggie, here is the profile sheet for Pres. Resources.    Call me if you need to...THANKS  Jim V> 704-502-1147

1

FDX_E3_0396273

| *EDGE ACCOUNT PROFILE FORM* | |
|---|---|
| | |
| | . |
| **EDGE Account Name / Location** | |
| WAM/ CAE: | Reggie Rankins |
| E-mail Address | rlrankins@fedex.com |
| | |
| | |
| **Facility Information** | |
| | |
| 9 Digit Account # | 245561164 |
| Account Name | Prescriptions Resources |
| Address | Southern Pine Dr. |
| City / State | Charlotte NC 28273 |
| | |
| Contact | Willyce Felder |
| Title | Pharmacy Mgr |
| | |
| Product | Viagra fulfillment |
| | |
| Express Packages per Day | 2000 |
| Ground Packages per Day | 0 |
| International Packages per Day | 0 |
| | |
| Average Weight | 1 |
| | |
| Primary Carrier (s) | Was Fedex |
| | |
| Attitude towards FedEx | Not applicable |
| (positive, neutral, negative) | |
| FedEx Activity | 0 now |
| | |
| Automation in Place | not any more |
| | |
| **Key Opportunity Point** | State/Fed law closed this facility down about two months ago. It continues to pop up at various places in the country, one step ahead of state regulators, I believe. |
| | |
| **Additional Comments** | Was great while it lasted! |
| | |
| | Jim Vernon |
| **MAE NAME** | |
| **MAE E-mail** | james.vernon@fedex.com |
| | |
| Date | |
| | ***Please forward to WAM/ CAE listed above*** |

# EXHIBIT 6B

| | |
|---|---|
| **From:** | Betty Hale |
| **Sent:** | Thursday, May 27, 2004 03:11 PM |
| **To:** | Joe Singler; Willie Patterson; Kendell Black; Josh Croft |
| **Subject:** | [Fwd: RE: Online Pharmacies] |

fyi

-------- Original Message -------- Subject: RE: Online Pharmacies
Date: Wed, 26 May 2004 20:47:48 -0500
From: Karl Stingily <kostingily@fedex.com>
To: Betty Hale <bmhale@fedex.com>

i agree with your proposal. from my standpoint we need to aggressively manage. i have sent a note to dianne/cathy re this. if they have any other thoughts they can let me know.

-----Original Message-----
From: Betty Hale
Sent: Wednesday, May 26, 2004 2:47 PM
To: Karl Stingily
Subject: Online Pharmacies

Karl, as we've discussed the financial exposure for online pharmacy accounts is significant.  In a recent memo dated 5/13, which we sent to Dianne and Cathy the total outstanding A/R was $5.7MM of which $2.8MM was on cash only status.  In the past couple of weeks the DEA and FBI have been to visit several of the
accts currently shipping w/ FedEx and have shut the them down.  We immediately cashed these accounts.  Currently the outstanding A/R balance for known accounts  is $10MM of which $4MM is on cash only status.  It is unlikely that the $10MM is FedEx's total exposure as we are identifying new online pharmacy accts daily.

Over the past couple of months we have been working w/ Sales to identify FedEx online pharmacy accounts and to minimize the exposure.  In addition, credit has been aggressively working to obtain better financial information about these customers and to obtain security.  To date we have only been able to secure $300K of the $10MM outstanding balance.  As the past few weeks have unfolded it is becoming more apparent to us that many of these companies are fraudulent and doing business outside Federal regulations.

Given the financial exposure we are moving all the known online pharmacy accts under 1 acct rep. effective immediately.  This acct rep will aggressively work to
obtain payment from these customers.  As shipments occur on new accts numbers the acct rep will be immediately establishing contact with the customer.  Accounts not meeting payment commitments will be immediately placed on credit hold. In addition, the acct rep will continue to work with Sales.  Please let me know if you have any questions or concerns.

FEDEX_E2_00479788

# EXHIBIT 6C

| | |
|---|---|
| **From:** | Patrick Galvin |
| **Sent:** | Thursday, July 06, 2006 10:38 PM |
| **To:** | Annamaria Kovacs; Anthony Ross; Craig Lilley; Joanne Rosater; Lisa Akers; Lisa Randa; Michael Simpson; Steven Perryman; Therese Coons; Ty Deleon |
| **Subject:** | FW: **URGENT** ONLINE/INTERNET PHARMACIES PROCEDURES |
| **Importance:** | High |

Team,

Please make sure we are following this process as lay out for the on line Pharmacies.

Lisa,

Thanks for sitting on this team and providing your support.  Pat

---

**From:** Bonnie Wagner [mailto:bjwagner@fedex.com]
**Sent:** Thursday, July 06, 2006 8:55 AM
**To:** Elliott Abernethy; Bob Baldwin; Danny Collins; Russell Cooper; Robert Daum; Robert Edwards; Daniel Gibbs; Rick Maloney; John Queram; Philip Stephens; Marc Verez; Gurn Freeman; David Holmes; Steve Jones; Koji Kuroki; Mark Maynard; Curtis Minnis Sr.; Tom Read; Marvin Smith; Ronald Steinthal; Tod Taylor; Allen Carmack; Timothy Jones; Leo Ward; Wayne Dozier; Robin Earle; Nick Gennari; Joseph Harding; Rudy Krasnansky; Larry Labelle; Robert Leroy; David Morales; Samuel Riskin; Brian Slattery; Michael Swanson; Nancy Brunkal; Patrick Charles; Christopher Gant; Paul Anderson; Aimee Dicicco-Ruhl; Donald Gergen; Phillip Ragatz; Myra Jenkins Spears; James Collier; Patrick Galvin; Peter Leary; Paul Rokich; Chris Suhoza; David Brown; Michael Foy; Herbert Hyde; Barbara Maloney; John Mellon; Greg Andrusin; Anthony Avella; Kye Beverly; Tommy Fullington; Raymond Poolat; Ken Hisamoto; Bryan Seiler; Joey Sichting; Lee Alcott; Paul Damoc; Steven Goddard; Tim Hinckley; John Longfield; Frank Newman; Paul Stein
**Cc:** Kendell Black; Joshua Croft
**Subject:** **URGENT** ONLINE/INTERNET PHARMACIES PROCEDURES
**Importance:** High

**<u>"Privileged and Confidential, For FedEx Internal Use and Communication Only"  Do not release to customer.</u>**

To:  Sales Directors
From:  Credit Operations
Subject:  Internet Pharmacies

As you all may know, FedEx has experienced multi million dollar losses on the internet pharmacy industry.  Two years ago, the procedures for setting up an internet pharmacy account was published in Sales Brief.  It has come to our attention from various sales managers that not all of the sales regions are aware of these procedures.  We need your assistance in getting these procedures out to all of the sales force.  Please forward this email to your sales managers and request they send out to their sales people, including inside sales.  Your assistance in helping to get the word out on the online pharmacies is greatly appreciated.  Sales Managers, Mary Shelfer, Scott Sutterman, Herman Robertson, Keith Anderson, Scott Hallum and Lisa Akers, aligned with Credit to put together the following overview of what an internet pharmacy is and the procedures that need to be followed.

1

FDX_E3_0398747

**Online Pharmacy Accounts**<!--[endif]-->

<!--[if !supportEmptyParas]-->The internet or online pharmacy industry presents several challenges to FedEx, which require different operating procedures in setting up and maintaining their accounts.<!--[endif]-->

**What is an online pharmacy:**

An online or internet pharmacy is any entity whose primary business is the marketing and/or selling of pharmaceuticals or weight loss aids via the internet. <!--[if !supportEmptyParas]-->This description does not include established pharmaceutical companies or drugstore chains with an online presence in addition to their physical storefront. The products sold fall into several sub categories such as diet pills, steroids, "vitamins", diabetic medications, in addition to controlled prescription medication such as Viagra and Loritab.<!--[endif]-->

**How they operate**:

The products are purchased through an Internet website, then the purchase order is filled by a fulfillment center (drugstore or warehouse) who carries the requested product. The company operating the website and the company operating the fulfillment center are normally separate companies.  Online pharmacies often process and fulfill their orders via WEB API. <!--[if !supportEmptyParas]-->This solution is portable and allows them to easily move orders from location to location.<!--[endif]-->

# Why this is important:

Many of these companies operate outside federal and state regulations over the sale of controlled drugs, which require diagnosis and prescription by a licensed physician.  Drugs purchased from these sites may be diluted or counterfeit.  Several sites have been shut down by the government without warning or simply disappeared leaving large balances owing to FedEx.  FedEx has written off more than $6M in unrecoverable revenue from these businesses since 2003.  Because these companies attempt to maintain a low profile, the local Sales Professional are often the last to know that large numbers of packages are being shipped from their territory.  Account numbers that are imported or aligned to other territories do not show up in our current visibility tools.  So, they may artificially inflate revenue and volume budgets, then disappear.<!--[if !supportEmptyParas]--> <!--[endif]-->

**How you recognize them:**

These customers typically order large numbers of FedEx padded packs to ship their product.  Large requests for padded packs should be reported to local sales management immediately. This order is usually the first contact that is made with either customer service or inside sales.  Also, these businesses may not look like a "normal" shipping operation. <!--[if !supportEmptyParas]-->Instead of operating in a commercial warehouse business district, these shippers may operate out of a retail or office location, a blank storefront, a small brick and mortar pharmacy that never had large shipping before, or even a basement. The business names on the airbill, its signs and telephone listings may not match, and the name could be disguised so as to hide what their business purpose is.<!--[endif]-->

**What do you do?**

It is important that FedEx recognizes this potential for exposure and insure these customers are compliant with the policies and procedures this high-risk industry warrants.  To reduce this risk, the Sales department aligned with the Credit department to implement procedures for new and existing online pharmacy accounts.   Email known online pharmacy account numbers along with any information that you may have to CreditAnalysts@mail.fedex.com<!--[if !supportEmptyParas]--> <!--[endif]-->

**New Account Procedures:**

2

FDX_E3_0398748

**All requests for new accounts or additional accounts related to online pharmacies (including pharmacy fulfillment centers) must be forwarded to the Credit department prior to account establishment**. Do not contact New Account Set Up/SASU, Revenue Services, or the Customer Service group to directly set up new accounts. Contact the Credit Department by sending your request to the following email  CreditAnalysts@mail.fedex.com .

<!--[if !supportEmptyParas]--> <!--[endif]-->

**Pharmacy fulfillment centers billing to recipients or third parties, will be held liable for any unpaid charges.  Fulfillment centers will be required to secure their account with the same options as online pharmacies.**

This must be communicated to the fulfillment centers prior to account establishment. The Service Guide states that a shipper, as the one who tenders the package to FedEx, is liable for payment.  If an existing online pharmacy account's ability to pay is questionable, then they will be set with a maximum credit line based on their credit history/financial data.   EZ Debit, security deposit, bank letter of credit or pre-payment will be required for all companies with weak or insufficient financial information.  You will be notified prior to any action being taken on the account.<!--[if !supportEmptyParas]--> <!--[endif]-->

**Our options for securing are as follows:**

1.  Credit card
2.  Daily invoicing with 1,3 or 5 day EZ Debit<!--[if !supportEmptyParas]--> <!--[endif]-->

**In addition to one of the 2 options above:**

The customer must provide a bank letter of credit or security deposit for a dollar amount based on revenue volume

    <!--[if !supportLists]-->•    <!--[endif]-->Bank letter of credit MUST be on our form.

- Prompt compliance with terms or credit revoked immediately.
- Strict adherence to agreed terms or credit revoked immediately.
  <!--[if !supportLineBreakNewLine]-->
  <!--[endif]-->

**Please contact Josh Croft in the Credit Department at 901-395-3737 or email** CreditAnalysts@mail.fedex.com **if you have any questions or concerns.**

<!--[if !supportEmptyParas]--> <!--[endif]-->

<!--[if !supportEmptyParas]--> <!--[endif]-->

<!--[if !supportEmptyParas]--> <!--[endif]-->

<!--[if !supportEmptyParas]--> <!--[endif]-->

3

FDX_E3_0398749

# EXHIBIT 6D

**From:** Kendell R. Black
**Sent:** Wednesday, October 19, 2005 11:38 PM
**To:** Josh Croft
**Subject:** RE: United Care Pharmacy #319627120

do you want me to send something to the director now or wait until he has a chance to respond. Regardless, we need to be involved in presenting this to the customer rather than Louis.  he can be on the call if you think appropriate but I think our message will not get across, particularly point about escalating BLOC as volume increases or explanation of how EZ Debit moving 5 to 1 will impact BLOC.  Not sure Louis can (or is willing to ) explain our rationale in persuasive manner

-----Original Message-----
From: Josh Croft [mailto:jcroft@fedex.com]
Sent: Wednesday, October 19, 2005 5:18 PM
To: louis.tapper@fedex.com; louis.tapper@fedex.com
Cc: Kendell Black; Kendell Black
Subject: RE: United Care Pharmacy #319627120

Lou,

The Security Deposit (or bank letter of credit) amount is based on the shipping volume.  The difference is that the shipping volume has increased from 9/6 when I stated that $50K would  be enough.  On 9/6 when I stated that $50K would be enough the account balance was at $90K (at the time the idea was that EZ Debit would push the account balance below $50K and that $50K would be adequate).  The balance is now over $150K with EZ Debit in place and a $150K bank letter of credit is required.

When David spoke to the customer he was clear that a bank letter of credit would be required in addition to EZ Debit.  We agreed that we would get EZ Debit established and then continue the conversation to obtain the bank letter of credit.  We now need to finalize the process and get a $150K bank letter of credit (or security deposit) in place to protect FedEx.

We are not targeting UCP as this is the approach that we have been given by SR management regarding the handling of all Internet Pharmacy accounts.  We have many other Internet Pharmacy accounts with bank letters of credit in place.  Internet Pharmacy accounts represent a significant risk unlike any other industry known to FedEx.  Internet Pharmacies are targeted by the DEA and are frequently shut down.  When the Pharmacies are shut down the balance outstanding is left unpaid.  EZ Debit assists in keeping the balance as low as possible, but will not prevent a large loss should the pharmacy be shut down by the DEA.   I included the article below regarding one of the recent DEA initiatives to give you some background information.  FedEx has experienced multi-million dollar losses in this industry, I could give you a long list of pharmacies that have been shut down by the gov't where FedEx was not paid.

We have made some progress on this account in getting it converted to EZ Debit and I appreciate your assistance in getting this done.  However, In order to keep the account open we need to have a $150K bank letter of credit in place no later than November 4th.  If the volume goes up the amount of the bank letter of credit will go up as well.  If we adjust the EZ Debit parameters down from 5 days to 1 day we could look at lowering the bank letter of credit amount.  The bank letter of credit amount will need to be the average balance on the account with a cushion for unbilled revenue.

It is critical that we get these items in place before an internet pharmacy begins to ship.  For future internet pharmacy accounts please pull credit into the loop before the accounts are given to the customer. If we had negotiated this prior to shipping, we would not have the large exposure that we currently have and I think the negotiation process would have gone much smoother.

I would like credit to be part of the discussions regarding the bank letter of credit.

Thanks,

Josh Croft
Credit Manager

Combating Rogue Internet Pharmacy Operations

FEDEX_E2_00479654

By Jim Kouri
Oct 15, 2005

One of the challenges for law enforcement in the 21st century is internet pharmaceutical drug traffickers operating in the United States. These online, legitimate looking and sounding pharmacies are peddling dangerous narcotics and other drugs, and in some cases counterfeit drugs that are ineffective for patients.

Many of these illegal internet pharmacies use spam e-mail to contact potential customers. A group of individuals involved may operate dozens of different websites with different medical-sounding names. Recognizing that criminals are facilitating more drug-related crimes through the use of 21st century technology, the DEA, along with their law enforcement counterparts recently arrested 18 people for allegedly selling pharmaceutical drugs illegally over the Internet. Those arrested include the ringleaders of more than 4,600 rogue Internet pharmacy websites.

This DEA-led investigative effort is the first to target e-trafficking located solely within the United States. The alleged drug dealers who operated these rogue internet pharmacies received prescription orders for controlled substances over the Internet, which were then shipped to the doors of many US citizens -- sometimes without any prescription needed. These alleged criminal pharmaceutical drug traffickers averaged more than $50,000 a day in profits from their illegal Internet based enterprise.

Those arrested included Johar Saran, of Arlington, TX; Gaston Blanchet and Gil Lozano, of Miami, FL; Ted Solomon, of Orlando, FL; and Steve Rosner, of Boca Raton, FL. These individuals are the alleged ringleaders of this multimillion dollar drug distribution network.

Operation CYBERx is part of the DEA's "Virtual Enforcement Initiative (VEI)." This new DEA cyber initiative acknowledges that criminals in the drug trade are embracing the use of state-or-the-art technology to peddle their narcotics and dangerous drugs into US communities, all with an air of respectability.

DEA Administrator Karen P. Tandy said, "Operation CYBERx puts out of business alleged cyber criminals who [are] selling powerful narcotics without legitimate prescriptions to anyone with a computer and cash. These high-tech drug dealers were fueling addictions by selling the very drugs intended to prevent and treat ailments—not inflict them. Just as important, this Operation makes more Americans aware that buying prescription drugs from these rogue websites is illegal and dangerous."

E-based illegal pharmacies allow abusers to easily access pharmaceutical drugs from the comfort of their homes. Without a doctor's visit, sometimes without a prescription, without consulting with a pharmacist, any drug abuser with enough cash could have almost any quantity of prescription drugs-with door to door delivery. With DEA-led efforts under the VEI, e-traffickers will find difficulty in luring our nations youth to their on-line pharmacies for easy access to drugs.

The VEI concept was realized last April when DEA led Operation "Cyber Chase," which resulted in more than 20 arrests in eight US cities and four foreign countries; shutting down an organization that ran over 200 web sites illegally selling what were identified as pharmaceutical drugs. This year-long OCDETF investigation targeted international Internet pharmaceutical traffickers operating in the United States, India, Asia, Europe and the Caribbean. These e-traffickers also distributed drugs world-wide using rogue Internet pharmacies.

In addition to the 18 individuals arrested as part of Operation CYBERx, seven luxury cars, 2,400 checks and money orders from individual customers, and several boxes of cash were seized.

Jim Kouri, CPP is currently fifth vice-president of the National Association of Chiefs of Police.


 -----Original Message-----
From: Louis Tapper [mailto:louis.tapper@fedex.com]
Sent: Wednesday, October 19, 2005 3:56 PM
To: Joshua Croft
Subject: FW: United Care Pharmacy #319627120


Josh,

In the email below you advocate a credit plan of 5 Day EZ Debit with a $50k Security Deposit...now you want a $150k Security Deposit?

Lou




From: Josh Croft [mailto:jcroft@fedex.com]
Sent: Tuesday, September 06, 2005 6:04 PM
To: Joshua Croft; Joseph Lukas; Jay Grable

FEDEX_E2_00479655

Cc: David Waycaster; Bonnie Wagner; Louis Tapper
Subject: RE: United Care Pharmacy #319627120


Jay,

Thanks for taking the time to discuss the account with me today.  At this point the total balance on
the account is $140K.  How did we get to this point without the account being secured? ?? All
internet pharmacy accounts should come through credit for evaluation BEFORE we begin billing the
account.  At this point we are much more exposed than we need to be and we need to get this resolved
ASAP.

We can offer up to 5 days on the EZD terms (with mandatory 1 day invoicing cycle)  with a $50K
security deposit.  If they want to go up to 10 days on the EZ Debit terms we will need a $150K
deposit.

Please call me tomorrow morning to discuss next steps.  If you do not get me pls call David
Waycaster at 901-395-7524.

Josh Croft
-----Original Message-----
From: Josh Croft [mailto:jcroft@fedex.com]
Sent: Tuesday, September 06, 2005 3:51 PM
To: Joe Lukas; Jay Grable
Cc: David Waycaster; Bonnie Wagner
Subject: RE: United Care Pharmacy #319627120


Jay,

What is the status on securing this account.  If we we have not received one of the options below by
this Friday we will have to revoke credit on the account.

Josh Croft
-----Original Message-----
From: Joe Lukas [mailto:joseph.lukas@fedex.com]
Sent: Tuesday, September 06, 2005 3:35 PM
To: Jay Grable
Cc: David Waycaster; Bonnie Wagner; Joshua Croft
Subject: FW: United Care Pharmacy #319627120


Jay, the deadline to secure these accounts has passed.  Account # 319627120 already has a $20K
balance on it and represents one of our fastest-growing commercial account balances.  Please contact
us about securing the accounts listed below by the end of this week.  Otherwise, we will be
contacting the customer directly.  Thank you.

-----Original Message-----
From: David Waycaster [mailto:david.waycaster@fedex.com]
Sent: Tuesday, September 06, 2005 3:22 PM
To: Joseph Lukas
Subject: FW: United Care Pharmacy #319627120




-----Original Message-----
From: Bonnie Wagner [mailto:bjwagner@fedex.com]
Sent: Friday, August 05, 2005 11:33 AM
To: jrgrable@fedex.com
Cc: louis.tapper@fedex.com; apavella@fedex.com; David Waycaster; Josh Croft; Cindy Blankenship; Joe
Singler
Subject: United Care Pharmacy #319627120


"Privileged and Confidential, For FedEx Internal Use and Communication Only"

                    PLEASE DO NOT FORWARD DIRECTLY TO THE CUSTOMER


Jay,
I will need United Care Pharmacy to secure their accounts: 319627120, 320618649, 321682006, and

FEDEX_E2_00479656

322360029

Internet transactions have created new customers and business opportunities for FedEx. However, internet transactions have also created additional bad debt risk that was unknown only a few years ago.  Online or internet pharmacy accounts represent an increase in FedEx bad debt risk that is different from our experience with other customers.  We are currently experiencing a significant bad debt write off with these particular accounts.
Per management directive we are moving to secure these accounts ASAP and we need your help in doing so. We understand that each customer is unique and have some latitude in securing these accounts.
Our options in securing are as follows:
1. credit card
2. 1 day invoicing with 1,3 or 5 day EZD
In addition to one of the 2 options above:
a bank letter of credit or security deposit equal for $50,000.00
Bank letter of credit MUST be on our form.
Immediate compliance with terms or account cashed immediately.
Strict adherence to agreed terms or account cashed immediately.
Please find attached the EZD form and bank letter of credit attached to this email.
Please contact us immediately if questions. I would like to have this account secured by week ending 8/12/05.


Bonnie Wagner
Credit Operations
(901) 395-7525

FEDEX_E2_00479657

# EXHIBIT 6E

**From:** Bonnie Wagner
**Sent:** Thursday, June 29, 2006 04:54 PM
**To:** clblankenship
**Subject:** Re: Kenwood Pharmacy  #3396 6020 4
**Attachments:** Message Text.txt

No, but this is a fulfillment pharmacy that is shipping products for Claude and billing Claude's account number.  Mary called me today and said DEA is investigating Claude, so apparently his is contracting with other pharmacies so that he can continue to stay in business.  More than likely he will be closing his location in Florida.   Mary sent me a list of accounts that Claude is currently using.  Out of the 13 she sent, I have 3 that need to be secured, so you will be getting additional emails today.

Cindy Blankenship wrote:

Is this Claudes account also?


Bonnie Wagner wrote:
"Privileged and Confidential, For FedEx Internal Use and Communication Only"  Do Not Send to Customer
Kenneth,
Kenwood Pharmacy, #339660204, is an internet pharmacy.  This account must be set up on credit card or EZ Debit with daily invoicing and debit terms of 1 day.  In addition we require a bank letter of credit or security deposit in the amount of $50,000.00.  Please see attached documents.  To avoid account going to a cash only basis,  I will need this account on credit card or EZ Debit by tomorrow.  I will need bank letter of credit or security deposit within the next 7 calendar days. We will not offer open credit terms if customer is unable to comply with these terms.  Please contact me to discuss.
Thank you,
Bonnie Wagner
Sr. Performance & Planning Analyst
Credit Operations
2003 Corporate Plaza 3rd Floor
Memphis, TN  38132
901-395-7525

FEDEX_E2_00402382

# EXHIBIT 6F

**From:** Mary Shelfer
**Sent:** Thursday, September 01, 2005 04:28 PM
**To:** Joshua Croft; Joe Singler; Scott Sutterman
**CC:** Lesli Garvett; Joe Singler; Tony Konen; Jennifer Giles
**Subject:** RE: Fw: APH

Tony,
Per our conversation, we will be working with Claude or Alberto on getting this bank letter of credit.  We will resume shipping on the credit card until we get this resolved.
Thanks for your help,
Mary F. Shelfer
District Sales Manager

-----Original Message-----
From: Josh Croft [mailto:jcroft@fedex.com]
Sent: Thursday, September 01, 2005 12:16 PM
To: Mary Shelfer; Joe Singler; Scott Sutterman
Cc: Lesli Garvett; Joe Singler
Subject: RE: Fw: APH
Thanks for the call Mary. Per our discussion we will need a $100K bank letter of credit or security deposit.  We can allow up  to 9/9 to get this in place.
Bonnie is on vacation, pls just work directly with me on this one.
thanks for your help!
josh
-----Original Message-----
From: Mary Shelfer [mailto:mary.shelfer@fedex.com]
Sent: Thursday, September 01, 2005 10:31 AM
To: Mary Shelfer; Joe Singler; Scott Sutterman; Joshua Croft
Cc: Lesli Garvett; Joe Singler
Subject: RE: Fw: APH


Sorry -- 954-497-2626 office
954-290-4725 cell
Thank you!


Mary F. Shelfer
District Sales Manager


-----Original Message-----
From: Mary Shelfer
Sent: Thursday, September 01, 2005 11:31 AM
To: Joe Singler; Scott Sutterman; Joshua Croft
Cc: Lesli Garvett; Joe Singler
Subject: RE: Fw: APH
Josh,
Please call me -- just spoke to the customer and to the Senior Manager -- had mentioned these accounts to Bonnie as well a while back.


Mary F. Shelfer
District Sales Manager


-----Original Message-----
From: Joe Singler [mailto:rjsingler@fedex.com]
Sent: Thursday, September 01, 2005 10:41 AM
To: Scott Sutterman; Joshua Croft
Cc: Lesli Garvett; Mary Shelfer; Joe Singler
Subject: Re: Fw: APH
Josh--Pls read the attached emails.  Do you have anything on these acct?

FEDEX_E2_00485803

```
Pls respond to Scott.
thanks
joe
Scott Sutterman wrote:
> Joe - can you help with this situation?  I understand the concern from
> EXP ops, but if the account is current, not much we can do....pls
> advise asap!  Thanks
>
> Scott
>
> -----Original Message-----
> From: Lesli Garvett <lesli.garvett@fedex.com>
> To: Scott Sutterman <scott.sutterman@fedex.com>
> Sent: Wed Aug 31 17:14:27 2005
> Subject: APH
>
> Scott,
>
> I spoke with the senior manager -Tony Conin...he said that he refuses
to pick APH up any longer because he says that AJ Hernandez is the same
person that ran RX Discount in North Miami last year and owes us 1/2
million dollars...
>
> I asked Tony if he was sure, and he said yes.....he said the  DEA shut
him down for illegally running his operation, and that he WAS on ez
debit and when the government shut him down , they froze all his
accounts and that's how he owes us the money.
>
> What do we do? He is current, opening up more accounts, revenue
recovery said he doesn't  owe us any money....
>
> What do I tell my customer is the reason we aren't picking him up
anymore?
>
> HELP
```

FEDEX_E2_00485804