1   DAVID R. CALLAWAY (CABN 121782)
    Attorney for the United States
2   Acting Under Authority Conferred by 28 U.S.C. § 515

3   KIRSTIN M. AULT (CABN 206052)
    JOHN H. HEMANN (CABN 165823)
4   Assistant United States Attorneys

5   JENNY C. ELLICKSON (DCBN 489905)
    Trial Attorney
6
        450 Golden Gate Avenue, Box 36055
7       San Francisco, California 94102-3495
        Telephone: (415) 436-6940
8       FAX: (415) 436-7234
        kirstin.ault@usdoj.gov
9       john.hemann@usdoj.gov

10  Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14  UNITED STATES OF AMERICA          )    CR No. 14-380 CRB
                                      )
15          Plaintiff,                )
                                      )
16     v.                             )    **UNITED STATES' TRIAL MEMORANDUM AND**
                                      )    **RULE 17-1 STATEMENT**
17  FEDEX CORPORATION,                )
    FEDERAL EXPRESS CORPORATION,      )
18    (A/K/A FEDEX EXPRESS), and      )    Trial Date:  June 6, 2016
    FEDEX CORPORATE SERVICES, INC.,   )    Time:        8:30 a.m.
19                                    )    Court:       Courtroom No. 8
            Defendants.               )                 Hon. Charles R. Breyer
20  _____  )

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.  Trial Memorandum ...........................................................................................1

    A.  Charges ...........................................................................................1

        1.  Conspiracy to Distribute Controlled Substances
            (Counts One and Thirteen).......................................................1

        2.  Distributing and Possessing With Intent to Distribute a Controlled
            Substance (Counts Two through Ten and Fourteen through Fifteen)..........2

        3.  Conspiracy to Distribute Misbranded Drugs in Interstate Commerce
            (Counts Eleven and Sixteen)....................................................2

        4.  Conspiracy to Launder Money (Counts Twelve and Seventeen
            Through Eighteen) ...............................................................2

        5.  Forfeiture Allegation................................................................3

        6.  Sentencing Allegation...............................................................3

    B.  Statement of Facts................................................................................3

    C.  Evidentiary Issues ...............................................................................7

II. Statement Pursuant to Local Rule 17.1-1(b)....................................................7

        1.  Disclosure of Jencks Act Material ...............................................7

        2.  Disclosure of Grand Jury Testimony .........................................8

        3.  Disclosure of Exculpatory Information .....................................8

        4.  Stipulations of Fact ...................................................................8

        5.  Appointment of Interpreters....................................................9

        6.  Dismissal of Counts, Elimination of Issues ...............................9

        7.  Joinder Pursuant to Rule 13 ......................................................9

        8.  Identification of Informants, Use of Line-Ups, Evidence of Prior
            Convictions of the Defendant, etc..............................................9

        9.  Witnesses to be Called at Trial ..................................................9

        10. Pretrial Exchange of Exhibits and Diagrams ...........................10

        11. Objections to Exhibits or Testimony to be Offered at Trial .....10

        12. Trial Briefs.............................................................................11

13.   Scheduling of Trial and Witnesses ............................................................. 11

14.   Voir Dire .................................................................................................... 11

15.   Other Matters ............................................................................................. 11

    a.   Forfeiture.......................................................................................... 11

    b.   Corporations Have No Fifth Amendment Right to Remain
        Silent ................................................................................................. 13

1

## <u>TABLE OF AUTHORITIES</u>

2

### FEDERAL CASES

3   *Bellis v. United States*, 417 U.S. 85 (1974) ...................................................13

4   *Braswell v. United States*, 487 U.S. 99 (1988) .................................................13

5   *United States v. Baird*, 414 F.2d 700 (2d Cir. 1969) .......................................7-8

6   *United States v. Baker*, 10 F.3d 1374 (9th Cir. 1993).......................................10

7   *United States v. Burgess*, 791 F.2d 676 (9th Cir. 1986) ...................................10

8   *United States v. Gee*, 695 F.2d 1165 (9th Cir. 1983).......................................11

9   *United States v. Holden*, 2015 WL 1514569 (D. Ore. 2015)............................10

10  *United States v. Hsia*, 2000 WL 195067 (D.D.C. 2000) ...................................10

11  *United States v. Larkin*, 2015 WL 4415506 (D. Nev. 2015) ............................10

12  *United States v. Newman*, 659 F.3d 1235 (9th Cir. 2011) ................................11

13  *United States v. Phillips,* 704 F.3d 754 (9th Cir. 2012)....................................11

14  *United States v. Richter*, 488 F.2d 170 (9th Cir. 1973) ...................................7-8

15  *United States v. Sineneng-Smith*, 10-CR-00414-RMW (N.D. Cal. 2014)....................10

16  *United States v. Swenson*, 298 F.R.D. 474 (D. Idaho 2014)...............................10

17  *United States v. Young,* 248 F.3d 260 (4th Cir. 2001) ....................................11

18

### FEDERAL STATUTES AND RULES

19  U.S. Const. Am. 5 ..........................................................................13

20  18 U.S.C. § 371............................................................................1

21  18 U.S.C. § 1956..........................................................................1

22  21 U.S.C. § 331............................................................................1

23  21 U.S.C. § 353............................................................................1

24  21 U.S.C. § 841............................................................................1

25  21 U.S.C. § 846............................................................................1

26  21 U.S.C. § 853..........................................................................11

27  Fed. R. Crim. P. 16(b) ..............................................................10-11

28

Fed. R. Crim. P. 16(d)(2) ...........................................................................................................10

Fed. R. Crim. P. 26.2(a) .............................................................................................................7

N. Dist. Cal. Local Rule 17.1-1(b)..........................................................................................1, 7

## <u>OTHER AUTHORITIES</u>

Black's law Dictionary (7th ed. 1999)...................................................................................10

Ninth Circuit Manual Model Criminal Jury Instructions § 1.2....................................................13

# I.      **TRIAL MEMORANDUM**

Pursuant to Criminal Local Rule 17.1-1(b), the United States respectfully submits the following Trial Memorandum.

## A.      Charges

On July 17, 2014, a grand jury sitting in the Northern District of California returned a 13-count indictment charging Federal Express Corporation (also known as FedEx Express), its parent company FedEx Corporation, and its sister company FedEx Corporate Services, Inc., (collectively "the defendants" or "FedEx") with 2 counts of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846, 11 counts of distributing and possessing with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), and 2 counts of conspiracy to distribute misbranded drugs in interstate commerce, in violation of 18 U.S.C. § 371 and 21 U.S.C. § §  331(k), 333(a)(1), (a)(2), and 353(b).  Clerk's Record (CR) 1.  On or about August 13, 2014, the grand jury returned a superseding indictment adding three additional counts of money laundering, in violation of 18 U.S.C. § 1956, and providing additional factual background regarding the drug trafficking and misbranding charges.  CR 28 (hereinafter "Super. Ind.").

Throughout the events underlying the charges, the employees of each charged company were acting as agents for the other charged companies with respect to the charged conduct.  Therefore, each company is responsible for the actions of the employees of the other companies, regardless of which company the employee technically worked for.

The indictment organized the eighteen counts into two separate conspiracies related to two separate but related Internet pharmacy organizations – the Chhabra-Smoley Organization and the Superior Drugs Organization.

### 1.      Conspiracy to Distribute Controlled Substances (Counts One and Thirteen)

The elements of this conspiracy charge are: (1) beginning no later than January of 2000 (count 1) and September of 2002 (count 13), and ending on or about February 20, 2008 (count 1) and May 12, 2010 (count 13), there was an agreement between two or more persons to distribute or possess with intent to distribute Schedule III or IV controlled substances outside the scope of professional practice

1  and not for a legitimate medical purpose, knowing that the distribution or possession with intent to

2  distribute was outside the scope of professional practice and not for a legitimate medical purpose; (2) the

3  defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

4                      2.      <u>Distributing and Possessing With Intent to Distribute a Controlled Substance</u>

5                                <u>(Counts Two through Ten and Fourteen through Fifteen)</u>

6        The elements of distributing and possessing with intent to distribute a controlled substance, are:

7  (1) the defendant knowingly delivered the substance outside the scope of professional practice and not

8  for a legitimate medical purpose; (2) the defendant knew that the delivery was outside the scope of

9  professional practice and not for a legitimate medical purpose; and (3) the defendant knew that it was

10  some form of prohibited drug; (Distribution) OR (1) the defendant knowingly possessed a controlled

11  substance; (2) the defendant possessed it with the intent to deliver it to another person outside the scope

12  of professional practice and not for a legitimate medical purpose; and (3) the defendant knew that the

13  delivery would be outside the scope of professional practice and not for a legitimate medical purpose

14  (Possession with intent to Distribute).

15                      3.      <u>Conspiracy to Distribute Misbranded Drugs in Interstate Commerce (Counts</u>

16                                <u>Eleven and Sixteen)</u>

17        The elements of this conspiracy charge are: (1) beginning no later than January of 2000 (count

18  11) and September of 2002 (count 16), and ending on or about February 20, 2008 (count 11) and May

19  12, 2010 (count 16), there was an agreement between two or more persons to introduce prescription

20  drugs without valid prescriptions into interstate commerce, which caused the drugs to be misbranded,

21  with the intent to defraud or mislead as to a material matter; (2) the defendant joined in the agreement

22  knowing of its purpose and intending to help accomplish that purpose.

23                      4.      <u>Conspiracy to Launder Money (Counts Twelve and Seventeen through Eighteen)</u>

24        The elements of conspiracy to launder money are: (1) there was an agreement to launder money

25  by (a) conducting a financial transaction involving the proceeds of the distribution or possession with

26  intent to distribute controlled substances outside the usual course of professional practice and not for a

27  legitimate medical purpose, knowing and intending that the possession with intent to distribute and

28

1   distribution was outside the usual course of professional practice and not for a legitimate medical

2   purpose, (b) knowing that the property involved in the financial transaction represented proceeds of

3   some form of unlawful activity, and (c) intending to promote the distribution or possession with intent to

4   distribute controlled substances outside the usual course of professional practice and not for a legitimate

5   medical purpose; (2) the defendant joined in the agreement knowing of its purpose and intending to help

6   accomplish that purpose.

7                               5.       <u>Forfeiture Allegation</u>

8   A forfeiture allegation is also made in the superseding indictment against all defendants.

9                               6.       <u>Sentencing Allegation</u>

10  Gross gains of at least $820 million are alleged in the superseding indictment for the purposes of

11  calculating the alternative maximum fine.

12  **B.   Statement of Facts**

13  At trial, the United States expects to prove the following facts through competent witnesses and

14  evidence.

15  Beginning in approximately 1998, a number of companies began selling prescription drugs,

16  including controlled substances, over the Internet.  A small number of these companies operated

17  legitimately, requiring a customer to provide a prescription from his or her personal physician, filling

18  that prescription at pharmacy licensed to dispense drugs to that customer, and either shipping the drugs

19  to the customer or making the drugs available at the pharmacy for pick-up.  However, the overwhelming

20  majority of Internet pharmacies operated illegally by distributing prescription drugs, including

21  controlled substances, without requiring that the customer have a valid prescription.

22  FedEx's own records demonstrate that from 2000 through the present, FedEx has distributed

23  drugs for over 600 accounts it believed were Internet pharmacies.  The DEA has identified over 400

24  illegal Internet pharmacies that used FedEx to ship drugs.  FedEx made over $180 million in proceeds

25  shipping drugs for these illegal customers.

26  Beginning no later than 2004, FedEx employees became aware that some of the company's

27  accounts were associated with Internet pharmacies.  They also became aware that some of those Internet

28

pharmacies were shut down by law enforcement because they were illegally distributing drugs.  FedEx undertook efforts to protect itself financially from the sudden losses it incurred when its Internet pharmacy customers were closed down by law enforcement.  However, FedEx took no steps to insure that it was not delivering drugs for illegal Internet pharmacies, despite being put on notice by its own employees and the DEA and FDA that it was illegally shipping controlled substances and prescription drugs.

On at least nine occasions, beginning in May of 2002 and continuing through November of 2010, Senior FedEx Security Managers, including Bruce Townsend, Senior Vice President of Corporate Security, met with the DEA and other law enforcement agencies to discuss FedEx's role in shipping drugs for illegal online pharmacies.  At these meetings, DEA and FDA representatives informed FedEx's senior Security management that FedEx's online pharmacy shippers were illegally shipping controlled substances to customers, including teenagers.  Nevertheless, FedEx Security did not conduct any investigations into its online pharmacy customers who were shipping these products, despite repeated training from the DEA regarding the illegality of Internet pharmacies, nor did FedEx senior Security managers provide any training or guidance on how to deal with online pharmacies to its lower-level Security employees or to any other employees within FedEx.

In 2003, FedEx began to experience a number of difficulties from a financial and operational perspective arising from its shipment of drugs for illegal Internet pharmacy customers.  As a result, FedEx implemented policies that applied only to online pharmacies.  The discussion among FedEx employees regarding these policies clearly indicated that one of the primary reasons for implementing these policies, if not the only reason, was to protect FedEx from losing money when its Internet pharmacy customers were shut down by law enforcement.  FedEx was also concerned about the safety of its employees, who were experiencing threats and harassment from the drug dealers and addicts to whom they were delivering online-pharmacy drugs.

The indictment charges FedEx with conspiring with two separate but related Internet pharmacy organizations – the Chhabra-Smoley Organization and Superior Drugs.  FedEx is charged with conspiring with each organization to violate (1) the Controlled Substances Act; (2) the Food Drug &

Cosmetic Act, and (3) money laundering statutes.  The conduct underlying all three conspiracies is the same – FedEx's delivery of drugs for illegal online pharmacies.  The CSA charges are based on the delivery of controlled substances.  The FDCA charges are based on the delivery of controlled and non-controlled prescription drugs.

It is essentially undisputed that FedEx delivered drugs for the Chhabra-Smoley organization[1] from 2000-2008 and for Superior Drugs from 2002-2010.  The only issue is whether FedEx knew and intended that it was delivering drugs for these organizations outside the usual course of professional practice and not for a legitimate medical purpose.  The evidence of FedEx's knowledge comes from e-mails and other communications exchanged among FedEx's employees contemporaneously with its delivery of drugs for these organizations, as well as FedEx's development of company-wide policies intended to address the plethora of problems spawned by its delivery of drugs for companies that operated outside of federal and state regulations. This evidence shows that FedEx's employees either had actual knowledge of the company's participation in the delivery of drugs that was not for a legitimate medical purpose and was outside professional norms, or they were deliberately ignorant of their involvement in this activity.

With respect to the Chhabra-Smoley Organization, the essential evidence of FedEx's knowledge is as follows: First, as early as 2002, FedEx's employees knew that that the State of Florida had taken administrative action against RxNetwork, Chhabra's primary fulfillment pharmacy for illegally distributing controlled substances.  Those employees were also aware that RxNetwork was then closed down by the DEA in October of 2003 for the same conduct.  Finally, FedEx's employees knew that Chhabra himself was arrested in December of 2003 for illegally distributing controlled substances through USA Prescription and RxNetwork and that Chhabra and other members of his organization, including the doctors and pharmacists he had employed, were subsequently convicted.  Those employees were likewise aware that Robert Smoley and Louis Cohen had taken over Chhabra's organization and continued to ship controlled substances and prescription drugs using the same business

---

[1] FedEx disputes that the conspiracy continued throughout the period alleged in the indictment, a subject that is addressed in one of their motions in limine.

1    model for which Chhabra had been convicted.  FedEx's employees were also aware that several

2    additional fulfillment pharmacies that Chhabra and Smoley had used to ship drug orders, including

3    Prescription Resources, Tri-Phasic Pharmacy, and United Care Pharmacy, were shut down by state or

4    federal agencies and that many of their owners and operators were successfully prosecuted for

5    distributing controlled substances and prescription drugs outside the usual course of professional

6    practice and not for a legitimate medical purpose.  With the knowledge that Chhabra and Smoley were

7    distributing controlled substances and prescription drugs outside of federal and state regulations, FedEx

8    continued to deliver drugs for their organization, until Smoley's Internet and fulfillment pharmacies

9    were also closed down by the DEA in February of 2008.

10          Similarly, FedEx employees knew that Superior Drugs filled orders for controlled substances and

11    prescription drugs for online pharmacies that issued prescriptions based solely on a customer's

12    completion of an online questionnaire.  As with the Chhabra-Smoley Organization, FedEx employees

13    knew that the DEA, FDA and other state and federal law enforcement agencies shut down several online

14    pharmacies that were using Superior for fulfillment.  FedEx employees also knew that several online

15    pharmacies transferred their drug orders to Superior for fulfillment after state and federal law

16    enforcement agencies shut down the fulfillment pharmacies with which they had previously been doing

17    business.  Finally, FedEx employees knew that the DEA, FDA and the Florida Board of Pharmacy

18    served numerous search warrants and administrative inspection orders on Superior.  Each time, Superior

19    ceased shipping drugs for a short period of time but then resumed shipping online pharmacy orders.

20    FedEx continued to ship drugs for Superior without doing anything to insure that Superior was no longer

21    shipping drugs outside the usual course of professional practice and not for a legitimate medical

22    purpose.  FedEx continued to ship drugs for Superior until Superior's pharmacy manager was indicted

23    and Superior was permanently shuttered by the DEA in May of 2010.

24          The Superseding Indictment also charges three money laundering conspiracies related to the

25    Chhabra-Smoley and Superior Drugs organizations.  Two money laundering conspiracies are based on

26    each online pharmacy's use of drug money to pay FedEx for its transportation of illegal drugs.  The final

27    money laundering conspiracy is based on FedEx's delivery of money orders and checks from customers

28

1     to Superior Drugs as payment for illegal drugs using FedEx's Collect on Delivery (COD) service.

2         **C.    Evidentiary Issues**

3         The United States has raised potential evidentiary issues in its motions in limine.  However, the

4     United States did not receive the defendants' exhibit list until after its motions in limine had been filed.

5     The defendants' exhibit list, to which the United States objects, consists of 32 pages of Bates numbers

6     with no descriptions.  Once the United States is able to determine which documents the defendants

7     propose to introduce as exhibits at trial, the United States may have additional objections to bring to the

8     Court's attention.

9     **II.    STATEMENT PURSUANT TO CRIMINAL LOCAL RULE 17.1-1(b)**

10         1.    <u>Disclosure Of Jencks Act Material</u>

11         The United States believes that it has produced or provided the defense access to all Jencks Act

12     material in its possession.  As the United States continues to review evidence and interview witnesses,

13     attorneys for the United States will produce or provide access to any additional Jencks Act material of

14     which we become aware.  The United States notes that the defendants have taken the position that e-

15     mails are not Jencks Act material.  *See* Def. Opp. Motion to Quash (CR 76) at 18-20.

16         Rule 26.2(a) of the Federal Rules of Criminal Procedure provides that the defendants make

17     reciprocal disclosures of witness statements upon request by the United States.  By rule, neither the

18     United States nor the defendants are required to produce witness statements until after the witness'

19     testimony on direct examination.   However, the United States has voluntarily disclosed, in the spirit of

20     cooperative discovery, the recorded statements of its witnesses pre-trial.   Because of the reciprocal

21     nature of Rule 26.2, and in the interest of expediting trial proceedings, the defendants should be required

22     to produce their witnesses' statements.  If the defendants decline to produce their witnesses' statements

23     until after direct examination, the trial will be unnecessarily delayed because the United States will need

24     time to review those statements prior to cross-examination.

25         Federal courts have "the responsibility to supervise the administration of criminal justice in order

26     to ensure fundamental fairness." *United States v. Richter*,  488 F.2d 170, 173 (9th Cir. 1973), *quoting*

27     *United States v. Baird*, 414 F.2d 700, 710 (2d Cir. 1969).  Thus, a district court has "wide latitude" to

28     

"carry out successfully its mandate to effectuate, as far as possible, the speedy and orderly administration of justice." *Richter*, 488 F.2d at 173   The United States requests that the Court use its power to effectuate the orderly administration of justice to order pre-trial production of defense witness statements by May 23, 2016, or at any time thereafter that such a statement is generated.

### 2.   Disclosure Of Grand Jury Testimony

The United States has produced transcripts of Grand Jury testimony for any witnesses it intends to call at trial or that may contain exculpatory information pursuant court orders authorizing disclosure. If the United States determines that it will call additional witnesses at trial, additional transcripts may be disclosed.

### 3.   Disclosure of Exculpatory Information

The United States believes that it has produced or provided access to all exculpatory information to the defense that is currently in the possession of the prosecution team based on the witnesses and evidence it plans to present at trial.  The United States recognizes its ongoing obligation to provide the defendants with any exculpatory material in possession of the prosecution team and will continue to provide copies or access to such material.  The United States has offered the defense the opportunity to examine the physical evidence in its possession.

The United States notes that the Court has permitted the defendants to submit arguments regarding the admissibility of evidence *ex parte* under the theory that exposing these arguments in a public proceeding would reveal a defense trial strategy that is apparently not obvious and of which the defendants believe the United States is unaware.  To the extent the United States is unaware of a potential defense, the United States cannot be held responsible for searching its files and making *Brady* disclosures that may support any such secret and non-obvious defense.

### 4.   Stipulations Of Fact

On May 12, 2016, the United States provided draft stipulations to the defendants and will meet and confer with defense counsel to discuss possible stipulations of fact as well as evidentiary stipulations that could dramatically shorten the anticipated length of trial.

5.      Appointment Of Interpreters

The United States does not anticipate that any of its witnesses will need the services of an interpreter.  If the United States becomes aware during trial preparation that any witness will need the services of an interpreter, the United States will make the necessary arrangements and will inform the Court.

6.      Dismissal of Counts, Elimination Of Issues

The Court has dismissed Counts 1-12, and 14-15, as to defendants FedEx Corporation and FedEx Corporate Services, Inc. on statute of limitations grounds. (CR 231)   No counts have been dismissed as to defendant Federal Express Corporation (a/k/a FedEx Express).  The United States does not intend to dismiss any counts of the superseding indictment.

7.      Joinder Pursuant to Rule 13

The United States is not aware of any joinder issues.

8.      Identification of Informants, Use of Line-ups, Evidence of Prior Convictions of the Defendant, etc.

The United States is not aware of any issues involving identification of informants, the use of line-ups, or evidence of prior convictions of the defendants.

9.      Witnesses To Be Called At Trial

*See* United States' Witness List.  The United States reserves the right to amend this list as trial approaches.  On May 12, the United States provided a list of the witnesses it is most likely to call in its case-in-chief to the defendants by letter.  This abbreviated list presumes that the defendants will enter into the stipulations proposed by the United States, and the United States reserves the right to call additional witnesses identified on its amended witness list should circumstances require.

The United States intends to call one witness, Special Agent Brandon Bridgers, to testify as both a fact witness and expert witness.  The United States proposes that Special Agent Bridgers be permitted to testify at two different times during the trial - once in his capacity as an expert and once in his capacity as a fact witness, so that there is a clear separation between the two forms of testimony and the risk that the jury will confuse the two types of testimony will be minimized.

1        10.    Pretrial Exchange of Exhibits and Diagrams

2        *See* United States' Exhibit List.  The United States reserves the right to amend this list as trial

3    approaches.

4        11.    Objections To Exhibits Or Testimony To Be Offered At Trial

5        The United States moves for an order precluding defendants from introducing evidence that

6    should have been produced under the reciprocal discovery obligations of Rule of Criminal Procedure

7    16(b).

8        The United States has complied with its disclosure obligations and has requested reciprocal

9    discovery.  The Court ordered that the defendants produce discovery pursuant to Rule 16(b) by April 1,

10    2016.  The defendants produced Rule 16(b) discovery as ordered.

11        The weight of the law holds that the term "case-in-chief" as used in Rule 16(b) does not refer to

12    evidence offered by the defense after the prosecution has rested, but, rather, to any non-impeachment

13    evidence the defense uses, regardless of when such evidence is used.  *See United States v. Hsia*, 2000

14    WL 195067, at *2 (D.D.C. 2000) ("A 'case-in-chief' is defined as '[t]he part of a trial in which a party

15    presents evidence to support its claim or defense.'  Black's Law Dictionary 207 (7th ed. 1999).

16    Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-

17    examination, certainly may be used to support her defense.  In this case, the defendant has indicated that

18    she intends to put in much (if not all) of her defense through the cross-examination of government

19    witnesses. . . .The cross-examination of these and other government witnesses therefore is properly seen

20    as part of defendant's case-in-chief if it buttresses her theory of the case."); *United States v. Larkin*,

21    2015 WL 4415506, at *5 (D. Nev. 2015); *United States v. Holden*, 2015 WL 1514569, at *4-5 (D. Ore.

22    2015); *United States v. Swenson*, 298 F.R.D. 474, 476-77 (D. Idaho 2014); *see also United States v.*

23    *Sineneng-Smith*, 10-CR-00414-RMW, Docket #139 (June 25, 2014 Order) at 5.

24        The Court has broad discretion to sanction any failure to comply with Rule 16(b), including

25    precluding the undisclosed evidence from use at trial.  *See* Fed. R. Crim. P. 16(d)(2); *United States v.*

26    *Baker*, 10 F.3d 1374, 1398 (9th Cir. 1993); *United States v. Burgess*, 791 F.2d 676, 681 (9th Cir. 1986);

27    *United States v. Gee*, 695 F.2d 1165, 1168 (9th Cir. 1983).  Courts of appeals have approved exclusions

28

1   of evidence on this basis.  *See*, *e.g.*, *United States v. Young,* 248 F.3d 260, 269 (4th Cir. 2001) (affirming

2   exclusion of defense evidence for failure to produce even though it was offered during cross-

3   examination of a Government witness because the defense "*intended* to offer the tapes not for

4   impeachment purposes, but as 'evidence in chief'") (emphasis added).

5          The United States therefore moves for an order precluding defendants from introducing

6   evidence, other than solely for impeachment, that should have been produced under the reciprocal

7   discovery obligations of Rule 16(b).

8          12.    Trial Briefs

9          *See* discussion above.

10         13.    Scheduling of Trial and Witnesses

11         The parties will meet and confer regarding the trial schedule and order of witnesses.  The United

12  States agrees to provide the defense with a list of the witnesses it intends to call on a particular day,

13  twenty-four hours in advance, provided that the defense agrees to do the same.

14         14.    Voir Dire

15         The parties have met and conferred regarding  a proposed jury questionnaire which will be

16  submitted to the Court along with each party's objections.  The United States has submitted questions

17  for the Court to consider asking prospective jurors orally during voir dire.

18         15.    Other Matters

19                a.    *Forfeiture*

20         The Superseding Indictment contains forfeiture allegations which require a determination by the

21  Court.

22         In the event a defendant is found guilty of one or more counts in the Superseding Indictment, the

23  United States will be seeking the forfeiture of $820 million in the form of a money judgment.  Forfeiture

24  is mandatory upon conviction of the charged offenses.  *See* 21 U.S.C. § 853(a); *United States v. Phillips,*

25  704 F.3d 754, 769 (9th Cir. 2012); *United States v. Newman*, 659 F.3d 1235, 1239 (9th Cir. 2011).

26         Forfeiture issues will not be considered until and unless the jury returns a guilty verdict on one or

27  more of the counts giving rise to the forfeiture.  *See* Rule 32.2(b)(1).  In that event, the Court must

28

U.S. TRIAL BRIEF                                    11
CR No. 14-380 CRB

1    determine the amount of any money judgment that the defendant will be ordered to pay.  Rule

2    32.2(b)(1)(A).  The Court's determination may be based on evidence already in the record and on any

3    additional evidence or information the parties submitted by the parties.  Rule 32.2(b)(1)(B).  The Rules

4    of Evidence do not apply in the forfeiture phase of the trial.  *See United States v. Ali*, 619 F.3d 713, 720

5    (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the

6    forfeiture phase of the trial; the evidence need only be "reliable"); *United States v. Capoccia*, 503 F.3d

7    103, 109 (2d Cir. 2007) (Rule 32.2(b)(1) allows the court to consider "evidence or information," making

8    it clear that the court may consider hearsay; this is consistent with forfeiture being part of the sentencing

9    process where hearsay is admissible).

10         The United States' burden of proof is by a preponderance of the evidence.  *See United States v.

11    *Garcia-Guizar*, 160 F.3d 511, 518 (9th Cir. 1998) ("[T]he government need prove by only

12    preponderance of the evidence, and not beyond a reasonable doubt, that property should be criminally

13    forfeited"); *United States v. Martin,* 662 F.3d 301, 307 (4th Cir. 2011) ("[T]he government must

14    establish a nexus between the property for which it is seeking forfeiture and the crime by a

15    preponderance of the evidence").

16         There is no right to have the jury determine the amount of a money judgment that the defendant

17    will be ordered to pay.  *See United States v. Phillips*, 704 F.3d 754, 771 (9th Cir. 2012) (no statutory

18    right to a jury under Rule 32.2(b)(5) when the United States is seeking only a money judgment); *United

19    States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005) (the defendant's right under Rule 32.2(b) is to have

20    the jury determine if the government has established the required nexus between the property and his

21    crime; the rule does not give the defendant the right to have the jury determine the amount of a money

22    judgment); *United States v. Gregoire*, 638 F.3d 962, 972 (8th Cir. 2011)  (following *Tedder*).

23         Accordingly, in this case, the United States will be asking the court to enter a money judgment in

24    the amount of $820 million.

25              b.    *Corporations Have No Fifth Amendment Right to Remain Silent*

26         Because the defendants are all corporations that do not have a Fifth Amendment privilege against

27    self-incrimination, the Court should not give any instructions to the jury referencing a defendant's right

28

1   to remain silent.  *See Braswell v. United States*, 487 U.S. 99, 103 (1988) ("[I]t is well established that

2   such artificial entities [as corporations] are not protected by the Fifth Amendment"); *Bellis v. United*

3   *States*, 417 U.S. 85, 90 (1974) ("[N]o artificial organization may utilize the personal privilege against

4   compulsory self-incrimination. . . .").  For example, Ninth Circuit Model instruction 1.2 regarding the

5   presumption of innocence that should be given to the jury at the beginning of trial should be modified as

6   follows:

7           "In addition, the defendant ~~has the right to remain silent and~~ never has to prove
            innocence or to present any evidence."

8

9           Defense counsel should similarly be precluded from making any reference to a defendant's right

10  to remain silent.

11

12  DATED: May 12, 2016                    Respectfully Submitted:

13                                         DAVID R. CALLAWAY
                                           Attorney for the United States Acting Under
14                                         Authority Conferred by 28 U.S.C. § 515

15                                               /s

16                                         _____
                                           KIRSTIN M. AULT
17                                         JOHN H. HEMANN
                                           Assistant United States Attorneys
18
                                           JENNY C. ELLICKSON
19                                         Trial Attorney

20

21

22

23

24

25

26

27

28  U.S. TRIAL BRIEF                        13
    CR No. 14-380 CRB